IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 12-cv-2620-JLK - AP

**Endrew F., a minor, by and through his parents and next friends, JOSEPH and JENNIFER F.,**

Petitioner,

v.

**DOUGLAS COUNTY SCHOOL DISTRICT RE 1,**

Respondent.

---

## OPENING BRIEF
---

     Plaintiff, Endrew F., a minor, by and through his parents and next friends, Joseph and Jennifer F., through counsel Spies, Powers & Robinson, P.C., submit the following Opening Brief.

## STATEMENT OF JURISDICTION

     The United States District Court for the District of Colorado has jurisdiction over this matter pursuant to 20 U.S.C. § 1415(i)(2)(A).  The  Individuals with Disabilities Education Act ("IDEA") 20 U.S.C. §§ 1400 *et seq.* provides that any party aggrieved by the findings and decision of the state educational agency[1] has the right to bring a civil action in a district court of the United States without regard to the amount in controversy.  *Id.*  Here, Endrew Farren ("Drew") and his parents have been aggrieved by the findings and decision of the Colorado Office of Administrative Courts who conducted the due process hearing on behalf of the Colorado Department of Education ("CDE"), and

---

[1] The Colorado Department of Education is the state educational agency for Colorado.

1

have filed this civil action to have those findings and decision reviewed and reversed.

## STATEMENT OF THE ISSUES

Whether the Administrative Law Judge ("ALJ") erred in her conclusion that Douglas County School District RE 1 ("School District") offered Drew a free appropriate public education (FAPE) as required by the IDEA.

## STATEMENT OF THE CASE

This is an appeal of a special education dispute under the IDEA regarding the School District's obligation to pay the costs associated with a severely disabled child's placement at a private school that specializes in the education of children with autism.  Drew is a child with autism.  While Drew is very capable of academic, functional and social learning, unless his many maladaptive behaviors, perservative behaviors, extreme fears, and communication difficulties are appropriately assessed, planned for, and addressed by the school staff, Drew is unable to participate in or be accessible for learning.  As established by his education records, Drew failed to make any meaningful educational, functional or social/communicative progress over the course of several years in the public schools within the School District.  In addition, Drew's problem behaviors and phobias dramatically increased over this time period.  Because the School District demonstrated that it could not provide Drew an appropriate education as required by the IDEA, Parents enrolled Drew at Firefly Autism House, a private school specializing in the education of children with autism and asked the School District to reimburse them for the costs associated with this educational Placement.  The School District refused.

Pursuant to the IDEA, if a public school fails to provide a meaningful educational benefit to a child with a disability, it must finance a private placement to get the job done.  The IDEA

specifically vests courts and hearing officers with the authority to order reimbursement to parents who unilaterally enroll their child in a private school without the consent of or referral by the school district when it is determined that the School District failed to provide the child an appropriate education.

Pursuant to the dispute resolution procedures set forth in the IDEA, the Parents filed a due process complaint with the Office of Administrative Courts to have the special education dispute decided.  A due process hearing took place on June 6, 7 and 8, 2012.  The ALJ issued her Agency Decision on July 9, 2012, in favor of the School District.  While the ALJ found that Drew exhibited disruptive behaviors since at least 2007, that Drew's problems behaviors were increasing in frequency, duration and intensity from 2007 to 2010, and that Drew's problem behaviors interfered with his ability to access learning, the ALJ held, erroneously, that the School District did not violate the IDEA because "Neither a FBA or a BIP are required components of an IEP."  Also, despite her finding that the record was virtually devoid of direct evidence that Drew made progress on his goals and objectives contained in his IEPs, or that the Parents received any reports documenting such purported progress (as required by the IDEA), the ALJ held that Drew must have made progress on the School District's goals and objectives because during the short time he was at Firefly Autism House he made progress on those same goals and objectives and even mastered some – an unsupportable and illogical conclusion.

The Parents timely filed this civil action.  The Parents request that this Court find that the School District did not provide Drew an appropriate education and that the Parents are entitled to reimbursement for the costs associated with Firefly Autism House until such time as the School District proposes an IEP that is reasonably calculated to provide Drew an appropriate education.

<u>**STATEMENT OF THE FACTS**</u>

**I.     RELEVANT FACTUAL BACKGROUND**

    **A.     Drew's Disabilities and His Educational Needs.**

Drew was born on September 28, 1999, and was diagnosed with autism by Dr. Ann Reynolds at The Children's Hospital when he was two years old.  ROA, Vol. 3, Ex. 20, p.1.  In 2003, Drew was also diagnosed with Attention Deficit/Hyperactivity Disorder ("ADHD"). *Id.* at p. 2.  The IDEA defines autism as "a developmental disability significantly affecting verbal and nonverbal communication and social interaction . . . that adversely affects a child's educational performance. Other characteristics often associated with autism are engagement in repetitive activities and stereotyped movements, resistance to environmental change or change in daily routines, and unusual responses to sensory experiences." 34 C.F.R. § 300.8(c)(1)(i).  Children with ADHD struggle with paying attention,

As a result of his disabilities, Drew has global developmental delays that impact his cognitive, language, and gross motor skills.  ROA Tr. Vol. 1, 37:19-22.[2]  While Drew was a student in the School District, Drew was unable to communicate his wants and needs and could not engage in social communication with his peers.  ROA Vol. 1, Agency Decision, p. 2, ¶ 2.

At school, Drew exhibited many problem behaviors when he was challenged or became anxious.  *Id.*  Drew would climb furniture, fall off furniture, hit the computer and TV screens, scream, kick others, kick walls, bang his head, yell, scream, and run away.  *Id.* at ¶ 3.

