IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
LEWIS T. BABCOCK,  JUDGE

Civil Action No. 12-cv-2620-LTB

Endrew F., a minor, by and through his parents and next friends, JOSEPH & JENNIFER F.,

Petitioners,

v.

DOUGLAS COUNTY SCHOOL DISTRICT RE 1,

Respondent.

_____

ORDER

_____

This matter comes before me upon a request for appellate review of an Office of

Administrative Courts decision denying Petitioner's claim under the Individuals with Disabilities

Education Act (the "IDEA"), 20 U.S.C. §§1400 and 34 C.F.R. §§300.500, *et. seq*.   Petitioner,

Endrew F., through his parents, Joseph and Jennifer F., sought reimbursement for private school

tuition and transportation costs from Respondent, Douglas County School District RE 1 (the

"District") pursuant to 20 U.S.C. §1412(a)(10)(C)(ii) and 34 C.F.R. §300.148(c).   The

Administrative Courts Agency Decision, issued by an Administrative Law Judge ("ALJ")

following a due process hearing, concluded that Petitioner and his parents were not entitled to

reimbursement on the basis that the District provided him a free appropriate public education

("FAPE") as is required by the IDEA.   This appeal is fully briefed and ripe for disposition.   After

consideration of the entire appellate record and the parties' briefing, I AFFIRM.

## I. BACKGROUND

Petitioner was born on September 28, 1999.  At two years of age he was diagnosed with autism, which is defined as "a developmental disability significantly affecting verbal and nonverbal communication and social interaction . . . that adversely affects a child's educational performance."  34 C.F.R. §300.8(c)(1)(i).  "Other characteristics often associated with autism are engagement in repetitive activities and stereotyped movements, resistence to environmental change or change in daily routines, and unusual responses to sensory experiences." *Id.*  In 2003, Petitioner was also diagnosed with Attention Deficit/Hyperactivity Disorder.

Petitioner struggles with the ability to communicate personal needs, emotions and initiations, and does not engage or interact with others in social routines or play.  He has compulsive and perseverative behaviors that he has difficulty overcoming throughout the day which, in turn, interferes with the learning environment.  He also has many maladaptive behaviors that interfere with his ability to participate, including:  eloping, dropping to the ground, climbing, loud vocalizations, perseverative language, and picking/scraping.  In addition, Petitioner presents with many severe fears – such as dogs, flies, and using a new or public bathroom – which severely limits his ability to function in school or in the community.  It is undisputed that his diagnosis affects his ability to access education, and he is eligible for services under the IDEA.

Petitioner attended school through second grade at Heritage Elementary, and then moved to Summit View Elementary for third and most of fourth grade, both District schools.  In May of 2010, during his fourth grade year, Petitioner's parents decided to withdraw him from Summit View and enroll Petitioner at the Firefly Autism House ("Firefly," previously known as the Alta

Vista School), a private school that specializes in the education of children with autism.  It is undisputed that Petitioner has been able to access education at Firefly where he is making academic, social and behavioral progress. [Administrative Record "AR" Ex. 21]  It is Petitioner's parents' position that he stopped making meaningful educational/functional progress in the District schools during his second grade year, and continuing until he withdrew from the District prior to his fifth grade year, as evidenced by the lack of advancement in the goals and objectives set out in his individualized education program ("IEP").

Petitioner's educational records start with his second grade IEP (May 10, 2007 to May 10, 2008) which sets forth six broad annual goals – Communication and Basic Language Skills, Language Arts/Reading and Writing, Mathematics, Physical (Motor), and Self-Advocacy/Self Determination – each implemented by detailed corresponding objectives. [AR Ex. 1] Petitioner's third grade IEP (April 30, 2008 to April 30, 2009) contained the same six annual goals, but with modified objectives. [AR Ex. 2]  The same is true for Petitioner's IEP for the four grade (April 14, 2009 to April 14, 2010) except that an annual goal was added in the area of self-advocacy/self-determination related to increasing his independence. [AR Ex. 3]

In April 2010, the District developed an IEP for Petitioner's fifth grade year. [AR Ex. 4] This draft IEP was never implemented, however, as Petitioner withdrew from the District before his fifth grade year, in May of 2010, and began attending school at Firefly.  Thereafter, input from Firefly was incorporated into a finalized IEP proposed by the District, which was presented during a meeting on November 16, 2010, but was rejected by Petitioner's parents. [AR Ex. 5]

Petitioner's parents argue that he stopped making educational progress during his second grade year in that no meaningful progress is recorded on his IEP for that year.  They contend that

Petitioner's third grade IEP reveals that 21 of the 26 objectives identified in his second grade IEP were discontinued or abandoned because he was not able to make adequate progress on them.  They further assert that Petitioner's fourth grade IEP shows that most of the objectives identified in his third grade IEP were likewise discontinued/abandoned because he was not able to make adequate progress.

Petitioner's parents also argue that the District failed to adequately address his progressively disruptive behavioral issues that, in turn, resulted in his increased inability to access the educational environment.  It is undisputed that in his second grade year Petitioner experienced escalating problem behaviors at school, including increased tantrums, yelling, and crying, dropping to the floor and eloping from class.  In third grade, following his transfer from Heritage to Summit View Elementary, Petitioner's social skills declined and his disruptive behaviors increased.  During Petitioner's fourth grade year, his ability to function at school and access the educational environment became noticeably worse.  He bolted from the classroom frequently and ran out of the school building and into the street on one occasion.  He urinated and defecated on the floor of the "calming room" twice.  Petitioner's problem behaviors included climbing furniture, falling off furniture, hitting computers or TV screens, yelling, kicking others, kicking walls, head banging, and asking others to punish him.

