IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 12-cv-2620-LTB

ENDREW F., a minor, by and through his parents and next friends, JOSEPH F., and JENNIFER F.,

Petitioner,

v.

DOUGLAS COUNTY SCHOOL DISTRICT RE-1,

Respondent.

***AMICUS CURIAE* BRIEF OF FORMER OFFICIALS OF THE U.S. DEPARTMENT OF EDUCATION, THE JUDGE DAVID L. BAZELON CENTER FOR MENTAL HEALTH LAW, THE NATIONAL DOWN SYNDROME CONGRESS, THE AUTISTIC SELF ADVOCACY NETWORK, THE ARC OF THE UNITED STATES, AND THE ARC OF COLORADO IN SUPPORT OF PETITIONER ENDREW F.**

The former officials of the U.S. Department of Education identified below, along with the Judge David L. Bazelon Center for Mental Health Law, the National Down Syndrome Congress, the Autistic Self Advocacy Network, the Arc of the United States, and the Arc of Colorado, all interested parties in the above-captioned case, through counsel María R. Coor of Baker Hostetler LLP, respectfully submit this brief, in support of Petitioner, Endrew F., as *amici curiae*.

**INTEREST OF *AMICI CURIAE***

*Amicus* Dr. Alexa Posny has almost four decades of experience in education, from classroom teacher to Chief State School Officer to Assistant Secretary of the Office of Special Education and Rehabilitative Services in the U.S. Department of Education. Dr. Posny was most recently the Senior Vice President of State and Federal Programs for Renaissance Learning. Dr.

Posny served as Assistant Secretary of the Office of Special Education and Rehabilitative Services (OSERS) in the U.S. Department of Education from 2009-2012. In this position, she played a pivotal role in policy and management issues affecting special education and rehabilitative services across the country. She also served as the principal adviser to the U.S. Secretary of Education on all matters related to special education. Prior to arriving at the Department, Dr. Posny served as the Commissioner of Education for the Kansas State Department of Education (KSDE) from 2007-2009, Director of the Office of Special Education Programs for the U.S. Department of Education (2006 -2007), deputy commissioner of education at KSDE (2001-2006), state director of special education at KSDE (1999 to 2001), and the director of special education for the Shawnee Mission School District in Overland Park, KS (1997-1999). Prior to that, she was the Director of the Curriculum and Instruction Specialty Option as part of the Title 1 Technical Assistance Center (TAC) network of TACs across the United States and a Senior Research Associate at Research and Training Associates in Overland Park, KS. Dr. Posny has also served on the board of directors for the Chief State School Officers and the National Council for Learning Disabilities and chaired the National Assessment Governing Board's Special Education Task Force.

*Amicus* Michael Yudin served as both the Assistant Secretary of the Office of Special Education and Rehabilitative Services and the Acting Assistant Secretary of the Office of Elementary and Secondary Education under President Barack Obama.  In these capacities, Mr. Yudin helped implement both the Individuals with Disabilities Education Act ("IDEA") and the Elementary and Secondary Education Act of 1965, as amended.  Prior to his work at the Department of Education, Mr. Yudin spent nine years in the United States Senate, where he worked for senior members of the Senate Health, Education, Labor, and Pensions Committee on

education legislation, including the IDEA reauthorization of 2004 and the No Child Left Behind Act of 2001.  With more than 25 years of experience in the executive and legislative branches of the federal government, Mr. Yudin has dedicated his career to advocating on behalf of educationally disadvantaged students and individuals with disabilities.

*Amicus* Stephanie Smith Lee is the Senior Policy Advisor for the National Down Syndrome Congress and has over thirty-five years of experience in public policy, including serving in senior Congressional staff positions, as a foundation administrator, and as a nationally recognized disability parent leader.  Since her daughter, Laura, was born with Down syndrome in 1982, Ms. Lee has organized and led many successful bipartisan, collaborative efforts to improve special education and disability policy in Virginia and at the national level.  As the Director of the Office of Special Education Programs (OSEP) in the U.S. Department of Education, from 2002 through March 2005, Ms. Lee directed the policy development, program planning, monitoring, evaluation, research and implementation of the Federal special education law.