Drew would also perseverate on certain objects in the classroom and when he was denied

---

    [2]  The citation for the transcript of the audio recording of the due process hearing references the volume number, the specific page within the volume and the line numbers for the referenced text.

access to the object he would engage in disruptive behaviors.  For example, became fixated on a timer that was used with Drew by school staff for his instruction.  ROA Vol. 1, Agency Decision, p. 3, ¶ 10.  When school staff denied Drew access to the timer, Drew would scream, cry, run away to find another timer, throw himself on the floor, and ultimately wet himself.  ROA Vol. 1, Ex. 1, p. 37.  Drew also suffered from many anxieties and phobias that paralyzed him and prevented his ability to access education, including the school's restroom, flies, spilled liquids and flies.  ROA Vol. 1, Agency Decision, p. 2, ¶ 2.

The School District recognized that despite Drew's difficulties, he was very capable of learning.  ROA, Vol. 1, Ex. 1, p.3.  According to the School District's IEPs, reading and math were strengths for Drew.  *Id.* and Ex. 3, p. 4.

However, the School District staff failed to appropriately evaluate, understand or address Drew's functional, communicative and behavioral issues.  This failure resulted in a continual escalation of Drew's disruptive behaviors, thereby preventing Drew from making meaningful progress on his goals and objectives.  The result was that Drew did not receive an appropriate education in while in the School District.

**B.     Second Grade (2007 - 2008 School Year) - Lack of Progress on the 10/31/07 IEP**

According to Drew's education records, Drew stopped making educational progress during the second grade (2007 - 2008 school year).  According to Drew's 10/31/07 IEP for the 2007 - 2008 school year, Drew had six goals[3]: Reading; Writing; Math; Language; Physical (Motor); and Self-Advocacy.  ROA Vol. 1, Ex. 1, pp. 17-30.  Each goal had certain corresponding objectives.  The

---

[3]  While the goals reference a start date of 05/10/07, Drew's educational records contained no IEP with such date or any indication that the 10/31/07 IEP was developed prior to 10/31/07.

Reading Goal had six objectives, the Writing Goal three objectives, the Math Goal four objectives, the Language Goal four objectives, the Physical Goal four objectives, and the Self-Advocacy Goal five objectives.  *Id.*

The 10/31/2007 IEP documents that Drew made no progress on these six goals and twenty-six objectives.  While no meaningful progress on these goals and objectives is recorded on the IEP as required, comparing the 10/31/2007 with the subsequent 04/30/08 IEP establishes that the School District discontinued twenty-one out of the twenty-six objectives (84% abandoned) because Drew was unable to make adequate progress towards the objective's criteria.

Of the six Reading objectives, five were neither completed nor continued - demonstrating a lack of progress on these objectives.  ROA Vol. 1, Ex. 6, pp. 1-3.[4]  Only one objective, objective b), was continued (but modified) on the 04/30/08 IEP. *See  Id.*, p. 4, objective a).  This modified objective was continued (and further modified) again on the subsequent 04/19/09 IEP after which it was declared "no longer appropriate" for Drew – apparently because he was not making adequate progress towards completion of this objective.  *See Id.*, pp. 7-8, objectives a) and b).

Of the three writing objectives, two were neither completed nor continued - demonstrating a lack of progress on these objectives.  ROA Vol. 1, Ex. 7, pp. 1-2.  Only one objective, objective b), was continued on the 04/30/08 IEP.  *See Id.*, p. 1, objective a).  This objective was discontinued after the 04/30/08 IEP after it was noted that "Drew has lost some independence in remembering to use correct conventions in his writing."  *See Id.*

---

[4]  For ease of comparison at the due process hearing the separate goals for each IEP at issue were collected in separate Exhibits.  For example, Exhibit 6 is the Reading Goals and Objectives for the 10/31/07, 04/30/08, 04/14/09, 04/13/10, and 11/16/10 IEPs; Exhibit 7 is the Writing Goals and Objectives; Exhibit 8 is the Math Goals and Objectives; Exhibit 9 is the Language Goals and Objectives; Exhibit 10 is the Physical Goals and Objectives; and Objective 10 is the Self-Advocacy Goals and Objectives.

Of the four math objectives, three were neither completed nor continued - demonstrating a lack of progress on these objectives.  ROA Vol. 1, Ex. 8, pp. 1-2.  Only one objective, objective d) regarding the counting of coins, was continued on subsequent IEPs without showing any meaningful progress, where it was finally recorded in the 04/13/10 IEP that "Drew can count money with a variety of coins but is inconsistent."  *Id.* at p. 10.

Of the four language objectives, three were neither completed nor continued - demonstrating a lack of progress on these objectives.  ROA Vol. 1, Ex. 9, pp. 1-2.  Only one objective, objective b), was continued on the 04/30/08 IEP.  *See Id.*, at p. 3, objective b).  This objective was discontinued after the 04/30/08 IEP after it was noted that "it is difficult for Drew to make and maintain eye contact with others even with verbal prompting.  *Id.*

Of the four physical objectives, none were completed or continued - demonstrating a lack of progress on these objectives.  ROA Vol. 1, Ex. 9, pp. 1-2.

Of the five self-advocacy objectives, four were neither completed nor continued - demonstrating a lack of progress on these objectives.  ROA Vol. 1, Ex. 11, pp. 1-3.  Only one objective, objective b), was continued (modified) on the 04/30/08 IEP.  *See Id.*, at p. 5, objective d).  This objective was discontinued sometime during after the 04/30/08 IEP with no indication of any progress being made, and with the "baseline" indicating that Drew could not perform this objective at all.  *See Id.*

### C.    Third Grade (2008 - 2009 School Year) - Lack of Progress on the 04/30/08 IEP

According to Drew's 04/30/08 IEP for the 2008 - 2009 school year, Drew had six goals: Reading; Writing; Math; Language; Physical (Motor); and Self-Advocacy.  ROA Vol. 1, Ex. 2, pp. 20-33.  Each goal had certain corresponding objectives.  The Reading Goal had five objectives, the

Writing Goal three objectives, the Math Goal five objectives, the Language Goal three objectives, the Physical Goal three objectives, and the Self-Advocacy Goal four objectives. *Id.*

The 04/30/08 IEP documents that Drew made no progress on these six goals and twenty objectives (even with a decrease of six objectives from the previous year). While no progress on these goals and objectives is recorded on the IEP as required, comparing the 04/30/08 IEP with the subsequent 04/14/09 IEP establishes that the School District discontinued twenty-one out of the twenty-six objectives (65% abandoned) because Drew was unable to make adequate progress towards the objective's criteria.