Petitioner's second grade IEP includes a Behavior Intervention Plan ("BIP") which, his parents argue, addresses only one behavior (Petitioner's fixation on a timer) and there is no indication in the record that it was ever finalized or implemented, as it was stamped "draft" at the top. [AR Ex. 1]  His third grade IEP includes no BIP, although it noted that one is required, and his fourth grade IEP includes a BIP, also stamped "draft," that was not developed as a result of

4

any functional behavioral assessment and only addresses two disruptive behaviors. [AR Ex. 3] Petitioner's parents contend that instead of implementing a BIP in response to his behavior problems, the District began limiting his time in the general education classroom and increasing the time he spent in the special education classroom.  The proposed IEP for Petitioner's fifth grade year also did not include a BIP, although a meeting was scheduled with District specialists to address Petitioner's behavior issues.  Petitioner's parents assert that the District failed to adequately address his disruptive behaviors which, in turn, prevented his access to education and impeded progress on his educational and functional goals and objectives.

As such, it is Petitioner's parents' position on appeal that the final IEP presented by the District in November of 2010 was not reasonably calculated to provide him with a FAPE, as it was not substantively different than his prior IEPs that failed to evidence progress on his educational/functional goals and, in turn, had failed to provide an appropriate education in the past.  Moreover, despite his maladaptive and disruptive behaviors that prevented his ability to access education, the District failed to conduct a functional behavioral assessment, implement appropriate positive behavioral interventions, supports or strategies, or develop an appropriate BIP.  Therefore, Petitioner's parents rejected the educational placement and IEP proposed by the District, and they unilaterally enrolled him at Firefly prior to the start of his fifth grade year.

## II.  PROCEDURAL HISTORY

Petitioner's parents claim the District failed to provide him a FAPE, as required by the IDEA, and so, they seek reimbursement for Petitioner's private school tuition expenses and the reasonable transportation costs incurred for his education at Firefly.  After the District refused, they filed a due process complaint with the Colorado Department of Education.  A due process

hearing was held before an ALJ with the Colorado Office of Administrative Courts on June 6-8, 2012.  The ALJ issued an Agency Decision on July 9, 2012, in which she ruled in favor of the District by concluding that the District provided Petitioner with a FAPE and, as such, did not violate the IDEA.

Specifically, the ALJ found the evidence established that Petitioner made "some measurable progress" towards the academic and functional goals in his IEPs during the time that he was enrolled in the District, as well as on the IEP drafted for his fifth grade year.  In so doing, the ALJ noted that the District's progress reporting was often minimal – in that many of the entries were lacking in detail or contained only conclusory statements about whether Petitioner was on target to meet the IEP goals and objectives – but concluded that "[w]hile the District's progress reporting could have been more robust and informative, the absence of more detailed reports does not amount to a substantive denial of a FAPE."  Finally, the ALJ rejected Petitioner's parents argument that the District failed to comply with the IDEA by not performing the appropriate behavior assessments or implementing a BIP.  As a result, the ALJ concluded that Petitioner and his parents did not meet their burden of establishing a claim for the costs of the Petitioner's unilateral private school placement under the IDEA.

Petitioner and his parents then initiated this action, pursuant to 20 U.S.C. §1415(i)(2)(A), seeking review and reversal of the ALJ's Agency Decision, and requesting an order awarding them the costs associated with his education placement at Firefly incurred from May 10, 2010, through the present.  They also seek an order requiring the District to maintain Petitioner's placement at Firefly, at the District's expense, until such time as the District provides an IEP that is reasonably calculated to provide him with an FAPE as required by the IDEA.

6

### III. IDEA

The IDEA is a federal statute that provides students with disabilities the right to a FAPE designed to meet their needs.  20 U.S.C. §1400(d)(1)(A).  Central to the IDEA is the requirement that local school districts develop, implement, and annually revise an IEP that is calculated to meet the eligible student's specific educational needs.  *Thompson R2–J Sch. Dist. v. Luke P., ex rel. Jeff P.,* 540 F.3d 1143, 1148-49 (10th Cir. 2008); 20 U.S.C. §1414(d).  Thus, the determination of whether a FAPE has been provided turns in large part on the sufficiency of the IEP for each disabled child.  *Tyler V., ex rel. Desiree V. v. St. Vrain Valley Sch. Dist. No. RE-1J,* 2011 WL 1045434 (D.Colo. 2011)(unpublished)(*citing A.K. v. Alexandria City Sch. Bd.*, 484 F.3d 672, 675 (4th Cir. 2007)).

Appropriate IEPs "must contain statements concerning a disabled child's level of functioning, set forth measurable annual achievement goals, describe the services to be provided, and establish objective criteria for evaluating the child's progress."  *J.P. ex rel. Peterson v. County Sch. Bd. of Hanover County, Va.*, 516 F.3d 254, 257 (4th Cir. 2008); 20 U.S.C. §1414(d).  Challenges to the adequacy of an IEP can take two forms, i.e., arguments that the IEP was procedurally deficient or that it was substantively deficient.  *Tyler V. v. St. Vrain Valley Sch. Dist., supra* (*citing Urban ex. rel. Urban  v. Jefferson County Sch. Dist. R-1*, 89 F.3d 720, 726 (10th Cir. 1996)); *see also* 34 C.F.R. §300.513.