*Amicus* Madeleine Will served as the Assistant Secretary of the Office of Special Education and Rehabilitative Services under President Ronald Reagan.  Ms. Will has more than 35 years of experience advocating for individuals with intellectual disabilities and their families and developing partnerships of parents and professionals involved in creating and expanding high-quality education and other opportunities for individuals with disabilities.  Since her adult son, Jonathan, was born with Down syndrome, she has been involved in disability policy efforts at the local, state, and federal levels.  Ms. Will founded the Collaboration to Promote Self-Determination, a network of national disability organizations pursuing modernization of services and supports for persons with intellectual and developmental disabilities, so that they can become employed, live independently in an inclusive community, and rise out of poverty.  She

3

has also served as Vice President of the National Down Syndrome Society and Chair of the President's Committee for People with Intellectual Disabilities.

*Amicus,* the Judge David L. Bazelon Center for Mental Health Law ("Bazelon Center"), is a non-profit legal advocacy organization that has been dedicated to advancing the rights of people with disabilities, including mental disabilities, for over four decades. Ensuring that children with disabilities are provided with a free and appropriate public education, as mandated by the Individuals with Disabilities Education Act, is a central part of the Bazelon Center's mission.

*Amicus,* the National Down Syndrome Congress ("NDSC"), is the leading national resource for advocacy, support, and information for anyone touched by or seeking to learn about Down syndrome, from the moment of a prenatal diagnosis through adulthood. Founded in 1973, the NDSC is a member-sustained, 501(c)(3) organization, representing the approximately 350,000 people in the United States with Down syndrome and their families. The NDSC's programs provide individuals with Down syndrome the opportunities and respect they deserve so they can live the life of their choosing.

*Amicus*, the Autistic Self Advocacy Network ("ASAN"), is a national, private, non-profit organization run by and for individuals on the autism spectrum. ASAN provides public educational outreach and promotes public policies that benefit autistic individuals and others with developmental or other disabilities. ASAN promotes policies that ensure that all people with developmental disabilities are presumed competent and offered meaningful opportunities to participate in public programs, including public education. ASAN takes a strong interest in cases that affect the rights of autistic individuals to participate fully in community life and enjoy the same rights as others without disabilities.

*Amicus*, The Arc of the United States (The Arc), founded in 1950, is the Nation's largest community-based organization of and for people with intellectual and developmental disabilities (I/DD) with 650 state and local chapters nationwide. Through its legal advocacy and public policy work, The Arc promotes and protects the human and civil rights of people with I/DD and actively supports their full inclusion and participation in the community throughout their lifetimes. The Arc is committed to ensuring that students with I/DD have the right to be educated in their neighborhood schools with appropriate services, supplementary aids, and supports.

*Amicus*, The Arc of Colorado is the Colorado state affiliate of The Arc of the United States and is dedicated to supporting and advocating for people with I/DD throughout the state of Colorado.

**INTRODUCTION**

In affirming this Court's determination that the individualized education program ("IEP") offered to Endrew F. ("Drew") provided a "free and appropriate public education" ("FAPE") under the Individuals with Disabilities Education Act ("IDEA"),[1] the Tenth Circuit stated that it was "without question a close case." *Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. Re-1*, 798 F.3d 1329, 1342 (10th Cir. 2015), *cert. granted*, 137 S. Ct. 29 (2016), *vacated and remanded*, 137 S. Ct. 988 (2017), *vacated sub nom. Endrew F. v. Douglas Cty. Sch. Dist. RE-1*, No. 14-1417, 2017 WL 3300349 (10th Cir. Aug. 2, 2017). It found, however, that "under our prevailing standard" there were "sufficient indications of Drew's past progress to find the IEP rejected by the parents substantively adequate." *Id*. Now, however, the Supreme Court has reversed the Tenth Circuit, in an opinion making plain that the "prevailing standard" that this Court and the Tenth Circuit applied to assess Drew's IEP was not nearly rigorous enough. Rather, the Supreme Court determined, the appropriate standard is "markedly more demanding than the 'merely more than *de minimis*' test applied by the Tenth Circuit." *Endrew F. ex rel.*