Of the five reading objectives, three were neither completed nor continued - demonstrating a lack of progress on these objectives. ROA Vol. 1, Ex. 6, pp. 4-7. Only one objective that was new to the 04/30/08 IEP was continued to the subsequent 04/14/09 IEP. *See Id.*, at pp. 4-5, objective c). While the IEP provides no real indication of Drew's progress on this objective, the School District declared it was "completed" after the School District noted that "when pushed Drew can sound out most of his words. He needs to believe he can and not ask for the word before he tries." *Id.* At pp. 8-9.

Of the three writing objectives, two were neither completed nor continued - demonstrating a lack of progress on these objectives. ROA Vol. 1, Ex. 7, pp.3-4. One objective was, objective c) was continued to the subsequent 04/14/09 IEP. *See Id.*, at p. 5, objective c). This objective provides that Drew will be able to write a 5 sentence paragraph with a beginning, three sentence body, and a conclusion. *Id.* The 04/30/08 IEP states that Drew is unable to write a five sentence paragraph at all. *Id.* at p. 4. Without reporting any measurable progress on this objective, the 04/14/09 IEP declares that this objective is complete. *Id.* at 5. The validity of Drew's ability to "complete" this

objective, let alone making progress on it, is refuted by testing performed in 2010 where it was recorded that "Endrew is unable to write a complete sentence.  Average length of written narrative 1.1 words."  *See* ROA Vol. 1, Ex. 12, p. 34.

Of the five math goals, all five were continued to the subsequent 04/14/09 without any progress being reported.  ROA Vol. 1, Ex. 8, pp. 3-5.  Because the School District changed how it recorded the "baselines" for these goals between 08 and 09, it impossible to determine whether Drew actually made any measurable progress.

Of the three language objectives, none were either completed or continued - demonstrating a lack of progress on these objectives.  ROA Vol. 1, Ex. 9, pp. 5-6.

Of the three physical objectives, two were neither completed nor continued - demonstrating a lack of progress on these objectives.  ROA Vol. 1, Ex. 10, pp. 3-4.  The one objective that was continued, objective a), provides no indication of any progress being made.  *Id.*, p. 4.  The baseline for this objective on the subsequent 04/14/09 IEP is identical demonstrating that no progress had been made on this objective between 08 and 09.  *Id.*, p. 5.

Of the three self-advocacy objectives, three were neither completed nor continued - demonstrating a lack of progress on these objectives.  ROA Vol. 1, Ex. 11, pp. 4-5.  The one objective that was continued, objective a), shows that Drew made no progress on this objective that was eventually discontinued after the 04/14/09 IEP.  *Id.*, pp. 6-7.

### D.    Fourth Grade (2009 - 2010 School Year) - Lack of Progress on the 04/01/09 IEP

According to Drew's 04/14/09 IEP for the 2009 - 2010 school year, Drew had six goals: Reading; Writing; Math; Language; Physical (Motor); and Self-Advocacy.  ROA Vol. 1, Ex. 3, pp. 18-34. Each goal had certain corresponding objectives.  The Reading Goal had three objectives, the

9

Writing Goal 2 objectives, the Math Goal seven objectives, the Language Goal three objectives, the Physical Goal two objectives, and the Self-Advocacy Goal two objectives. *Id.*

The 04/14/09 IEP documents that Drew made no meaningful progress on these six goals and nineteen objectives. Eight objectives were either abandoned as not being appropriate for Drew or were simply discontinued. While certain objectives indicate that the objective has been "completed," there is no measurable progress reported for these objectives or evidence that these objectives had actually been achieved or progress made.

With regard to the three reading objectives, objectives a) and b) were determined to be "no longer appropriate" for Drew. ROA Vol. 1, Ex. 3, pp. 18-19. Objective c) which was continued from the previous year was declared "complete" despite the fact that no measurable progress is recorded or indication that Drew ever met (let alone made progress towards) the specific criteria of this objective. *Id.*, pp. 19-20.

With regard to the two writing objectives, both record that these objectives are complete – but both statements are suspect and without support. *Id.*, pp. 21-22. For example, objective a) concerns writing a five paragraph sentence. Despite the indication of "completed" in the IEP, subsequent testing established that Drew was incapable of writing one complete sentence, let alone five. With regard to objective b), there is no evidence that Drew completed this objective either; just the note that "Drew is capable of this if he desires. *Id.*

With regard to the seven math objectives, three were continued from the previous year's IEP (objectives a), e) and f)) without indication that any measurable progress had been made on these objectives. *Id.*, pp. 23-25. Because these objectives had not been mastered (or measurable progress made), they were continued on to the subsequent IEP. Objectives b) and g) were new objectives for

this IEP.  *Id.*, pp. 23, 26.  Again, no measurable progress is reported on these objectives and they were continued on the subsequent IEP.  *Id.*  With regard to objective g), the IEP indicates that Drew could not do any division, was not even working on division, and was still trying to work on his multiplication objective.  *Id.*, p. 26.  The IEP indicates that two objectives (objectives c) and d)) were "complete."  However, no measurable progress was reported for these objectives or indication that Drew had demonstrated the criteria necessary to complete these objectives.  *Id.*, pp. 23-24.

With regard to the three language objectives, one objective (objective b)) was discontinued after the objective was required to be modified, apparently due to Drew's difficulty with this task. *Id.*, pp. 27-28.  One objective (objective c)) was also modified, but continued on to the subsequent IEP.  *Id.*, p. 28.  While no measurable progress was reported for this objective, the baseline for this objective on the 04/13/10 IEP indicates that Drew did not make any progress.  *Id.*, Ex. 4, pp. 17-18. While one objective (objective a)) was reported to be "complete," there is no measurable progress reported and the last comment for this objective states that Drew continues to have difficulty demonstrating the criteria for the objective.  *Id.*, p. 27.