As relevant here, the IDEA provides for the reimbursement from a public school district when parents decide to enroll their disabled child in a private school without the consent of the school district.  Parents are entitled to such reimbursement if:  (1) the school district violated the IDEA; and (2) the education provided by the private school is reasonably calculated to enable

the child to receive educational benefits.  *Thompson R2–J Sch. Dist. v. Luke P., supra,* 540 F.3d

at 1148; *see also* 20 U.S.C. §1412(a)(10)(C)(ii)("[i]f the parents of a child with a disability . . .

enrolls the child in a private elementary school or secondary school without the consent of or

referral by the public agency, a court or a hearing officer may require the agency to reimburse

the parents for the cost of that enrollment if [it] finds that the agency had not made a free

appropriate public education available to the child in a timely manner prior to that enrollment");

34 C.F.R. §300.148(c).

    In this case, it is undisputed that the education provided by Firefly is reasonably

calculated to enable the Petitioner to receive educational benefits.  Thus, the sole issue is

whether Petitioner and his parents have met their burden to prove that the District violated the

IDEA by failing to provide Petitioner with a FAPE.  To determine whether a FAPE was

provided, the Court must ask whether the IEP was "reasonably calculated to enable [him] to

receive educational benefits."  *Thompson R2–J Sch. Dist. v. Luke P., supra,*  540 F.3d at 1148-49

(*quoting Bd. of Educ. v. Rowley,* 458 U.S. 176, 207, 102 S.Ct. 3034, 73 L.Ed.2d 690  (1982)).

"If the IEP was so calculated, the school district can be said to have provided a FAPE; if not,

then not."  *Id.* at 1149.

    As the Tenth Circuit has noted, this standard is not onerous as "Congress did not impose

upon the States any greater substantive educational standard than would be necessary to make

. . . access meaningful . . . [t]he intent of the Act was more to open the door of public education

to handicapped children on appropriate terms than to guarantee any particular level of education

once inside."  *Thompson R2–J Sch. Dist. v. Luke P., supra*, 540 F.3d at 1149 (*quoting Bd. of*

*Educ. v. Rowley*, *supra*, 458 U.S. at 192, 198)(rejecting the proposition that Congress sought to

guarantee educational services sufficient to "maximize each child's potential"). Rather, Congress sought only to require a "basic floor of opportunity" aimed at providing individualized services sufficient to provide every eligible child with "some educational benefit." *Thompson R2–J Sch. Dist. v. Luke P., supra* (*quoting Bd. of Educ. v. Rowley, supra*, 458 U.S. at 200); *see also Urban v. Jefferson County Sch. Dist. R–1, supra*, 89 F.3d at 727 (requiring that the educational benefit mandated by IDEA must merely be "more than *de minimis*"). Finally, because the question is only whether the IEP is reasonably calculated – not guaranteed – to provide some educational benefit, the measure and adequacy of an IEP can only be determined as of the time it is offered. *See Thompson R2–J Sch. Dist. v. Luke P., supra* (*quoting O'Toole ex rel. O'Toole v. Olathe Dist. Schs. Unified Sch. Dist. No. 233*, 144 F.3d 692, 701–02 (10th Cir. 1998)).

## IV. BURDEN & STANDARD OF REVIEW

The parties challenging the IEP bear the burden of persuasion to show it was deficient. *Tyler V. v. St. Vrain Valley Sch. Dist., supra* (*citing Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 62, 126 S.Ct. 528, 163 L.Ed.2d 387 (2005)); *see also Jefferson County Sch. Dist. R-1 v. Elizabeth E. ex rel. Roxanne B.*, 798 F.Supp.2d 1177, 1183 (D.Colo. 2011).

In determining whether they have met their burden, the Court "shall receive the records of the administrative proceedings;" "shall hear additional evidence" if requested by a party; and, "basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. §1415(i)(2). "[T]hough the statute specifies that review is *de novo*, the Supreme Court has interpreted the requirement that the district court receive the administrative record to mean that 'due weight' must be given to the administrative proceedings,

the fact findings of which are considered *prima facie* correct." *Thompson R2–J Sch. Dist. v. Luke P., supra,* 540 F.3d at 1150 (citation omitted).  The Tenth Circuit describes this "somewhat unique standard of review" as a "modified *de novo* standard." *Id.* at 1149; *see also Tyler V. v. St. Vrain Valley Sch. Dist., supra.*

Thus, the District Court reviewing the final state administrative IDEA decision reviews questions of law *de novo.  See O'Toole v. Olathe Dist. Schs. Unified Sch. Dist. No. 233*, *supra*, 144 F.3d at 698.  Otherwise, when the administrative record is fixed, the District Court conducts a "modified *de novo*" review in that it "evaluate[s] the record, and determine[s] whether a preponderance of the evidence indicates that the ALJ decision should be reversed." *Jefferson County Sch. Dist. R-1 v. Elizabeth E., supra,* 798 F.Supp.2d at 1184.

In their reply brief, Petitioner's parents argue that I should afford the ALJ's Agency Decision, including her findings of fact, no weight at all because her decision was "entirely conclusory," it fails to substantiate her findings with reference to the evidence or citation to the administrative record, and it neglects to specifically evaluate conflicting evidence or make credibility determinations.  However, they have provided me with no case law or authority supporting this argument.  Furthermore, while I agree that the written decision lacks specific notation to the record, it contains all the relevant law and findings of fact necessary to support the ALJ's determinations.  In fact, the decision is lengthy and quite thorough.  While the ALJ does not specifically address credibility issues or the inconsistencies in the evidence, it is clear that she made such determinations in her findings.