---

[1] The Individuals with Disabilities Education Act ("IDEA") established an "enforceable substantive right to public education." *Honig v. Doe*, 484 U.S. 305, 310 (1988). Under the IDEA, states that receive federal funds are required to provide a "free appropriate public education," or "FAPE," to all eligible children with disabilities. 20 U.S.C. 1401(9), 1412(a)(1)(A), 1414(d)(1)(A). The "FAPE requirement embodies Congress's ambitious objective of promoting educational opportunities for such children." *Sch. Comm. of Burlington v. Dep't of Educ.*, 471 U.S. 359, 368 (1985) (internal quotes omitted). The FAPE is achieved for each child through the development and implementation of an "individualized education program," ("IEP"), that is tailored to each child's individual needs. 20 U.S.C. 1401(29); *see* 20 U.S.C. 1401(9)(D), 1414(d)(1)(A); 34 C.F.R. 300.22, 300.34, 300.39, and 300.320. The IEP must include both "special education" and "related services." "Special education" is "specially designed instruction" that adapts, as appropriate to the child's needs, "the content, methodology, or delivery of instruction . . . to ensure access of the child to the general curriculum, so that the child can meet the educational standards within the jurisdiction . . . that apply to all children." 34 C.F.R. § 300.39(b)(3). "Related services" are the "developmental, corrective, and other supportive services . . . required to assist a child with a disability to benefit from special education." 34 C.F.R. § 300.34(a).

*Joseph F. v. Douglas Cty. Sch. Dist. RE-1*, 137 S. Ct. 988, 1000 (2017). Indeed, students offered an educational program providing for "merely more than *de minimis*" progress from year to year "can hardly be said to have been offered an education at all." *Id.* at 1001. Accordingly, the Supreme Court reversed and remanded for consideration of Drew's particular circumstances under this "markedly more demanding" standard.

Under the Supreme Court's new standard, this "close case" should go the other way. Under *Endrew*, **all** students are entitled to an IEP tailored to their individual circumstances that is ambitious and reasonably calculated to help them make progress and meet challenging goals. That standard, the Court made clear, includes students who have fallen behind or who have significant cognitive or other disabilities. Drew's 2010 IEP did not meet that standard.

## ARGUMENT

I. **The Supreme Court's Decision in *Endrew* Announced a "Markedly More Demanding" Standard for Educating Students with Disabilities, Reflecting the IDEA's High Expectations for Students.**

The Tenth Circuit, in affirming this Court, had explained that its "prevailing standard" was that "the educational benefit mandated by IDEA must merely be 'more than *de minimis*.' " *Endrew F.*, 798 F.3d at 1338–39 (quoting *Thompson R2-J Sch. Dist. v. Luke P., ex rel. Jeff P.*, 540 F.3d 1143, at 1149 (10th Cir. 2008) (quoting *Urban ex rel. Urban v. Jefferson Cty. Sch. Dist. R–1*, 89 F.3d 720, 727 (10th Cir. 1996))). It characterized this standard as established by the Supreme Court's 1982 decision in *Board of Education of Hendrick Hudson Central School District, Westchester City. v. Rowley*, 458 U.S. 176 (1982). *Id.* In *Endrew,* however, the Supreme Court made clear that the "merely more than *de minimis*" standard is not what *Rowley* means. *Endrew F.*, 137 S. Ct. at 1000–01 (2017). *Rowley* did not "endorse any one standard for determining 'when handicapped children are receiving sufficient educational benefits to satisfy

the requirements of the Act.'" *Id.*, 137 S. Ct. at 993 (quoting *Rowley*, 458 U.S. at 202). The Court addressed "[t]hat 'more difficult problem' " in *Endrew*. *Id.*

As the Court explained, schools are required to offer each eligible child an IEP that is "reasonably calculated to enable [the] child to make progress appropriate in light of the child's circumstances." *Id.* at 999. The "essential function of an IEP is to set out a plan for pursuing academic and functional advancement." *Id.* A substantive standard not focused on student progress "would do little to remedy the pervasive and tragic academic stagnation that prompted Congress to act" in the IDEA. *Id.* As the Court noted, "an 'education' is what the IDEA promises," and "[p]rogress through [mastery of the school curriculum] is what our society generally means by an 'education.'" *Id.* This is why the U.S. Department of Education declared in 2015 that, under the IDEA, IEPs "must be aligned with the State's academic content standards for the grade in which the child is enrolled."[2]