With regard to the two physical objectives, the IEP records that these objectives are "complete," with no comment and no evidence that any of the criteria have been met (or progress made) to complete this objective.

With regard to the two self-advocacy objectives, both objectives were discontinued - demonstrating a lack of progress on these objectives.  *Id.*, pp. 29-30.

### E.    Lack of Progress Reporting

None of the IEPs at issue include any meaningful or measurable reporting on the progress, if any, towards the given objective's criteria for completion.

With regard to the 10/31/07 IEP, only one entry is included in the progress reporting section of each objective, and this entry is dated 11/09/07 - just nine days after date of the IEP.  The report does not document any measurable information that could give an indication about the progress toward the completion of the objective.

With regard to the 04/20/08, only one objective out of twenty-one objectives included in the IEP provides any reference to progress reporting.  *See* ROA Vol. 1, Ex. 2, p. 27, objective a).

With regard to the 04/14/09 IEP, while the objectives include narrative comments about Drew's work on the objectives, the "progress reporting" does not document any measurable information that could give an indication about the progress toward the completion of the objective.

The Parents were never provided any reports on Drew's progress towards his goals and objectives by the School District.  ROA Tr. Vol. 1, 67:20 - 68:9.

Drew's education records contained no "progress reports" or documentation that reported on Drew's progress on his goals and objectives.

**F.      Failure to Perform a Functional Behavioral Assessment or Develop an Appropriate Behavior Intervention Plan, and Resultant Escalation of Drew's Problem Behaviors at School.**

The School District never performed a functional behavioral assessment (FBA) of Drew to determine why Drew engages in the disruptive behaviors that impede his learning and assess how those behaviors relate to the school environment.   While the 10/31/07 IEP included a "draft" behavior intervention plan (BIP), it addressed only one behavior - Drew's fixation on the timer - and did not address the many other behaviors that impeded Drew's learning.  ROA Vol. 1, Ex. 1, pp. 37-38.  There is no indication in Drew's education records that this BIP was ever finalized, approved by the IEP Team, or implemented.  The 04/30/08 IEP includes no BIP at all, despite a statement in

12

the IEP that a BIP is required for Drew.  *Id.*, Ex. 2, p. 34.  The 04/14/09 includes a BIP that was not developed as a result of any FBA.  *Id.*, Ex. 3, pp. 43-45.  The BIP only addresses two disruptive behaviors: 1) "Drew yells out when frustrated; and 2) "Drew gets out of his seat and wanders around the classroom."  *Id.*  The BIP does not identify or address the many other disruptive behaviors that impeded Drew's learning.  The 04/13/10 also does not include a BIP – although a meeting was scheduled to discuss a BIP after the 04/13/10 IEP was rejected by the Parents.

As recognized by the ALJ, Drew's problem behaviors began increasing during Drew's second grade year (2007-2008).  ROA Vol. 1, Agency Decision, p. 3, ¶ 9.  Drew had more frequent tantrums, which included yelling, crying, dropping to the floor and eloping from class.  *Id.*

During Drew's third grade year (2008-2009) Drew's social skills declined and his problem behaviors escalated throughout the year.  *Id.*, p. 3-4, ¶ 13.

At the outset of the beginning of fourth grade at Summit View Elementary things became noticeably worse.  On one occasion, Drew ran out of the school building and into the street.  ROA Tr. Vol. 1, 76:3-22.  He was retrieved by a staff member and returned to the building where he was placed in a "calming room" where he ripped off his clothes, urinated and defecated on the floor.  *Id.*

The School District's social worker reported about Drew's problem behaviors that prevented his ability to access education in his 04/13/10 IEP (end of third grade year) as follows:

> Concerning behaviors, Drew seems to have limited means of expressing his thoughts/emotions.  When upset by events that occur in the home, with academics, or possibly with others in his environment, Drew reacts to such feelings by yelling, dumping shelves, disrobing or ripping his clothes, kicking walls, running, and pretend falling.  At times, Drew will also entangle himself in chairs and other furniture. *This behavior is inhibiting him from accessing academic learning as well as social learning*.  When Drew's [sic] exhibits such behavior he typically does not stop until he wears himself out.  At times, he has re-engaged in learning and been able to calm down enough to focus and he has also teetered on the edge of losing

control.

ROA Vol. 1, Ex. 4, p. 7 (emphasis added).

No BIP was developed at the 04/13/10 meeting nor was any evaluation conducted regarding Drew's problem behaviors before this meeting.

As a response to Drew's problem behaviors, the School District began limiting the time Drew was in the general education classroom and increased the time Drew was in the special education classroom.  For example, at the beginning of Drew's second grade year, Drew spent most of his day in the general education class.  ROA Vol. 1, Ex. 1, p. 3.  Within a few months, the School District changed Drew's IEP to include less time in the general education classroom and more time in the severe special needs (SSN) classroom.  *Id.*, p. 32.

Drew's 04/14/09 IEP reflected a further restriction in placement to the SSN room.  *Id.*, Ex. 3, p. 34.  Despite the location of the service hours reflected in Drew's IEPs (general v. SSN), Drew would be removed to the SSN room whenever he engaged in disruptive behaviors. *See Id.* ("How much time is student only with students with disabilities? 37% or as behavior allows.");  ROA Tr. Vol. 1, 78:24 - 79:12.

### G.    Firefly Autism House is Providing Drew an Appropriate Education.

It was uncontested at the due process hearing that Drew is receiving an appropriate education and making substantial academic, social and behavioral progress at Firefly Autism House.

### ARGUMENT

## I.    STANDARD OF REVIEW AND BURDEN OF PROOF.

Judicial review in IDEA cases differs substantially from judicial review in other agency actions which provide for a highly deferential standard of review.  *Murray v. Montrose County Sch.*

*Dist.*, 51 F.3d 921, 927 (10th Cir. 1995).  "The court does not use the substantial evidence standard typically applied in agency decisions, 'but instead must decide independently whether the requirements of the IDEA are met.'" *Id.*, *quoting Board of Educ. v. Illinois State Bd.*, 41 F.3d 1162, 1167 (7th Cir. 1994).