Therefore, I reject Petitioner's parents' assertion that I should give no weight to the ALJ's decision.  As discussed above, I review questions of law *de novo*, but I undertake a

"modified *de novo*" review of the factual determinations in that I "independently review the evidence contained in the administrative record, accept and review additional evidence if necessary, and make a decision based on a preponderance of the evidence, while giving 'due weight' to the administrative proceedings below." *Murray v. Montrose County Sch. Dist. RE–1J*, 51 F.3d 921, 927 (10th Cir. 1995). In so doing, I note that I have thoroughly read the entire adminstrative record, including the transcript from the adminstrative due process hearing, and I have based my decision on that record with due weight to the ALJ's determinations of the contested facts.

## V. DISCUSSION

In their complaint, Petitioner's parents assert that the District's final proposed IEP (for his fifth grade year) was both procedurally and substantively insufficient to provide Petitioner with a FAPE in violation of 20 U.S.C. §1414 (which provides processes for evaluating and implementing IEPs) and 20 U.S.C. §1412 (which sets forth the District's obligation of providing a FAPE to children with disabilities). Petitioner's parents refer to: 1) the lack of past progress on the goals and objective in Petitioner's IEPs from 2007 through 2010 and, in turn, the inadequacy of the IEP proposed for his fifth grade year; 2) the District's failure to provide regular and meaningful reports to Petitioner's parents as to his progress; and 3) the District's failure to perform a functional behavioral assessment and develop an appropriate BIP for him. His parents contend that the lack of progress on Petitioner's IEPs, coupled with the failure of the District to provide reporting and behavior assessment/intervention, and a proposed IEP that was a continuation of that pattern, resulted in denial of a FAPE.

## A.  Lack of Progress on IEPs

Petitioner's parents first argue that his IEPs with the District reveal "an almost complete lack of progress" starting with the IEP for second grade and continuing through the IEP proposed for his fifth grade year.  They contend that over that three year period (his second, third and fourth grade years) Petitioner's educational records, as well the record on appeal as a whole, are "devoid of any demonstrable evidence that [he] made any measurable progress on the goals and objective contained in his IEPs."  The District, in response, argues that while not always consistent or as robust as the IEP team would have hoped, Petitioner did in fact make educational/functional progress while enrolled in the District and under the IEPs developed for him.

The IDEA mandates that school districts provide IEPs for all eligible disabled students, "but then left the content of those programs entirely to local educators and parents, requiring only that they include 'a statement of measurable annual goals, including academic and functional goals, designed to meet the child's needs that result from the child's disability to enable the child to be involved in and make progress in the general education curriculum' and meet the child's 'other educational needs.'" *Thompson R2–J Sch. Dist. v. Luke P., supra*, 540 F.3d at 1151 (*quoting* 20 U.S.C. §1414(d)(1)(A)(i)(II)).  As such, Congress established procedures to guarantee disabled students access and opportunity, not substantive outcomes.  *Id.* (*citing Bd. of Educ. v. Rowley*, *supra*, 458 U.S. at 192, 197 n.21)(noting that Congress did not guarantee children "a potential -maximizing education," but rather some educational benefit).  Although the controlling question is whether, going forward, the IEP proposed by the District was reasonably calculated to confer some educational benefit, past progress on the IEP goals "strongly suggests" that when a proposed IEP is modeled on prior IEPs that had succeeded in

generating some progress, the proposed IEP "was reasonably calculated to continue that trend." *Thompson R2–J Sch. Dist. v. Luke P., supra*, 540 F.3d at 1153.

Petitioner's second grade IEP, beginning in May of 2007 and ending in May of 2008, contains six broad academic/functional annual goals, with several corresponding objectives. [AR Ex. 1]  For example, it provides an annual goal that Petitioner will demonstrate basic language and communication skills, and then lists six short-term objectives employed to meet that goal such as that he will be able to express his desires and emotions when prompted, and he will make eye contact with peers and teachers with minimal prompting.  In the discipline of language arts, an annual goal was that Petitioner will improve his writing skills.  There are three listed objectives to this goal; for example, the first one is that given a detailed picture, Petitioner will write one complete sentence describing the picture independently.  This objective contains a criteria: ("3) performs activity with verbal/gestural cues"), a baseline: ("0) does not participate"), and a method of measurement: ("Demonstration/Performance").  At the bottom of each objective, there is a section to record quarterly progress, with a place to indicate "Level" and the "Status," as well as make a comment.  A progress key defines Level 1 as "skill/behavior is rarely or never demonstrated, therefore incomplete positive data is available," up to Level 4 which is that the "skill/behavior is generalized and transferred without prompts and is above expectation of plan."  Petitioner's second grade IEP contains twenty-six objectives, and each objective has a progress report only for the period ending in the beginning of November 2007.  Each reporting is at a Level 2 ("skill/behavior is inconsistent with frequent prompts and is below expectation of plan") or Level 3 ("skill/behavior is consistent over time with few prompts and meets expectation of plan"), and the status is either left blank or "[w]ill be continued." [AR Ex.1]  It is

13

Petitioner's parents' assertion that no meaningful progress is recorded on his second grade IEP.