The progress must, moreover, be "appropriately ambitious" in light of each child's individual circumstances and unique strengths and capabilities. 137 S. Ct. at 1000. Reflecting the U.S. Department of Education's guidance, the Court stated that "for most children, a FAPE will involve integration in the regular classroom and individualized special education calculated to achieve advancement from grade to grade." *Id.*

---

[2] U.S. Dep't of Educ., Office of Special Educ. & Rehab. Servs., Dear Colleague Letter on FAPE at 1 (Nov. 16, 2015) (the Department's guidance is designed to "help make certain that children with disabilities are held to high expectations"), https://www2.ed.gov/policy/speced/guid/idea/memosdcltrs/guidance-on-fape-11-17-2015.pdf. The Department's guidance was a focus of Petitioner's brief in the Supreme Court, as well as those of the United States and other *amici*. *See generally* Brief for Petitioner, *Endrew*, 137 S. Ct. 988 (2017) (No. 15-827) 2016 WL 6769009; Brief for the United States as Amicus Curiae in Support of Petitioner, *Endrew*, 137 S. Ct. 988 (2017) (No. 15-827) 2016 WL 6873024; Brief of Former Officials of the U.S. Department of Education as Amici Curiae in Support of Petitioner, *Endrew*, 137 S. Ct. 988 (2017) (No. 15-827) 2016 WL 6873058.

For children with significant cognitive or other disabilities that may limit their ability to meet grade level academic standards, the IEP must give the student "the chance to meet challenging objectives." *Id*. As Congress has directed, for these students, progress should be measured against "alternate academic achievement standards" that must be "aligned to ensure" the student "is on track to pursue postsecondary education or employment." Every Student Succeeds Act, 20 U.S.C. § 6311(b)(1)(E)(i) (2015). As the Department of Education has clarified, "alternate academic achievement standards" must be aligned with state content standards for the grade in which the student is enrolled, and designed to promote further education, work, and independence."[3]

In *Endrew,* therefore, the Court resoundingly rejected the "bigotry of low expectations"[4] that marked lower courts' interpretations of *Rowley*. It required instead that schools provide special education designed to enable students with disabilities to meet high expectations. *Endrew F.*, 137 S. Ct. at 1000.

As backdrop to the Court's decision, Congress expressly linked the IDEA to the "No Child Left Behind Act," the Elementary and Secondary Education Act ("ESEA"), which requires States to adopt "challenging academic content standards and aligned academic achievement standards" for all students, including those with disabilities. 20 U.S.C. § 6311 (b)(1)(A)-(D); *see also* 20 U.S.C. 6311(b)(2) and (c)(4)(A). By linking the IDEA to the ESEA's accountability

---

[3] Dear Colleague Letter, supra note 2, at 5; 20 U.S.C. § 6311(b)(1)(E)(i); *see also* 20 U.S.C. § 1400(d)(1)(A) (special education should "emphasize[]" instruction and services designed to prepare students "for further education, employment, and independent living").

[4] Brief of Former Officials of the U.S. Department of Education as Amici Curiae in Support of Petitioner at 6, *Endrew*, 137 S. Ct. 988 (2017) (No. 15-827) 2016 WL 6873058. ("[W]e should reject the soft bigotry of low expectations and expect all children, including children with disabilities, to achieve academic success….").

9

measures, Congress established a "unified system of accountability" to promote its purpose of "ensur[ing] that all children"— "including children with disabilities"—"are held to high academic achievement standards." S. Rep. No. 108-185, at 17-18 (2003). The 2015 reauthorization of the ESEA through the Every Student Succeeds Act retains the requirement that children with disabilities are held to the same challenging state academic standards as are all students. 20 U.S.C. § 6311(b)(1).[5]

Some children may be far behind grade level and require help to catch up. According to the U.S. Department of Education, "In a situation where a child is performing significantly below the level of the grade in which the child is enrolled, an IEP Team should determine annual goals that are ambitious . . . . [T]he annual goals need not necessarily result in the child's reaching grade-level within the year covered by the IEP, but . . . help close the gap."[6]

In all circumstances, however, *Endrew* requires States to implement an IEP that is reasonably calculated to enable the child to make progress commensurate with the child's potential. The decision of the Tenth Circuit that the Supreme Court reversed makes clear that Drew's IEP did not meet this standard.