Under the IDEA's standard of review, the district must independently review the evidence contained in the administrative record and decide, based on a preponderance of the evidence, whether the requirements of the IDEA are met.  20 U.S.C. § 1415(i)(2).  In so doing, the court gives "due weight" to the hearing officer's findings of fact, which are considered *prima facie* correct. *Id.* at 927 n.11.

Because the Parents challenge the adequacy of the School District's IEP, they have the burden of persuasion on the issues on review.  *Shaffer v. Weast*, 546 U.S. 49 (2005).

## II.    THE REQUIREMENT OF A FREE APPROPRIATE PUBLIC EDUCATION.

The IDEA is a comprehensive statute enacted to ensure that all children with disabilities have access to "a free appropriate public education that emphasizes special education and related services designed to meet their unique needs."  20 U.S.C. § 1400(d)(1)(A).  A FAPE is defined as "special education and related services . . . provided in conformity with an individualized education program."  20 U.S.C. § 1401(9).  The IDEA contains both extensive procedural requirements designed to ensure that an IEP is properly developed for each child and that parents have significant involvement in the educational decisions involving their children, as well as substantive requirements designed to ensure that each child receives the "free appropriate public education" mandated by the IDEA. *Murray by & Through Murray v. Montrose County Sch. Dist. RE-1J*, 51 F.3d 921, 925 (10th Cir. 1995).

The IEP is the basic mechanism through which the school district's obligation of providing a FAPE is achieved.  *Id.*  The IEP must be in the form of a written document.  *Burilovich v. Lincoln Consolidated Schools*, 208 F.3d 560 (6th Cir. 2000).   This formal written offer requirement is not merely technical, but rather serves the important purpose of creating a clear record of the educational placement and other services offered to the parents. *See Union Sch. Dist. v. Smith*, 15 F.3d 1519, 1526 (9th Cir. 1994).   The written offer not only helps to eliminate factual disputes between the school district and parents about proposed placements, but also "greatly assists parents in presenting complaints with respect to any matter relating to the . . . educational placement of the child." *Id.* (internal quotation marks omitted).   The written offer requirement should therefore be enforced rigorously.  *Knable v. Bexley City Sch. Dist.*, 238 F.3d 755, 768 (6th Cir. 2001).

An IEP is designed as a package.  That is, it must target "all of a child's special needs," *Burlington v. Department of Educ.*, 736 F.2d 773, 788 (1st Cir. 1984), whether they be academic, physical, emotional, or social. *See Roland M. v. Concord School Committee*, 910 F.2d 983, 992 (1st Cir. 1990); U.S. Dep't of Educ., Notice of Policy Guidance, 57 Fed. Reg. 49,274 at 49,275 (1992)(stating that an IEP must address "the full range of the child's needs").

The IEP must be tailored to the unique needs of the disabled child, and must be reasonably calculated to provide 'effective results' and 'demonstrable improvement' in the educational and personal skills identified as special needs.  *See* 34 C.F.R. 300(a)(3)(ii); *Lenn v. Portland School Committee*, 998 F.2d 1083 (1st Cir. 1993), *citing Burlington*, 736 F.2d at 788.  Naturally, "effective results" and "demonstrable improvement" should be measured in light of the student's individual potential.

III.     **THE SCHOOL DISTRICT VIOLATED THE IDEA BY ITS FAILURE TO PROVIDE DREW AN APPROPRIATE EDUCATION.**

Pursuant to the IDEA, Parents are entitled to reimbursement for the costs associated with Firefly Autism House if it is found that the School District violated the IDEA and that the education provided by Firefly Autism House is reasonably calculated to enable Drew to receive educational benefits. *Thompson R2-J Sch. Dist. v. Luke P.*, 540 F.3d 1143, 1148 (10th Cir. 2008).  A violation of the IDEA occurs where it is found that the School District failed to provide Drew with an appropriate education.  *Id.*

In *Thompson R2-J Sch. Dist.*, the Court specifically addressed the issue of "How do we know when a school district has or has not provided a disabled student with a FAPE?"  *Id.* at 1148.  The Tenth Circuit answered this question by stating that a FAPE is shown by demonstrable evidence from the student's educational records that establish some measurable progress on the goals and objectives contained in the student's IEP.  *Id.*  Absent demonstrable and measurable progress, a school district has not provided the student a FAPE.

While the court evaluates the adequacy of the IEP from the perspective of the time it is written, the implementation of the program is an ongoing, dynamic activity, which must be evaluated as such.  *O'Toole v. Olathe Dist. Schools Unified Sch. Dist. No. 233*, 144 F.3d 692, 702 (10th Cir. 1998).  Thus, a school district cannot "ignore the fact that an IEP is clearly failing, nor can it continue to implement year after year, without change, an IEP which fails to confer educational benefit on the student."  *Id.*

A.     **Lack of Progress on Drew's 2007 Through 2010 IEPs Demonstrates That The School District Did Not Provide Drew an Appropriate Education.**

Lack of progress on previous IEPs is dispositive of the controlling issue of whether a

prospective IEP is reasonably calculated NOT to provide a FAPE when the IEP at issue is not substantially different from the previous IEPs.  *O'Toole*, 144 F.3d at 702.  As established at the due process hearing, Drew's IEPs from 2007 to 2010 show no measurable progress. On their face, these IEPs confirm that Drew made no real progress on his goals and objectives and was not provided an appropriate education.  Drew's education records contained no such evidence and the School District presented no such evidence on cross or in its case in chief.

The ALJ erroneously found that the IEPs from 2007 through 2010 evidenced measurable progress on the goals and objectives contained therein.  While the ALJ recognized that Drew failed to make progress towards some goals, the ALJ failed to identify a single goal or objective where Drew made progress. *See* ROA Vol. 1, Agency Decision, p. 10.  The ALJ mistakenly credits the School District's recommendation for continuing certain objectives as evidence that Drew was making progress towards these objectives.  *Id.*  However, the ALJ ignores the fact that while a *recommendation* was made to continue an objective because Drew had not completed it (or made progress towards it), in over 90% of the time the recommendation was not heeded and the objective was simply discontinued without comment.  Of the few objectives that were actually continued, virtually all but one (counting coins) were modified downwards and were discontinued after the following year without completion.