In his third grade IEP, for the period of April 2008 through April 2009, there are six annual goals, and twenty-three listed objectives. [AR Ex.2]  This IEP provides, in essence, the same annual goals with adjustments in the implementing objectives.  For example, for the goal of demonstrating basic language and communication skills, the second-grade objective is to "make eye contact with peers and teachers with minimal prompting," while the third grade objective is to "make and maintain eye contact with peers and adults" without prompting.  The IEP for third grade does not show progress reporting for most of the objectives, but does indicate progress reporting for three periods for the objective "will use correct punctuation, capitalization and spacing in his writing" and the objective of "[g]iven a variety of coins and dollars, [Petitioner] will accurately count the money up to $5.00."  At each period the status is "[w]ill be continued," and the Level is at 3 or, in the case of his use of punctuation, capitalization and spacing, he went down to a Level 2 as he "lost some independence in remembering to use correct conventions in his writing."  It is Petitioners parents' position that the objectives listed were merely carried over from the past year with little or no increase in difficulty resulting, in turn, in no measurable progress on Petitioner's academic goals.  Petitioner's parents maintain that twenty-one of the twenty-six objectives identified in his second grade IEP were discontinued or abandoned in his third grade IEP because he was not able to make adequate progress on them.

In Petitioner's fourth grade IEP, for the period of April 2009 through April 2010, there are seven annual goals, and twenty-three listed objectives. [AR Ex.3]  Again, the general goals are the same except for the addition of a self-advocacy goal of  "[i]ncrease[d] independence," with implementing objectives such as "independently follow along with morning and afternoon

routines of packing and unpacking his backpack" and "[u]sing a work system, [h]e will increase

his independent worktime in a nonpreferred assignment."   The objectives related to his

continuing goals were again changed or modified.  For example, the third grade IEP provides

that  "[g]iven a variety of coins and dollars, [Petitioner] will accurately count the money up to

$5.00," and his fourth grade objective requires that he then will "hand over the correct amount."

The objective of learning his multiplication facts "from 0-10" in third grade is amended to

learning his multiplication facts "from 6-10."  The IEP for fourth grade provides progress

reporting for all four quarters, except in the areas of increased independence and improved social

skills, which have reporting in only three quarters.  Several of the objectives were deemed at the

end of the year to be "completed," while others were "modified," "will be continued" or "no

longer appropriate."  The objectives all went up from a Level 2 to a Level 3 (or remained at a

Level 3 throughout the year) except in learning his division facts from 0-5 (where it was noted

that the focus was changed to mastering multiplication), and in increasing his independent work

time on a non-preferred assignment.  His objective to respond with a relevant comment to others

did not increase above a Level 2.  His parents again claim that Petitioner's four grade IEP reveals

that most of the objectives identified in his third grade IEP were likewise discontinued or

abandoned because he was not able to make adequate progress.

In the initial IEP drafted for Petitioner's fifth grade year, for the period of April 2010

through April 2011, his overall annual goals were altered in the areas of self-advocacy and social

interaction. [AR Ex. 4]  The objectives not completed from his fourth grade IEP were continued

(particularly in the area of math), and additional objectives were added to address his

communication and basic language goal of "improv[ing] social communication skills in order to

access the general education curriculum " as well as his new goals to "learn and utilize age appropriate coping strategies when feeling anxious and seek adult support when needed" and "participate in a developmentally appropriate job in an educational setting."  Firefly used the goals and objectives in this draft IEP to assess Petitioner's status upon his enrollment in May of 2010, in order to determine his level of proficiency or progress on the objectives, based on the measurement criteria provided. [Transcript Volume "TR" 2, pp. 238, 242-249, 293-94]  By July 23, 2010, Firefly determined that Petitioner had mastered some of the draft IEP objectives, including all four language arts objectives, and was "keeping goal" as to most of the objectives that were not mastered, except in the communication and basic language skills objectives, which were amended. [AR Ex. 12]

The finalized IEP proposed by the District, dated November 16, 2010, provides essentially the same goals and objectives, except that his objectives for his social goals are increased and more clearly defined. [AR Ex. 5]  For example, his objectives of utilizing age appropriate coping strategies and to participate in a developmentally appropriate job are redefined to focus on "learn[ing] and utilizing strategies to improve social interactions with adults and peers" and to "increase independence in an educational setting in order to demonstrate decreased anxiety."  The majority of the implementing objectives contained more detail about how they would be carried out and measured, as well as information related to Firefly's observations and data as to Petitioner's current abilities to perform.  For example, an objective to improve his social communication skills was changed from demonstrating two appropriate verbalizations during game play (simple board game, bingo, etc.) with at least one peer, to: "[g]iven a structured small group setting, [Petitioner] will demonstrate 2 appropriate

16

verbalizations, following a model/prompt, during game play (simple board game, bingo, racing matchbox cars, etc.) with at least one peer."  The checkpoint criteria remained the same (of more than or equal to 2 occurrences with less than or equal to 1 verbal prompt), but additional information was added for measurement purposes ("[w]hen [Petitioner] engages in structured play with a peer, he will make at least two appropriate comments or questions directed at the peer and that are related to the situation").  In addition, his current status or ability to perform the objective, as observed at Firefly, was indicated (Petitioner "does verbalize during game play; however, his comments are often unrelated to the activity and are not directed at other people").  Parents contend that this finalized IEP constitutes a continuation of the prior pattern revealing no progress by Petitioner on his IEP goals and objectives.  The finalized IEP was not accepted, and Petitioner remained enrolled at Firefly where a new IEP was implemented using, at least in part, the goals and objectives contained in the District's final proposed IEP from the District. [TR 2, pp. 298-306]