II.  **Schools Across the Country Have For Years Employed Educational Methods That Permit Them to Meet the Standard Announced in *Endrew*.**

As *Endrew* recognized, the IDEA requires children with disabilities to receive both "special education" and "related services." *Endrew F.*, 137 S. Ct. at 994. Special education is "specially designed instruction" that adapts, as appropriate to the child's needs, "the content,

---

[5] These standards must be aligned with the entrance requirements for public colleges and universities in each State. 20 U.S.C. § 6311(b)(1)(D)(i).

[6] Dear Colleague Letter, *supra* note 2, at 5 (in such cases, "in order to align the IEP with grade-level content standards, the IEP Team should estimate the growth toward the State academic content standards for the grade in which the child is enrolled that the child is expected to achieve in the year covered by the IEP").

methodology, or delivery of instruction …to ensure access of the child to the general curriculum, so that the child can meet the educational standards within the jurisdiction . . . that apply to all children." 34 C.F.R. § 300.39(b)(3). "Related services" are the "developmental, corrective, and other supportive services . . . required to assist a child with a disability to benefit from special education." 34 C.F.R. § 300.34(a).

Over the last thirty-five years, education methods for students with disabilities have vastly improved. "Research has demonstrated that children with disabilities who struggle in reading and mathematics can successfully learn grade-level content and make significant academic progress when appropriate instruction, services, and supports are provided."[7] This includes students, who like Drew, have been diagnosed with Autism Spectrum Disorder, or "ASD."

For example, public schools regularly implement multi-tiered systems of support to meet the academic and behavioral needs of all students, including students with disabilities.[8] Using this approach, sometimes called Response to Intervention ("RTI"), schools provide quality core instruction that meets students' needs.[9] After identifying students who need additional support,

---

[7] Dear Colleague Letter, *supra* note 2, at 1.

[8] *See* OSEP Technical Assistance Ctr., Positive Behavioral Interventions & Supports, Multi-tiered System of Support (MTSS) & PBIS (defining MTSS as "the practice of providing high-quality instruction and interventions matched to student need, monitoring progress frequently to make decisions about changes in instruction or goals, and applying child response data to important educational decisions"), http://www.pbis.org/school/mtss (last visited Oct. 5, 2017).

[9] *See* U.S. Dep't of Educ., Office of Special Educ. Programs, A Response to Intervention (RTI) Process Cannot Be Used to Delay-Deny an Evaluation for Eligibility under the Individuals with Disabilities Education Act (IDEA) at 2 (Jan. 21, 2011) ("OSEP Response") ("[m]any [school districts] have implemented successful RTI strategies"; among the core characteristics of such approaches is "high quality research-based instruction in [the] general education setting"), http://www2.ed.gov/policy/speced/guid/idea/memosdcltrs/osep11-07rtimemo.pdf. *See generally*

schools provide evidence-based interventions of moderate to high intensity to address the individual learning challenges of each student.[10]

Schools, including those implementing tiered systems of support are also guided by the principles of Universal Design for Learning (UDL), which focuses on individualized approaches to teaching and learning for all students, thereby facilitating the inclusion of students with disabilities in classrooms with students without disabilities.[11]

Behavioral interventions, known as positive behavioral interventions and supports ('PBIS'), have success in eliminating or minimizing inappropriate behavior. PBIS builds positive behavior, including by addressing the role of the school environment in students' behaviors.[12]

---

U.S. Dep't of Educ., Office of Special Educ. Programs, IDEAs That Work: Tiered Support, https://ccrs.osepideasthatwork.org/teachers-academic/tiered-support (last visited Oct. 5, 2017).

[10] *See*, *e.g.*, American Institutes for Research, Ctr. on Response to Intervention, RTI Glossary of Terms ("MTSS allows for the early identification of learning and behavioral challenges and timely intervention for students who are at risk for poor learning outcomes."), http://www.rti4success.org/resources/mtssrti-glossary-terms#MTSS (last visited Oct. 5, 2017); OSEP Technical Assistance Ctr., Positive Behavioral Interventions & Supports, Multi-tiered System of Support (MTSS) & PBIS *supra* note 8.