The ALJ erroneously states that while the IEPs did not provide any meaningful progress reporting, the IEPs demonstrated progress by a continuation or modification of certain (unidentified) objectives with modified criteria that reflected a higher expectation.  *Id.*  As demonstrated in the Statement of Facts section above, the Administrative Record does not support the ALJ's finding.

Ironically, the ALJ found that the "most persuasive evidence" of Drew's progress on the

School District IEPs was the fact that Drew made progress on similar goals and objectives after Drew had been a student at Firefly Autism House for several months. *Id.* This fact proves just the opposite. This fact establishes that, when given appropriate special education services and supports and when his problem behaviors are appropriately addressed, Drew is able to learn and make measurable educational progress – which he did only at Firefly Autism House. Notably, the ALJ fails to cite to any evidence of progress in the School District's education records.

Anna Kroncke, Ph.D., a licensed school psychologist who testified at the due process hearing performed a comprehensive evaluation of Drew for the purpose of assessing, inter alia, Drew's progress and to provide the Parents recommendations for Drew's academic success in the future. ROA Vol. 3, Ex. 20. As part of her evaluation, Dr. Kroncke reviewed all of Drew's educational records including all of his IEPs from 2007 through 2010 when Drew attended Heritage and Summit View Elementary and the IEPs from 2010 and 2011 when Drew attended Firefly Autism House. ROA Tr. Vol. 1, 133:21 - 25.

Dr. Kroncke specifically analyzed the goals and objectives contained in the 2007 through 2010 IEPs to assess their adequacy and whether there was any documented evidence of progress that could be discerned from those documents. *Id.*, 139:1 - 140:9. Dr. Kroncke testified that she was unable to determine any measurable progress documented in the IEPs from 2007 through 2010. *Id.*, 140:17-22. Dr. Kroncke further testified that the goals and objectives were vague and that the baselines and criteria were vague and hard to measure. *Id.*, 140:22 - 141: 4.

Dr. Kroncke cited as evidence of lack of progress the fact that most of the IEPs' objectives that were recommended to be continued on to the next IEP because of Drew's lack of mastery or progress were abandoned and not continued. ROA Tr. Vol. 1, 149:7 - 151:9. Replacement

objectives were similarly reported to be continued on the subsequent IEP because of lack of mastery or progress and were similarly abandoned with no explanation given. *Id.*

Dr. Kroncke further testified that none of the IEPs provided any substantive information that indicated that Drew had made any progress towards the written goals and objectives. *Id.*, 150:20 - 156:24. As reported by Dr. Kroncke, the majority of the IEPs contained no information at all regarding progress. *Id.* What little progress reporting that was contained in one IEP, was so vague and general that it provided no real evidence of measurable progress. *Id.* Dr. Kroncke testified, again, that despite the progress reported on the 2009 IEP, objectives weren't continued on the subsequent IEP as indicated, the "Level 3s" indicated on the progress reports were meaningless and uniformly reported on each objected regardless of the fact that objectives were abandoned, completed or modified. *Id.*, 157:21 - 162:7.

Dr. Kroncke also testified that she there was no way to determine from the IEPs what progress, if any, that Drew made on any of his goals and objectives. *Id.* While the objectives provided specific criteria about how the objective was to be achieved and progress was to be measured, the IEPs contained no evidence that these objectives were ever actually measured or that progress on these objectives was ever made. *Id.*, Dr. Kroncke further testified that she searched Drew's education records to determine whether any of the goals and objectives were ever actually measured and whether progress could be shown by any other documents. *Id.*, at 148:17 - 149:3. Dr. Kroncke could not find any such evidence. *Id.*

Dr. Kroncke testified, and such testimony was not contested by counsel for the School District on cross-examination, that Drew's IEPs demonstrate that he made no measurable progress on his goals and objectives contained in his IEPs from 2007 through 2010. *Id.*, at 161:21 - 162:7.

The 10/31/07 IEP includes one several goals that are to be measured by certain specified objectives.  *See* ROA Vol. 1, Ex. 1.  Each objective states that progress towards mastery of the objective will be by a specified criteria; e.g., >= 4 success, over the course of 1 week, that will be specifically recorded by a stated method of measurement.  *Id.*  Nowhere in the IEPs or in Drew's educational records is there any indicia of evidence that any objectives were ever measured or specifically worked on.  For example, while a given objective states that criteria for mastery is determined by a specific number of successes measured by a specific method, over a given time period, there is no indication that Drew achieved even once success.

By contrast, the 04/30/08 IEP includes entirely different criteria by which to determine mastery of the objectives; e.g., >= 80% in 3 out of 4 consecutive trials.  *See* ROA Vol. 1, Ex. 2.  Curiously almost all of the objectives have the exact same criteria.  There is no indication that any of the objectives were measured or that Drew made any progress on these objectives.  The IEPs and Drew's educational records are devoid of any such information.