At the due process hearing, parents presented testimony from Anna Kroncke who completed a neuropsychological evaluation of Petitioner for his parents after he enrolled in Firefly in August of 2011. [AR Ex. 20][TR 1, p. 125]  Ms. Kroncke testified that she reviewed Petitioner's academic records from the District (including the goals and objectives in his IEPs), but she "wasn't able to determine measurable progress." [TR 1, pp. 138, 130, 154, 158-59, 162]  She explained that the goals and objectives in Petitioner's IEPs were vague or hard to measure, and the the progress reports lacked quantifiable data. [TR 1, pp. 140, 144-49, 150-51]  She concluded that it was her opinion that there was no evidence of academic progress. [TR 1, p. 165]  On cross-examination, she admitted that minimal progress data was noted (such as the

level of progress or that an objective was completed), and that additional information was provided in narrative form, but that it was insufficient – in her opinion – to determine any academic progress. [TR 1, pp. 186-87, 193-94, 196-200]

      Petitioner's special education teacher at Summit View, Amy Holton, testified that Petitioner's IEP goals from one year to the next were similar, but that the implementing objectives were changed to accommodate his progress and usually included an additional task or skill.  For example, she testified that from his second grade IEP to his third grade IEP, Petitioner's writing objective was increased to add capitalization when working on correct punctuation and spacing. [TR 2, pp. 341-44]  With regard to the proposed IEP for Petitioner's fifth grade year, she testified that the objectives were again modified to add skills, such as the ability to comprehend and follow directions from nonfiction (in addition to fiction) writing, in order to make progress on his broad annual goals. [TR 2, pp. 373-382]  When reporting on Petitioner's progress, Ms. Holton testified that she used raw data from the classroom – such as her anecdotal notes, and data with percentages – in her "running log."  Then, at the reporting periods, she would accumulate it and rate out his progress (via the level system) and indicate his status towards completion of the objective (usually as "continued" or, at the end of the year, "completed" if applicable). [TR 2, pp. 430-432]  As the school year progressed, she usually rated his progress on an objective at Level 3, which meant that he has not completed or mastered the objective, but that he was on the right course or trajectory to be able to complete the objective and in meeting the expectation plan. [TR 2, pp. 433-37]  She testified that this reporting was adequate, consistent with District practice, and was discussed with parents at the annual IEP meeting.  [TR 2, pp. 437-8, 440]  Ms. Holton testified that it was her opinion that the objectives

related to each goal were increased in each subsequent IEP.  [TR 2, pp. 352-53, 360-61, 371-72]

The Director of Special Education for the District, Don Bell, testified that the District declined parents' request for reimbursement at Firefly because the District felt that it could provide Petitioner with a FAPE in the least restrictive environment at Summit View because his past  IEPs had shown growth in his goals and objectives. [TR 3, pp. 482-3]  He testified that the progress reporting in Petitioner's IEP met the required standard, although he admitted that he would have hoped to have seen additional entries. [TR 3, pp. 490-91]  When specifically asked about the reporting in Petitioner's fourth grade IEP, he admitted that the progress on a language arts objective, as an example, contained "not as much [reporting] as I would like to see." [TR 3, p. 493]  However, he further indicated that other places within the IEPs spoke to Petitioner's progress, and it was his opinion that the documents, when taken as a whole, provided sufficient information to assess his educational growth. [TR 3, pp. 493-94]  On cross-examination, Mr. Bell indicated that the goals and objectives in the proposed fifth grade IEP from the District – in the draft IEP in May of 2010 and the final proposed IEP presented in November 2010 – were very similar and contained only "some slight" changes in either criteria or the actual wording of the goal. [TR 3, pp. 488-89]  He further testified that both Firefly and the parents, who had an opportunity to provide input, did not object to the fact that they were similar goals and objectives. [TR 3, p. 505]

Petitioner's mother testified that although Petitioner never achieved his academic potential, they did see some reading level improvements in third grade and some academic progress in fourth grade. [TR 1, pp. 71, 74, 96-97]  With regard to the proposed fifth grade IEPs, however, she saw only a continuation of the past IEP pattern of no measurable increase in the

goals and objectives required. [TR 1, p. 93]

My review of the record establishes that while the additions and modification in his IEP objectives from year to year – including the IEP proposed for his fifth grade year – did not reveal immense educational growth, they were sufficient to show a pattern of, at the least, minimal progress.  For example, his math objectives related to money were modified as follows.  In his second grade IEP the math objectives were: 1) given subtraction problems using numbers 1-12, he will use manipulatives to accurately solve the problem; 2) given addition problems, he will demonstrate adding whole numbers with regrouping with sums to 20; 3) he will identify and state the value of coins; and 4) given coins, he will accurately count to one dollar. [AR Ex. 1]  In his third grade IEP the math objectives were: 1) given a variety of coins and dollars, he will accurately count the money up to $5.00; 2) he will understand time related vocabulary and concepts as it relates to the calendar; 3) when given a clock, he will indicate the time shown on the face in quarter hours, five minutes and minute intervals; and 4) given a word problem, he will be able to identify which operation (addition, subtraction or multiplication) to use to solve the problem. [AR Ex. 2]  In his fourth grade IEP the math objectives were: 1) given a variety of coins and dollars, he will accurately count money up to $5.00 and then hand over the correct amount counted; 2) when identifying an object he wishes to purchase, he will be able to answer the question "is that enough?"; 3) he will understand time related vocabulary and concepts as it relates to the calendar; 4) given an analog clock, he will be able to tell the correct time; 5) given a word problem, he will be able to identify which operation (addition, subtraction, multiplication or division) to use to solve the problem; 6) he will learn his multiplication facts 6-10; and 7) he will learn his division facts 0-5. [AR Ex.3] And, in his final proposed fifth grade IEP the math

objectives were: 1) given a variety of coins and dollars, he will accurately count money up to $5.00 and then hand over the correct amount counted; 2) when identifying an object he wishes to purchase, he will be able to answer the question "is that enough money?"; 3) given a word problem, he will be able to identify which operation (addition, subtraction, multiplication or division) to use to solve the problem; 4) he will learn his multiplication facts 6-12; and 5) he will learn his division facts 0-5. [AR Ex.5]