[11] *See, e.g.*, Massachusetts Dep't of Elementary & Secondary Educ., The Massachusetts Tiered System of Supports (MTSS) (last updated Oct. 11, 2011) (explaining that schools implementing MTSS are guided by UDL principles), http://www.doe.mass.edu/sped/mtss.html (last visited Oct. 5, 2017); Nat'l Ctr. On Universal Design for Learning, What is UDL?, http://www.udlcenter.org/aboutudl/whatisudl (last visited Oct. 5, 2017). In 2015 Congress recognized the success of UDL as an approach to helping all students achieve proficiency, including students with disabilities, in the Every Student Succeeds Act, which requires states to develop academic assessments consistent with UDL, and requires schools providing federally funded comprehensive literacy instruction to incorporate UDL in the instruction. *See* 20 U.S.C. § 6311(b)(2)(B)(xiii), (b)(2)(D)(i)(IV), (b)(2)(J).

[12] *See* OSEP Technical Assistance Ctr., Positive Behavioral Interventions & Supports, Tier 3 Supports ("Positive behavior intervention and support is an application of a behaviorally-based systems approach. . . . Attention is focused on creating and sustaining Tier 1 (universal for ALL students), Tier 2 (targeted group support for SOME students), and Tier 3 (individual support for a FEW students) systems of support that improve lifestyle results (personal, health, social,

Educators have developed many interventions incorporating PBIS for students with ASD who may, like Drew, have behavioral needs.[13] Functional communication training ("FCT") helps students with ASD learn to avoid or replace challenging behaviors, leading to better education outcomes.[14] This involves a school-based team, including the student's parents, the student, teachers, administrative staff, and specialists, that identifies the function of a problem behavior and determines how the student will be taught the replacement response, as part of a behavior intervention plan.[15]

---

family, work, recreation) for all children and youth by making problem behavior less effective, efficient, and relevant, and desired behavior more functional."), http://www.pbis.org/school/tier3supports (last visited Oct. 5, 2017); *see also* OSEP Technical Assistance Ctr., Positive Behavioral Interventions & Supports, Multi-tiered System of Support (MTSS) & PBIS, *supra* note 8 ("Positive Behavioral Interventions and Supports (PBIS) is a process that is consistent with the core principles of MTSS").

[13] *See* U.S. Dep't of Educ., Inst. of Educ. Sciences, Nat'l Ctr. for Special Educ. Research, *Summary of Autism Spectrum Disorders Research* at 1 (Oct. 2015) ("*Autism Spectrum Disorders Research*") (noting that ASD symptoms may vary in severity and may include social communication and interaction deficits; restrictive and repetitive behaviors, interests, and activities; intellectual impairment; sensory sensitivity; attention and executive functioning problems, motor difficulties, and behavior problems), http://ies.ed.gov/ncser/pdf/ASD_2015.pdf.

[14] *See* Robert C. Pennington & G. Rich Mancil, *Functional Communication Training*, *in* Darlene E. Perner & Monica E. Delano, Council for Exceptional Children, *A Guide to Teaching Students with Autism Spectrum Disorders* Ch. 5 (2013) ("Pennington & Mancil, *Functional Communication Training*"); *see also* G. Richmond Mancil, *Functional Communication Training: A Review of the Literature Related to Children with Autism*, 41 Educ. & Training in Developmental Disabilities 213, 214 (2006) ("Mancil, *Functional Communication Training*") (defining "functional communication training" as assessing the function of a behavior through functional behavior assessments and then replacing the challenging behavior with a communicative response that serves the same function), http://daddcec.org/Portals/0/CEC/Autism_Disabilities/Research/Publications/Education_Training_Development_Disabilities/2006v41_Journals/ETDD_200609v41n3p213-224_Functional_Communication_Training_A_Review_Literature_Related.pdf.