The 04/14/09 IEP is the only IEP that contains "progress reporting" sections on each of the objectives.  Despite the fact that entries have been inputted in to these sections, the so-called progress reporting contains no meaningful information by which to determine whether Drew was making progress towards the given objective.  For example, the first reading objective states that "Given text at an instructional level, Drew will read a passage and retell it in logical sequence."  Criteria for mastery of this objective is ">= 80% in 4 out of 4 consecutive trials."  ROA Vol. 1, Ex. 3, p. 17.  Percentage success on specified trials were to be measured and recorded by "Written performance [and] oral performance."  *Id.*  Instead of reporting what percentage of success in how many trials Drew had performed, the "progress reporting" provides vague and meaningless

observations such as "Working hard on this objective.  He is enjoying the Magic Tree House series." *Id.*

Testimony was elicited regarding one of Drew's writing objectives that particularly challenged the credibility of Drew's IEPs as written.  The first writing objective in the 04/14/09 IEP states that "With a visual cue Drew will be able to write a 5 sentence paragraph with a beginning, 3 sentence body and conclusion sentence." ROA Vol. 1, Ex. 3, p. 20.  This same objective was contained in Drew's 2008 where it was reported that Drew could not perform this skill at all.  *Id.*, Ex. 2, p. 26.  No progress was reported on this objective.  In the 2009 IEP there is no real reporting on Drew's progress other than "This all depends on his desire."  *Id.*, Ex. 3, p. 20.  There is no indication in any of Drew's IEPs that he could write one sentence let alone a complete five sentence paragraph.  Despite the absence of any evidence of this skill, the 2009 IEP reports "Level 3 Objective complete."  *Id.*

Contrary to what is reported in the School District's 2009 IEP, Drew was tested by Firefly Autism House soon after his enrollment and it was determined that "Endrew is unable to write a complete sentence.  Average length of written narrative 1.1 words." ROA Vol. 1, Ex. 12, p. 33.  Drew's lead teacher at Firefly Autism House testified that they were continuing to work on Drew's writing and that as of the date of the due process hearing in June 2012, Drew was working on two-sentence paragraphs.  ROA Tr. Vol. 2, 279:12-20.

The 04/13/10 IEP, like the prior IEPs, is not reasonably calculated to provide Drew an appropriate education.  Lack of progress on the 2007, 2008 and 2009 IEPs demonstrates that the IEPs were clearly failing to provide Drew an appropriate education.  As recognized by the ALJ, the 04/13/10 IEP, on its face, is not substantively different than the prior IEPs.  There is no reason to

expect, and none was given at the due process hearing, that Drew would make any progress on the goals and objectives under the 04/13/10 IEP.  Accordingly, Drew's education records establish that the School District failed to provide Drew an appropriate education.

      **B.**    **The School District's Failure to Provide Parents Regular and Meaningful Reports on Drew's Progress on His Goals and Objectives Violated the IDEA By Depriving Parents of Meaningful Participation in Drew's Educational Planing.**

The IDEA requires that parents are afforded an opportunity to meaningfully participate in meetings to develop an IEP that will ensure that their child receives a FAPE.  34 C.F.R. § 300.500(b).  In order for parents to meaningfully participate in the IEP development, the IDEA requires, *inter alia*, that the IEP include a statement of how each IEP goal is to be measured in order to demonstrate progress and a statement of when "periodic reports" of such progress are to be provided to the parents.  34 C.F.R. § 300.320(a)(3).  As recognized by the ALJ, failure to provide parents periodic progress reports can amount to a substantive violation of the IDEA that may deny a child FAPE.  ROA Vol. 1, Agency Decision, p. 11; *see also*, *Escambia County Bd. of Educ. v. Benton*, 406 F.Supp. 2d 1248, 1275 - 1276 (S.D. Ala. 2005).

In *Escambia County Bd. of Educ.*, the court found that because the school district's annual goals were "fuzzy, ambiguous, ill-defined terms that render it difficult to know what the objectives are, and virtually impossible to measure whether he has achieved them," the parents were denied information "needed to enable them to participate in the IEP formulation process, and caused a deprivation of educational benefits, thereby denying [student] a FAPE.  *Id.*

Here, each IEP requires that before developing new goals and objectives for Drew the IEP team is required to "review and document progress toward completion of the student's previous goals and objectives."  *See e.g.*, ROA Vol. 1, Ex. 1, p. 17.  Progress towards goals are demonstrated

by progress towards the corresponding objectives, and progress towards objectives are to be demonstrated by measuring specific criteria. *See e.g.*, *Id.*, at p. 19 ("≥ 4 successes, over the course of 1 week(s).").

As evident in the IEPs, progress was not measured or documented. Therefore, it could not have been reviewed by Parents or IEP members prior to developing new goals and objectives. Further Parents were never provided periodic progress reports as required by the IDEA. ROA Tr. Vol. 1, 67:20 - 68:9. Drew's education records are devoid of any progress reports that were created by the School District.

These errors are fatal to the provision of an appropriate education and a violation of the IDEA. As recognized by the court in *Escambia County Bd. of Educ.*, "the missing data throws [the child's] IEPs into disarray, undermining the goals and objectives set for him and reducing the IEP process to a hollow shell of what the IDEA intended. Such a state of affairs necessarily implicates [the child's] educational opportunities and benefits, stripping him of a FAPE. 406 F.Supp. 2d at 1276, n. 45.

The School District's failure to comply with the progress reporting requirements of the IDEA amounted to a substantive violation of the IDEA that resulted in a denial of a FAPE.

### C.   The School District's Failure to Conduct a Functional Behavioral Assessment and Develop an Appropriate Behavior Intervention Plan Violated the IDEA and Resulted in a Denial of a FAPE.

The ALJ's conclusion that a failure to perform an functional behavioral assessment (FBA) or develop an appropriate behavior intervention plan (BIP) thereon does not violate the IDEA is contrary to the law. In the case of a child whose behavior impedes his learning, "the FBA is essential to addressing the child's behavioral difficulties, and as such plays an integral role in the development

24

of an IEP." *Harris v. District of Columbia*, 561 F.Supp. 2d 63, 68 (D.C. 2008).  Because of the FBA's centrality to the development of an appropriate IEP, the FBA is an "educational evaluation" that must be conducted under the IDEA.  *Id.*, at 67.

The IDEA expressly recognizes that the quality of a child's education is inextricably linked to the child's behavior and, thus, an effective educational evaluation must identify behavioral problems.  *Id.*, at 68 *citing* 34 C.F.R. § 300.324(a)(2)(i).  This principle is supported by the official commentary to the IDEA regulations, which provide: "a failure to consider and address [behaviors impeding learning] in developing and implementing the child's IEP would constitute a denial of [a] FAPE to the child."  34 C.F.R. § 300, Appendix A, Notice of Interpretation, Section IV, Question 38.