While some of the objectives carried over from year to year, and some are only slightly modified, it is clear that the expectation in the objectives are increased over time.  Petitioner's past IEPs revealed a pattern of some progress on his education and functional goals, and that the proposed IEP for the fifth grade continues that pattern. *Thompson R2–J Sch. Dist. v. Luke P., supra*, 540 F.3d at 1153 (past progress on the IEP goals "strongly suggests" that when a proposed IEP is modeled on prior IEPs that had succeeded in generating some progress, the proposed IEP "was reasonably calculated to continue that trend").   I disagree with Petitioner's parents' argument that the modifications were insufficient to show any meaningful progress. Rather, I agree with the ALJ that Petitioner made progress towards his academic and functional goals in his IEPs and although this does not mean that he achieved every objective, or that he made progress on every goal, the evidence shows that he received educational benefit while enrolled in the District.  As such, Petitioner's parents have failed to show that the District's IEPs – both past and proposed for the future – were not reasonably calculated to provide him with some educational benefit. *Thompson R2–J Sch. Dist. v. Luke P., supra*, 540 F.3d. at 1150 (whether a proposed IEP was reasonably calculated to enable a child to receive education benefits requires only a "basic floor of opportunity aimed at providing individualized services

sufficient to provide every eligible child with some educational benefit").

**B. Failure to Provide Progress Reports**

Petitioner's parents also contend that they were not provided adequate progress reports as required by the IDEA. They argue that a failure to provide periodic progress reports can amount to a substantive violations of the IDEA which, in turn, denies parents an opportunity to meaningfully participate in meeting to develop their child's IEP. In support of this argument, Petitioner's parents cite to *Escambia County Bd. of Educ. v. Benton,* 406 F.Supp.2d 1248, 1273-74 (S.D.Ala. 2005), in which a District Court in the Southern District of Alabama deferred to the Hearing Officer's finding of adverse impact when the "dates of mastery are either excluded from IEPs or jotted in as a *pro forma* afterthought at year's end [as] the IEP team 'cannot determine the progress that the child has been making during the school year' towards achieving annual goals and whether adjustments to the program might be necessary." *Id.* The District, in response, concedes that the progress reporting on the IEPs in this case – especially on Petitioner's second grade IEP – was lacking in details, but argues that the reporting was sufficient to assess his progress. The District notes that there was constant informal communication between the school and the parents on Petitioner's progress, and there is ample evidence that Petitioner's parents participated in his education. The District contends that Petitioner's parent were aware of his progress, as evidenced by their role in modifying his IEP goals and objectives.

At the due process hearing, Petitioner's mother testified that she could not recall ever seeing or being provided with "any kind of quantitative data on either his progress or achievements with regard to his goals" beyond the reporting on his IEPs. [TR 1, pp. 68, 74, 85-

88, 121]  She also testified that the progress notes on the IEPs did not provide her with information about whether or not he was progressing towards completing the objectives. [TR 1, pp. 117-122]  However, on cross-examination she indicated that she did receive the IEPs for each year which indicated the goals and objectives, the level/measure of success on each goal, his current function with regard to that goal and where he was on the progress. [TR 1, pp. 100-04]  She also testified that if she was confused about any reporting or information on the IEP, she had opportunities to ask for clarification both during the IEP meetings and in between, and that she had asked questions and provided input, but did not express any disagreement with the IEPs becuase she had hoped then would work. [TR 1, pp. 103, 110]

The record is clear that there was significant informal communication with the parents as to Petitioner's progress. [TR 1, pp. 72, 109]  Petitioner's mother testified that she had regular communication with Ms. Holton in which she expressed her concerns about Petitioner's deteriorating behaviors and how that was, at least in part, overshadowing his academics. [TR 1, p. 55]  In addition, Ms. Holton implemented a back-and-forth notebook with his parents in order to address behavior issues and report how Petitioner performed at school. [AR Ex. J][TR 1, p. 55][TR 2, pp. 384-5]  Although Petitioner's mother testified that there was not much communication about his academic progress [TR 1, pp. 85-87], there is evidence that Petitioner's parents provided feedback about their concerns related to the educational/functional objectives in his IEPs. [TR 1, pp. 110-11, TR 2, pp. 358, 390-91]  In April of 2009, Petitioner's mother provided significant input about her desired goals for his next school year including a breakdown of the academic and functional goals she believed should be continued, modified, dropped or added. [AR Ex. G]

Furthermore, Ms. Holton testified that Petitioner's parents received a copy of the IEPs, including the notations of progress reporting, each year at the annual IEP meeting. She further testified that three times a year she reported on his progress on the IEP goals and objectives, which were copied and sent home with his report card in Petitioner's daily take-home folder in his backpack.  In addition, she testified that she notified Petitioner's parent that the report card and IEP report would be coming home in case they got lost from Petitioner's backpack. [TR 2, pp. 408-411, 413]  Finally, Ms. Holton testified that Petitioner's parents did not complain that the goals/objectives in IEPs where inappropriate [TR 2, p. 346], and they were made aware of his end-of-year progress (close-out reporting) with his IEP objective each year at the formal IEP meeting for next year. [TR 2, pp. 331, 476-77]