[15] *See* Mancil, *Functional Communication Training*, 41 Educ. & Training in Developmental Disabilities at 214 (after replacing challenging behavior with a functional communicative response, "[t]he final step in FCT involves ignoring the challenging behavior" and "prompting and acknowledging the use of the communicative response that replaces the challenging behavior"). The requirement that schools perform a functional behavioral assessment and develop

Other evidence-based behavioral interventions for students with ASD include preteaching and prompting. Teachers or peer students may also model desired behavior. Students may be taught to more effectively self-regulate behavior.[16] Sometimes, it is simply a matter of offering a student an opportunity to regroup from overwhelming outside stimuli.[17]

These approaches are just a small sample of the numerous techniques that have been employed in public schools to enable students with disabilities, including those with behavioral and communication challenges, to meet high expectations. When schools employ these methods, children, including children like Drew who have behavioral needs, can thrive.[18]

**CONCLUSION**

Drew's IEP was not "appropriately ambitious." *Endrew F.*, 137 S. Ct. at 997. The "markedly more demanding" standard embraced by the Supreme Court requires entry of judgment for Drew and his parents.

---

or revise a behavior intervention plan when a student with a disability is repeatedly suspended, or suspended or expelled for more than 10 days, was included in the IDEA as part of the 1997 amendments. *See* Individuals with Disabilities Education Act Amendments of 1997, Pub. L. No. 105-17, § 101, 111 Stat. 37, 93-94 (codified as amended at 20 U.S.C. § 1415(k)(1)).

[16] *See* Barry M. Prizing, Ph.D., et al., *The SCERTS Model: A Transactional, Family Centered Approach to Enhancing Communication and Socioemotional Abilities of Children with Autism Spectrum Disorder*, Infants and Young Children, vol. 16:4 (Oct./Nov./Dec. 2003), at pp. 296-316, http://journals.lww.com/iycjournal/Abstract/2003/10000/The_SCERTS_Model__A_Transactional,_Family_Centered.4.aspx.

[17] *See* Pennington & Mancil, *Functional Communication Training*, *supra* note 14; *see also* Cleveland Clinic, Behavioral Intervention for Children with Autism, http://my.clevelandclinic.org/childrens-hospital/specialties-services/departments-centers/center-for-autism/behavioral-intervention-autism (last visited Oct. 5, 2017).

[18] *See* Wendy Machalicek et al., *A Review of School-Based Instructional Interventions for Students with Autism Spectrum Disorders*, 2 Research in Autism Spectrum Disorders 395-416 (2008) (evaluating research indicating effective methods in teaching students with ASD academic skills, communication skills, functional life skills, play, and social skills), http://www.meadowscenter.org/files/resources/RASD-Machalicek-08.pdf.

Dated this 5th day of October 2017.

                                                Respectfully submitted,

**BAKER HOSTETLER LLP**

/s/ *María R. Coor*
María R. Coor (D.C. Bar No. 493407)
Baker & Hostetler LLP
1050 Connecticut Ave., N.W., Suite 1100
Washington, D.C. 20036
(202) 861-1644
mcoor@bakerlaw.com

*Attorney for undersigned Organizations and former officials of the U.S. Department of Education*

**Organizational Signatories**

The Judge David L. Bazelon Center for Mental Health Law

The National Down Syndrome Congress

The Autistic Self Advocacy Network

The Arc of the United States

The Arc of Colorado

**Former Officials of the U.S. Department of Education Signatories**

Dr. Alexa Posny, Assistant Secretary of the Office of Special Education and Rehabilitative Services (2009-2012)

Michael Yudin, Assistant Secretary of the Office of Special Education and Rehabilitative Services (2015 - 2016); Acting Assistant Secretary of the Office of Special Education and Rehabilitative Services Elementary and Secondary Education (2012 – 2015), Acting Assistant Secretary for Elementary and Secondary Education (2011 - 2012)

Stephanie Smith Lee, Director of the Office of Special Education Programs (2002 – 2005)

Madeleine Will, Assistant Secretary of the Office of Special Education and Rehabilitative Services (1983-1989)

## CERTIFICATE OF SERVICE

I hereby certify that on this October 5, 2017, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send electronic notification to the following:

William E. Trachman
General Counsel
Douglas County Public Schools
*Attorney for Respondent*

W. Stuart Stuller
Caplan & Earnest, P.C.
*Attorney for Respondent*

Jack D. Robinson
Spies, Powers & Robinson, P.C.
*Attorney for Petitioner*