The ALJ found it undisputed that Drew's problem behaviors impeded his ability to access education.  ROA Vol. 1, Agency Decision, p. 12.  In violation of the IDEA, the School District never performed an FBA of Drew.  An FBA was necessary to, among other things, ascertain all of the problem behaviors that impeded Drew's learning, determine the cause(s) of those behavior, and consider the environmental factors that may contribute to those behaviors.  Without an effective FBA, the IEP Team was unable to develop an effective and comprehensive plan to address and correct those behaviors.

As referenced above, while th 10/31/07 IEP included a "draft" BIP that addressed only Drew's fixation on timers, without addressing Drew's other problem behaviors at the time, including emotional outbursts, verbal perseverations, heightened movements, and anxiety.  *See* ROA Vol. 1, Ex. 1, pp. 5, 8-9, 36-37.

The 04/30/08 does not include an IEP at all, despite that fact the IEP requires one.  *Id.* Ex.

2, p. 34.

The 04/14/09 IEP includes a "draft" IEP that identified many concerning behaviors including climbing furniture, falling off furniture, hitting computers and TV screens, head banging, kicking people, kicking walls, dumping objects, screaming, and asking to be punished. *Id.*, Ex. 3, pp. 39-40. However, this "draft" BIP was replaced with a finalized BIP dated 04/25/09. *Id.* Pp. 43-45. This BIP only identified two concerning behaviors: yelling when frustrated and wandering around the classroom. *Id.*, at 43. Neither the draft BIP or the final BIP identify or address one of the most concerning behaviors involving Drew's tendency to elope from the classroom or school. *Id.*, p. 4.

The 04/13/10 IEP, does not include an IEP at all, despite that fact the IEP requires one. *Id.* Ex. 4., p. 22. This IEP recognizes, but fails to address, that Drew's problems behaviors "inhibit[] him from accessing academic learning as well as social learning." *Id.*, Ex. 5, p. 7. The IEP describes a child "teeter[ing] on the edge of losing control," ripping his clothes, disrobing, dumping shelves and objects, yelling, kicking furniture and walls, until he wears himself out. *Id.*

The School District's failure to conduct a FBA and develop an appropriate BIP prevented Drew from accessing an education and resulted in a denial of a FAPE. This is evidenced by the escalation in the scope, frequency and number of Drew's disruptive behaviors between 2007 and 2010 and Drew's failure to make measurable progress on his goals and objectives.

## IV. THE EDUCATION PROVIDED BY FIREFLY AUTISM HOUSE IS REASONABLY CALCULATED TO ENABLE DREW TO RECEIVE EDUCATIONAL BENEFITS.

It was uncontested at the due process hearing that Drew is receiving an appropriate education at Firefly Autism House. The Agency Decision found that "There is no question that [Drew] has made progress at [Firefly Autism House] . . . ." Accordingly, the education provided by Firefly

Autism House is reasonably calculated to enable Drew to receive educational benefits.

A private educational placement is appropriate for the purposes of the IDEA, regardless of whether the child may be exposed to more non-disabled students in the School District's placement. The United States Supreme Court specifically endorsed a parents' unilateral private placement of their child at a private school specializing in the education of children with disabilities, even though that school did not even comply with IDEA requirements. *Florence County Sch. Dist. Four v. Carter*, 510 U.S. 7, 13-14 (1993).

The IDEA mandates that each School District ensure that "a continuum of alternative placements be made available to meet the needs of children with disabilities for special education and related services." 34 C.F.R. § 300.551; *Nebo Sch. Dist.*, 379 F.3d 966, (10th Cir. 2004). Such a continuum includes private school placements. 34 C.F.R. § 300.145.

By definition, LRE is a subset of FAPE and is a consideration only between two placements that are determined to be appropriate. According to *Nebo*: "The IDEA's substantive provisions are violated if: (1) the school district fails to provide a child with a FAPE; *or* (2) a FAPE is provided, but *not*, to the maximum extent appropriate, in a least restrictive environment." 379 F.3d at 975, n. 13, *citing* 20 U.S.C. § 1412(a)(1), (a)(5); and *Murray*, 51 F.3d at 925-26 (emphasis in original). The inability of the School District's inability to provide Drew a FAPE, coupled with the uncontradicted evidence that Drew is receiving an appropriate education at Firefly Autism House, by necessity defeats the argument that Firefly Autism House is not the least restrictive environment for Drew at the current time.

The LRE requirement "was not developed to promote integration with non-disabled peers at the expense of other IDEA educational requirements" and does not apply unless education is

appropriate. *Board of Educ. of Murphysboro v. Illinois Bd. of Educ.*, 41 F.3d 1162, 1168 (7th Cir. 1994); *see also Warren G. v. Cumberland*, 109 F.3d 80, 84 (3rd. Cir. 1999)("An appropriate private placement is not disqualified because it is a more restrictive environment than that of the public placement.").

## CONCLUSION

Based on the foregoing reasoning an authority Parents request that the Court reverse the Agency Decision and enter an order awarding parents the costs associated with Drew's educational placement at Firefly Autism House from May 10, 2010 through the present, including reasonable transportation costs, and enter an order that the School District is required to maintain Drew's educational placement at Firefly Autism House, at the School District's expense, until such time as the School District provides the Parents an IEP that is reasonably calculated to provide Drew an appropriate education.

Respectfully submitted March 22, 2013.

**SPIES, POWERS & ROBINSON, P.C.**

*/s/ Jack D. Robinson*
Jack D. Robinson
1660 Lincoln Street, Suite 2220
Denver, Colorado  80264
Telephone: (303) 830-7090
**Attorney for Petitioners**

28

## CERTIFICATE OF SERVICE

I hereby certify that on March 22, 2013, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following email addresses:

Robert Ross
General Counsel
620 Wilcox Street
Castle Rock, CO 80104
*Attorney for Douglas County School District*
Grand Junction, CO  81502-1206
*attorneys for Defendant*

*/s/ Christina Hupp*

_____