As a result, I reject the Petitioner's parents' argument that the record is "devoid of any written data or information about [his] work on or progress towards that goals and objectives contained in the IEPs" and that this "violates the IDEA and makes it impossible for [his parents] to participate in [his] educational programming in any meaningful way."  First, as noted by the District, the IDEA requires only periodic reporting on the progress the student is making toward meeting his or her IEP annual goals, and while the IEP must contain description of when those reports will be provided, there are no specific legal requirements about the frequency or content of the reports.  *See* 34 C.F.R. §300.320(a)(3)(IEPs require a description of how the child's progress will be measured, and when "periodic reports on the progress the child is making . . . will be provided).  In addition, there is record evidence that Petitioner's parents received the quarterly IEP reporting which was sufficient for them to participate in the process as evidenced by their continued formal and informal communications about his progress.  Although the IEPS

24

in Petitioner's second and third grade years are missing many of the quarterly progress reports, and those included were conclusory as to whether he was on course of meeting the objectives, it is undisputed that progress was reported at the annual IEP meeting and that parents were in constant informal communication about his progress.  Therefore, I find that Petitioner's parents have not met their burden to prove that the lack of progress reporting resulted in a denial of his FAPE.

**C. Failure to Perform a Behavioral Assessment and/or Intervention Plan**

Finally, Petitioner and his parents contend that the IEPs were deficient in that they failed to adequately address his behavioral problems because the District did not conduct a functional behavior assessment, or implement an adequate BIP.  They argue that this failure resulted in an escalation of his disruptive behaviors, thereby preventing him from making any meaningful progress on his educational/functional goals and objectives in his IEPs and, as such, he did not receive a FAPE.  The District asserts that the IDEA does not require either, except in circumstances not present here, as there is no evidence in the record that Petitioner's placement was changed, or that he was removed for more than ten days, due to disciplinary actions.  *See* 34 C.F.R. §300.530(d)(1)(ii)(requiring an functional behavior assessment "as appropriate" when a student has been removed from a current placement for more than 10 days due to disciplinary infractions).  Rather, the IDEA requires only that the IEP team consider interventions to address behavioral issues.  20 U.S.C. §1414(d)(3)(B)(i)(in the case of a child whose behavior impedes the child's learning, the IEP team shall "consider the use of positive behavioral interventions and supports, and other strategies, to address that behavior"); *see also* 34 C.F.R. §300.324(a)(2)(i). Moreover, the District asserts that Petitioner's second grade IEP did, in fact, include a BIP (as

was found by the ALJ)[AR Ex. 1], as did his fourth grade IEP [AR Ex. 3], and that another

behavior assessment and plan was in progress at the time Petitioner withdrew from the District

and enrolled at Firefly.  Finally, it notes that the record is clear that it regularly addressed

behavioral issues, as they arose, with the cooperation of Petitioner's parents.

It is undisputed that Petitioner's behavioral issues interfered with his ability to learn. [TR

1, pp. 109, 138][TR 2, pp. 254-59, 382-87]  Ms. Holton testified that her interventions with

Petitioner's escalating disruptive behaviors were not effective, but that she was in the process of

addressing them with the District. [TR 2, pp. 387-89]  After graphing patterns of Petitioner's

behavior during his fourth grade year – such as the specific behavior, the circumstances, and the

time of day – Ms. Holton testified that she was unable to discern causation and, as such,

scheduled a meeting with the District Autism Specialist and the Behavior Specialist. [TR 2, pp.

387-389, 391-93, 461, 464]  Ms. Houston testified that by the time they drafted Petitioner's IEP

for his fifth grade year, they had scheduled a separate behavior meeting to address and change

Petitioner's behavior plan. [TR 2, 382-83]  Although this meeting with the specialists did not

occur, because Petitioner had previously withdrawn from the District, the IEP team met to

document their data and to formulate an initial plan regarding Petitioner's behavioral issues. [TR

2, p. 393][TR 3, pp. 465-68][Ex. F]  On cross-examination, Ms. Holton testified that she was not

aware, aside from her anecdotal classroom data, if other behavioral data was collected by the

District in order to create either a BIP for Petitioner. [TR 3, 449-452]

I agree with the District that the record reveals that it was addressing Petitioner's

behavioral issues, in order to allow him better access to education, and that Petitioner's parents

were involved in the management thereof.  Whether or not the District failed to conduct a

functional behavioral assessment or implement a BIP in this case, at any particular or specific time, is mainly irrelevant to this decision as the Petitioner does not dispute that the IDEA does not require such assessment or plan.  Rather, I am to determine whether the District's approach to managing Petitioner's behavior, in order to allow him to effectively learn, failed to provide him with a FAPE.  The evidence of record is that the District was, at the very least,  addressing Petitioner's behavioral issues and that a new behavior plan was deemed necessary and was in progress at the time that Petitioner withdrew from the District.  As a result, I find that despite the District's inability to manage Petitioner's escalating behavioral issues at the time of his withdrawal, it was in the process of reassessing his BIP in order to address the issue.  As such, Petition has not met his burden of proving that his was denied a FAPE.

## VI. CONCLUSION

Because Petitioner and his parents have failed to meet their burden to prove that the District violated the IDEA by failing to provide Petitioner a FAPE, they are not entitled to reimbursement of his tuition and transportation costs to attend school at Firefly under 20 U.S.C. §1412(a)(10)(C)(ii) and 34 C.F.R. §300.148(c).

ACCORDINGLY, for the foregoing reasons, I AFFIRM the Administrative Court Agency Decision.

Dated: September  15 , 2014, in Denver, Colorado.

BY THE COURT:


 s/Lewis T. Babcock
LEWIS T. BABCOCK, JUDGE

27