# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No.  12-CV-02620-LTB

Endrew F., a minor, by and through his parents and next friends, JOSEPH and JENNIFER F.,

Petitioners,

v.

DOUGLAS COUNTY SCHOOL DISTRICT RE-1,

Respondent.

---

## RESPONDENT'S SUPPLEMENTAL BRIEF ON REMAND
## AND REQUEST FOR HEARING

---

As this Court is aware, *Endrew F. v. Douglas County Sch. Dist. RE-1*, 137 S. Ct. 988 (2017), refined the standard for a free appropriate public education ("FAPE").  It clarified that the Individuals With Disabilities Education Act, 20 U.S.C. § 1400 et seq. (IDEA), requires school districts to go beyond the old "more than *de minimis*" standard.  Instead, an educational program must be "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances."  *Id.* at 999.

For a student like Endrew (Drew) who is not educated in the general education setting—such that aiming for grade-level advancement is not the appropriate goal—providing a satisfactory IEP still means that a student's educational program "must be appropriately ambitious in light of his circumstances."  For that purpose, and while every student's individual "goals may differ, … every child should have the chance to meet challenging objectives."  *Id.* at 1000.

On remand, Petitioners continue to rely heavily on the argument that the Tenth Circuit described this matter, in *dicta*, as "without question a close case." [Dkt. No. 46, at 2.] Petitioners contend that the new standard must therefore, "as a matter of logic, require a decision in favor of Drew under the 'markedly more demanding' standard articulated by the Supreme Court." [*Id.*] But the Tenth Circuit noticeably declined to adopt this reasoning, instead further remanding to this Court for additional proceedings. Moreover, the new standard adds two critical elements to this Court's inquiry that were not present previously: (1) whether progress was appropriate, considering (2) a student's unique circumstances.

Below, the School District demonstrates that it met the standard announced in *Endrew F.*, over seven years ago, when an IEP team based at Summit View Elementary offered an appropriate Individualized Education Program (IEP) to Drew and his family in April 2010. However, to the extent this Court determines that the existing record is indeterminate, the appropriate course is not to enter judgment, but for the Court to consider additional evidence directed at the new legal standard. *See* 20 U.S.C. § 1415(i)(2)(C)(ii) (in reviewing the administrative decision, the court shall "hear additional evidence at the request of a party…").

## FACTUAL HISTORY

Drew is a student with autism spectrum disorder ("ASD"), among other conditions. ASD is characterized by difficulties with communication and social interaction, and repetitive or ritualistic behavioral difficulties. As this Court previously held:

> [Drew] struggles with the ability to communicate personal needs, emotions and initiations, and does not engage or interact with others in social routines or play. He has compulsive and perseverative behaviors that he has difficulty overcoming throughout the day which, in turn, interferes with the learning environment. He also has many maladaptive behaviors that interfere with his

> ability to participate, including: eloping, dropping to the ground, climbing, loud
> vocalizations, perseverative language, and picking scraping.

*Endrew F. v. Douglas County Sch. Dist. RE 1*, 2014 U.S. Dist. LEXIS 128659, **2-3 (D. Colo.,

Sept. 15, 2014); [ROA Vol. I at 75.][1]

With all due respect to Petitioners, Drew also presents with very low cognitive skills. [*See*

ROA Vol. III, at 141 (2007 IEP); ROA Vol. III, at 172, 181 (2008 IEP); ROA Vol. III, at 208, 216-

217 (2009 IEP).] This, too, impacts Drew's ability to access the general education curriculum. In

fact, Drew's cognitive disability qualifies him for the CSAP-A assessment, which is the alternative

state-wide assessment in Colorado for students with severe cognitive disabilities.[2] [ROA Vol. III,

at 240 (2009 IEP); ROA Vol. III, at 274 (2010 IEP).] Sadly, Drew also suffers from yet another

condition that affects his learning: ADHD. [ROA Vol. I, at 7 (ALJ Decision).] Put simply, Drew's

disabilities interfere with his education from a cognitive, behavioral, and functional standpoint.

1. **Drew's April 2010 IEP Was Based On Drew's Unique Needs, And Was Reasonably Calculated To Allow Him To Make Progress In Light of his Circumstances.**

At issue is the adequacy of the IEP developed on April 13, 2010. That document was

crafted in the in the late spring of Drew's fourth grade year, for use during Drew's fifth-grade year

the following fall. Petitioners have consistently argued that previous IEPs developed in 2007,

2008, and 2009, did not provide FAPE, and that Drew made little or no progress during those

---

[1] Because Petitioners cite to the appellate record (Record on Appeal, or "ROA") for their factual claims, the School District does so as well. This Court's decision affirming the ALJ's order is found at pages 74 through 100 of Volume I of the record on appeal. It is not reported in the federal reporter, but is found on Lexis Nexis at 2014 U.S. Dist. LEXIS 128659, and on Westlaw at 2014 WL 4548439. The Lexis Nexis citation is used in this brief.

[2] *See*, Colorado Department of Education's *Participation Guidelines: Alternate Academic Achievement Standards for Instruction and Alternate Assessment,* http://www.cde.state.co.us/cdesped/altstandsassessparticipationguidelines.

years. While the School District disagrees with those assertions, the adequacy of those IEPs is not presently before this Court.[3] Instead, those IEPs are relevant only to the extent they were considered for the purpose of crafting the April 2010 IEP. *See Endrew F.*, 2014 U.S. Dist. LEXIS 128659 at \*\*17-18 (school districts are allowed to consider past progress as part of a trend line).

### a. Drew's IEPs Were Updated And Modified Each Year To Reflect Drew's Progress.

In their Supplemental Brief, Petitioners repeat the argument that Drew's IEPs went essentially unchanged from year to year. They also assert that Drew made no progress during these periods, and that the April 2010 IEP merely continued unsuccessful programming. These assertions are demonstrably incorrect.[4]

### 1) Academic goals and progress

Petitioners focus on the argument that Drew's IEPs from second, third, and fourth grade maintained the same general goals and areas of functioning to be addressed. But that fact has been misrepresented by Petitioners to assert that Drew's IEP barely changed. Instead, the relevant objectives and measuring criteria were carefully updated to take into account Drew's progress. Indeed, this Court engaged in an extensive analysis of Drew's IEPs, and compared his objectives.

---

[3] Indeed, any such argument would have been untimely, had it been made. Petitioner's due process hearing request was filed on February 21, 2012. [ROA Vol. I, at 3-5.] A two-year limitations period applies to due process complaints. *See* 34 C.F.R. § 300.507(a)(2); 1 Colo. Code Regs. § 301-8, 2220-R-6.02(7.5)(b)(iii). Thus, any claim related to the development of IEPs created before February 21, 2010 were time-barred.

[4] Importantly, the Supreme Court did not engage in fact-finding in its opinion in *Endrew F.* The Supreme Court elaborated that its limited role was to "endorse [a] standard for determining when handicapped children are receiving sufficient educational benefits to satisfy the requirements of the [IDEA]." 137 S. Ct., at 993. For that reason, Petitioners' citations to the Supreme Court's recitations of facts should be given little to no weight, particularly where they contradict earlier findings made by the ALJ or this Court.

In a finding that has never been disturbed, this Court held that "while some of the objectives carried over from year to year, and some are only slightly modified, it is clear that the expectation in the objectives increased over time." *See Endrew F.*, 2014 U.S. Dist. LEXIS 128659, at **31-32.

Drew's mother also conceded during her testimony that Drew's IEPs had been developed through a collaborative process in which she was an active participant. *See Endrew F.*, 2014 U.S. Dist. LEXIS 128659, at **34-35. This Court held:

> [S]he did receive the IEPs for each year which indicated the goals and objectives, the level/measure of success on each goal, his current function with regard to that goal and where he was on the progress. She also testified that if she was confused about any reporting or information on the IEP, she had opportunities to ask for clarification both during the IEP meetings and in between, and that she had asked questions and provided input, but did not express any disagreement with the IEPs because she hoped [they] would work.

*Endrew F.*, 2014 U.S. Dist. LEXIS 128659, at **34-35 (internal citations omitted); [ROA Vol. I., at 212-13 (Test. of J. Farren).] Thus, Petitioners are complaining about IEPs that were developed with extensive participation and input from Drew's mother.

Further, this Court found that Drew made progress while at Summit View. *Endrew F.*, 2014 U.S. Dist. LEXIS 128659, at **34-35 ("I agree with the ALJ that [Drew] made progress towards his academic and functional goals in his IEPs and although this does not mean that he achieved every objective, or that he made progress on every goal, the evidence shows that he received educational benefit while enrolled in the District."). Indeed, the court held Drew's IEP modifications had led to some <u>meaningful</u> progress. *See id.* at *32 ("I disagree with Petitioner's parents' argument that the modifications were insufficient to show any meaningful progress.").

Even Drew's mother testified that she saw academic progress in fourth grade. That year is key for this Court's analysis, because it is the year in which the April 2010 IEP was developed.

[*See* ROA Vol. I, at 199-200 (Test. of J. Farren); *see also* ROA Vol. I, at 10 (ALJ Decision) ("Despite the increase in [Drew's] problem behaviors, during school year 2009 he was still making some progress towards his academic and functional goals.").] For that reason, it is difficult to square the parents' recognition of progress in fourth grade, with their claim that the April 2010 IEP—designed to build on that progress—constituted more of the same old strategies.

### 2) Behavioral strategies and interventions

Throughout Drew's education in Douglas County, the School District "regularly addressed behavioral issues, as they arose, with the cooperation of Petitioner's parents." *See Endrew F.*, 2014 U.S. Dist. LEXIS 128659 at *39. "The record reveals that [the School District] was addressing Petitioner's behavioral issues, in order to allow him better access to education, and that Petitioner's parents were involved in the management thereof." *Id.* at **40-41.

For example, in 2007 and 2008, a Behavioral Intervention Plan ("BIP") was in place for Drew. The BIP addressed his fixation on objects and routines, and the resulting anxiety or frustration-related behaviors such as tantrums and wetting pants. [ROA Vol. III, at 167-168.] [5] Petitioners mistakenly claim that the 2007 BIP "addressed only one behavior—a fixation on a classroom timer—and did not address the many other problem behaviors that impeded Drew's learning." Even a cursory glance at the BIP, however, reveals that this is incorrect. Rather, the

---

[5] Petitioners claim that the 2008 IEP indicated that Drew needed a behavior plan, but that none was in place. Petitioners simply ignore the 2007 BIP. While the 2007 BIP was not formally incorporated by reference into the 2008 IEP, the IDEA does not require any such process. Nor are BIPs subject to the same procedural requirements as IEPs generally, which include the need for an annual review. *See, e.g.*, *Indep. Sch. Dist. No. 11 v. Renollett*, 440 F.3d 1007 (8th Cir. 2006) (a compliant BIP does not even need to be in writing); *E.H. v. Shenendehowa Central Sch. Dist.*, 361 F. App'x 156 (2d Cir. 2009) (a BIP need not be formalized or labeled a BIP to meet the requirements of IDEA, where the IEP itself identified techniques to address behavioral issues).

classroom timer was simply an <u>example</u> of an object on which Drew might fixate. [ROA Vol. III, at 167 ("When Drew is fixated on an object <u>such as a timer</u> …") (emphasis added).] More broadly, the behavioral goal was the overall reduction of "incidents of tantrums/wetting pants," and, in addition to the timer fixation, included responses to behaviors such as "not following directions or refusing work" and "when Drew runs away." [*Id.*]

Another BIP was developed in 2009 to deal with new behaviors that Drew was exhibiting. These included yelling when frustrated, and getting out of his seat and wandering around the classroom. [*See* ROA Vol. III, at 247.] The 2009 BIP also included preventive strategies, direct teaching of skills, and responses to specific behaviors (*e.g.*, if Drew yells out in class, have him "write related sentences in an area near his classroom and then go back to class to complete assignment"). [*Id.* at 247-248.] These strategies were directly responsive to Drew's unique needs.

Moreover, numerous behavioral strategies and supports were embedded in the IEPs themselves. Every IEP in the record addressed Drew's behavioral and functional issues, with accommodations like a visual schedule and visual work system, preferential seating, movement and sensory breaks, sensory strategies (*e.g.*, deep pressure, weighted lap pillow), facilitated peer interaction, shortened assignments, and a specific spot for Drew to calm when anxious. [ROA Vol. III, at 161 (2007 IEP); ROA Vol. III, at 203 (2008 IEP); ROA Vol. III, at 239 (2009 IEP).] Even some IEP objectives targeted Drew's behavior and functional needs, such as objectives for social skills, self-advocacy/self-determination, and physical/motor. [ROA Vol. III, at 157-159 (2007 IEP); ROA Vol. III, at 199, 201-202 (2008 IEP); ROA Vol. III, at 233-238 (2009 IEP).]

**2. The April 2010 IEP Addressed Drew's Academic and Behavioral Needs.**

**a. Escalating Behaviors in the 2009-2010 School Year**

During the 2009-2010 school year, Drew began demonstrating an increase in disruptive and problematic behaviors, and "his ability to function at school and access the educational environment became noticeably worse." *Endrew F.*, 2014 U.S. Dist. LEXIS 128659, at *6. Drew's behaviors included climbing on furniture, falling off furniture, eloping, hitting computer or TV screens, kicking others, kicking walls, head banging, and asking others to punish him. *Id*. On two occasions early in the school year, Drew ran from school and when he returned, took off his clothes, and urinated and defecated on the floor of the "calming" room. *Id.*; [*see also* ROA Vol. II, at 241-242 (Test. of A. Holton.][6]

Throughout the fall of 2009, the school team, in collaboration with Drew's parents, made serious and persistent efforts to address Drew's behaviors, and to understand what was causing them. Drew's mother agreed that "as behaviors would come up, [the team] would meet and try to address them." [ROA Vol. I, at p. 212.] The team met in December of 2009 to look at "all of the problems that had occurred that year [and to strategize] and [make] a plan." [*Id.*, p. 188.] As this Court expressly held, "the record reveals that [School District] was addressing [Drew's] behavioral issues, in order to allow him better access to education, and that [his] parents were involved in the management thereof." *Endrew F.*, 2014 U.S. Dist. LEXIS 128659, at **40-41. The Supreme Court's decision did not disturb this holding.

Ms. Holton, Drew's special education teacher, described the school team's philosophy for dealing with behaviors that might interfere with education as an "ABC" method that looked at the antecedents to the behavior, the behavior itself, and the consequences for the behavior. [ROA Vol.

---

[6] Drew's special education teacher testified that this behavior, which was obviously very concerning, was a new behavior at the time. [ROA Vol. II, at 242.] Fortunately, after those initial incidents, the behavior did not recur. [*Id.*]

II, pp. 228-29.] The approach also worked "off of a functional analysis and figuring out what is the driving force behind the behavior, whether it be task avoidance or affiliation … any other reasons [the student] would exhibit a behavior." [*Id.*]

Part of these efforts included tracking the daily behavioral data collected by Drew's teachers in painstaking detail. In doing so, Ms. Holton started noticing a pattern that became pronounced in February and March.

> When we saw the pattern [of behavior in February and March], we decided that we had gathered enough data that it was now time to call in Cora Nash, who is the autism specialist, and Stacy Stressal, who is the behavior specialist, and have them comb through our records and help us troubleshoot what we had a hunch was going on but we weren't quite sure. … We felt like we were in the ballpark, but we just couldn't quite put our finger on exactly what was triggering the morning behaviors.

[ROA Vol. II, at 232.][7]

The timing of the behaviors—in the morning—suggested a number of possible triggers.[8] These included (1) the time at which Drew took his medication, (2) possible sensory overload from the students' morning lineup routine, (3) ritualistic behavior patterns, (4) Drew's impending

---

[7] In support of Petitioners, Amici argued in favor of the use of Multi-tiered System of Supports. (MTSS). MTSS is used by Colorado school districts as a "prevention-based framework of team-driven data-based problem solving … ." *See* Colorado Department of Education MTSS guidance, https://www.cde.state.co.us/mtss. Importantly, MTSS is not a special education instructional method or practice, but refers to a framework through which students receive an increasingly intensive level of support, based upon their individual needs. Drew—who was receiving specially designed instruction individually tailored to meet his unique needs—was at the top of the MTSS "pyramid." He received the most intensive level of support available in the school setting. Further, the inclusion of behavioral and autism specialists to analyze his behavior data to develop appropriate interventions was an example of MTSS at work. *See*, *Video Investigation Guide: Layered Continuum of Supports,* p. 4,
https://www.cde.state.co.us/mtss/layeredcontinuumofsupports.
[8] "Drew typically exhibits this behavior between 8:45 and 10:00 in the morning." [ROA Vol. III, at 258 (2010 IEP).]

adolescence, and (5) a possible impulse on his part to assert more control over his routines and actions at school. [*Id.* at 232-234.] But in order to make programming decisions that would be appropriate for Drew, Ms. Holton consulted with the autism and behavior specialist and convened a team meeting with Drew's parents as soon as possible. [*Id.*][9]

### b. The April 2010 IEP

The last IEP meeting between Summit View and Drew's parents was held on April 13, 2010. [ROA Vol. III, at 236.] Petitioners do not dispute that the IEP team was properly constituted, or that the IDEA's procedural requirements governing the development of IEPs were followed. The IEP team appropriately considered Drew's progress over the previous year, and updated his goals and objectives to reflect his progress, difficulties, and individual preferences. The team's approach was individualized for Drew, and included a consideration of Drew's current levels of performance (his baseline), and then an increase in the "degree of difficulty" to present him with challenges going forward that were age and functionally appropriate. [ROA Vol. II, at 222 (Test. of A. Holton).]

Petitioners assert that "*all* of the comprehension objectives contained in successive IEPs from second to fifth grade were abandoned for lack of progress." [Dkt. No. 46, at 12 (original

---

[9] Petitioners have frequently mischaracterized Ms. Holton's testimony by asserting that the School District "admitted that it was 'unable to discern' any way to prevent his disability-related challenges from impeding his educational progress." [*See, e.g.*, Dkt. No. 46, at 4.] Nowhere did the School District make such an admission, nor did the Court make such a finding. Rather, when the school team analyzed the detailed daily data of Drew's behaviors in the spring of 2010, and saw a pattern showing an "uptick" in problematic behaviors in the mornings, the team was "unable to discern" <u>causation</u>. In other words, it was working through potential triggers for those behaviors. It was <u>not</u> giving up on responding to them. *Endrew F.*, 2014 U.S. Dist. LEXIS 128659, at *40 ("Ms. Holton testified that she was unable to discern causation and, as such, scheduled a meeting with the District Autism Specialist and the Behavior Specialist.").

emphasis).] That assertion is belied by the record. For example, the team modified Drew's reading comprehension objectives to target nonfiction text and the ability to read and follow directions. [ROA Vol. III, at 218; *see also* ROA Vol. III, at 262 ("Drew will read non-fictions texts and answer teacher directed questions from his reading."; "Given a set of directions or steps, Drew will read and follow the directions or steps.".] The goal was to move Drew from a baseline of 50% to one of 80%, and to reduce verbal prompts. [ROA Vol. III, at 262.] Ms. Holton explained that Drew needed to begin working on nonfiction reading, because that was the kind of reading that was necessary as he approached adulthood. This would include everything from academic reading comprehension that would help him access and participate in the general education classroom, to functional reading such as reading recipes or instruction. [ROA Vol. II, at 222.] Indeed, as Petitioners are surely aware, this Court took note of Ms. Holton's testimony. *Endrew F.*, 2014 U.S. Dist. LEXIS 128659, at *27.

Similarly, Drew's writing objectives were designed to teach him new vocabulary that he could then use to answer questions about a nonfiction passage, and also to use appropriate writing conventions to communicate via email. [ROA Vol. II, at 221.] Ms. Holton stated that the focus on email was age appropriate because in fourth and fifth grade, students start communicating more by email, and but was also a positive goal for Drew because of his love of computers. [*Id.*][10]

---

[10] Petitioners contend that even by fifth grade, Drew was "unable to use appropriate conventions (capitals and punctuation) at all. [Dkt. No. 46, at 12.] Once again, this is an unfortunate mischaracterization of the record. The goal referred to in this context is that Drew will use appropriate conventions "to communicate via e-mail." [ROA Vol. III, at 264.] The baseline is zero because "Drew has not yet used e-mail as a regular form of communication." It is <u>not</u> zero because on the basis that know how to use the underlying linguistic conventions themselves.

Drew's math objectives related to counting money, and for multiplication were "bumped up," in addition to having his accuracy "targets" increased. "The objective [for multiplication facts] before was zero through five maybe, and this one is six through ten." [*Id.* at 222.] Drew had not made as much progress in division, so that objective was appropriately continued. [*Id.*] With respect to increasing accuracy:

> [M]ath is something that the accuracy needs to be at 100 percent. And then word problems, the accuracy also needs to be high. I knew when we first introduced those skills that I was not going to be able to get 90 percent accuracy when you take into account … breaking it down and … teaching him the small steps. And so that's why you see over the years the same objective with the criteria moving [towards a] higher-level accuracy.

[*Id.* at 223.]

Communication objectives were also enhanced to incorporate turn-taking and game play, to help Drew interact with typical peers, and develop language that he would use socially. [ROA Vol. III, at 224.] Drew's physical goal was designed to teach and encourage him to use playground swings. During recess, he had been playing with rocks and not engaging with peers; the swinging, by contrast, would provide him with sensory input that would help him self-regulate and engage more appropriately with peers. [*Id.* at 224-225.][11]

Drew's inter-/intrapersonal goals were based on the behaviors that Drew had exhibited during fourth grade, and focused on teaching him to identify feelings and sensory needs. [ROA Vol. II, at 225; ROA Vol. III, at 271.] There was also a goal to have Drew participate in a "job"— a task that can give a student a sense of accomplishment and build self-esteem—with the objective of fostering peer interaction by demonstrating knowledge of their names. [ROA Vol. III, at 272.]

---

[11] Both of these goals served the additional benefit of targeting Drew's social and behavioral needs.

In addition, like all of Drew's previous IEPs, the April 2010 IEP included accommodations to address Drew's behaviors through "visual and/or written schedules as needed, movement and sensory breaks, clear rewards for meeting expectations or finishing work, clear consequences for undesired behavior, [and] use of social stories/social movies."  [ROA Vol. III, at 273.]  And of course, the IEP team scheduled a meeting solely dedicated to addressing Drew's behaviors shortly after the IEP meeting.

As Ms. Holton testified, the educational programming she provided was based on contemporary research, and designed to model best practices.  Ms. Holton noted that, "in teaching, I use task analysis, we use some ABA, we use chaining and backwards and forwards teaching, we use the TEACCH model, we have the PEC system."  [ROA Vol. II at 252.]  "[T]here are times when you teach—or any teacher teaches that you use your best judgment as a teacher, taking in and assimilating information."  [*Id.*]  It is indisputable that the teachers at Summit View were qualified, appropriately trained, and implementing Drew's IEPs with well-founded instructional techniques and methodologies.

Petitioners contend that between second and fifth grade, "only the objective of counting coins continued in Drew's firth grade IEP."  [Dkt. No. 46, at 11.]  But it is not clear why Petitioners think this argument supports their case.  If anything, the fact that second-grade goals were not being addressed by the fifth grade IEP is further evidence of progress.  The second-grade goals were often well behind the goals of the April 2010 IEP.  [*See, e.g.*, ROA Vol. III at 147 (second grade IEP) ("Drew will express desires and emotions with words when prompted."); *id.* at 148 ("Drew will expand his utterances …").]

Notably, the April 13, 2010 IEP meeting occurred immediately before Summit View Elementary went "off-track" for a three week break.[12]  [ROA Vol. II, at 236.]  The meeting immediately thereafter, to address Drew's behaviors, was to include Summit View's autism specialist, its behavior specialist, Drew's speech/language and occupational therapy providers, his social worker, his special education teacher (Ms. Holton), and Drew's parents.  [ROA Vol. II, at 228.]  Ms. Holton prepared for the meeting during the "off-track" period by extensively consulting with the autism specialist.[13]  <u>This was not the picture of a team looking to short-change Drew</u>.

By the time school resumed, however, Drew's parents had already withdrawn him from the School District, and unilaterally placed him at Firefly.  Drew's mother admitted that by the April 2010 meeting, she had already determined that Drew's placement would be at Firefly, and as a result, later refused to participate in the behavior meeting.  [ROA Vol. II, at 215 ("I knew at that time that his placement was going to be elsewhere.").]  Nevertheless, the school team went ahead with the meeting, feeling that it was important because they had already gathered so much useful data, and consulted with the autism and behavior specialists.  Ms. Holton stated:

> We had the meeting just because we had collected so much data and we had already called Stacy and Cora.  We felt as a team we needed to go ahead and have the meeting and capture our thoughts on paper in case Drew returned to Summit View, then we would have the most current document.  We left it in draft form so that if Drew did return, mom and dad could have input on that document.  But we felt it was important just to capture kind of our train of thought, some techniques that we were going to try, some behaviors that we had seen and how we were going to address that.

---

[12] At that time, Summit View used a "track" scheduling system that involved four tracks, each one with nine weeks of school followed by a three-week break.  [ROA Vol. II, at 192.]

[13] In terms of actual school days, the meetings to develop the April 2010 IEP and the behavior plan were scheduled close to one another.  Drew would have been in school for only one day before the behavior meeting was held.

[ROA Vol. II, at 237-38.]

Petitioners' suggestion that the School District was doing as little as it could for Drew is entirely rebutted by even a cursory review of the record and Ms. Holton's testimony. The evidence demonstrates that the School District's offer of FAPE in 2010 was not merely a rehashing of old strategies, or an attempt to provide Drew with the "bare minimum." [Dkt. No. 46, at 25.] Rather, the school team worked exceedingly hard—in collaboration with Drew's parents—to respond to Drew's educational and behavioral needs as they arose. These efforts including numerous productive meetings, efforts to "brainstorm" the problem, extensive data collection, and consultation with an autism and behavioral specialists. In short, the IEP team made every effort to create a challenging IEP, with goals addressing Drew's unique needs and circumstances.

Later, in November 2010, the School District even presented the parents with another IEP, which included the completed behavior plan that had been drafted in the spring of 2010. The November IEP further increased and refined Drew's social objectives. It even incorporated information based upon Firefly's observations about Drew's present levels of performance. *Endrew F.*, 2014 U.S. Dist. LEXIS 128659, at *24. Though the parents once again rejected the School District's IEP, the IEP developed and implemented at Firefly used, "at least in part, the goals and objectives contained in the District's final proposed IEP." *Id. at *25.

### c. Firefly

In May 2010, Drew's parents unilaterally placed him at Firefly. Firefly is a private, center-based therapy center for students with "challenging behaviors." [ROA Vol. II at 56.] The center is dedicated to the use of applied behavioral analysis (ABA), a methodology that uses reinforcements to increase positive behaviors and decrease negative behaviors. [*Id.* at 58-59.]

From an academic perspective, the focus of the programming at Firefly was remarkably similar to that at Summit View. The Firefly team even worked from the same IEP goals that had been developed in the April 2010 IEP. By the beginning of July, Drew had mastered some of the April IEP goals, and those that he did not master were continued or modified. [ROA Vol. II, at 93-94.] Similar to his progress at Summit View, Drew made progress on some goals, needed time to keep working on others, and altered some because they were not quite right for him or not applicable. [*Id.*] Drew's teacher at Firefly agreed that the goals in the 2010 IEP were important goals for Drew. [ROA Vol. II, at 141.] In other words, both the goals at Summit View and at Firefly were appropriately ambitious and challenging.

The behavioral goals and interventions in each setting were similar as well. For example, Firefly worked on Drew's functional communication to increase his ability to express his wants and needs rather than using screaming or other negative behaviors. [ROA Vol. II, at 108-109.] Likewise, at Summit View, Drew's behavior plan focused on functional communication. [*E.g.*, ROA Vol. III, at 244.] At Firefly, Drew's teacher targeted problem behaviors that she wanted to see reduced and replaced with other, more appropriate behaviors. The school team at Summit used a similar analysis in their approach to Drew's behaviors, as described by Ms. Holton. [ROA Vol. II, at 228-29.]

As Drew's teacher at Firefly noted, Drew continued to exhibit behavioral difficulties, particularly as he progressed in his education. She stated: "[W]hen we increase the demand for him and put more difficult demands on him, we are going to see an increase in behaviors. … A lot of his behaviors are maintained by escape, and he wants to escape those tasks. So we'll see a lot more of those behaviors when we're applying harder tasks for him and harder demands on him."

[ROA Vol. II, at 152-153.]  Firefly, unsurprisingly, was encountering the same challenges that Summit View had.

Petitioners highlight a number of behavioral "successes" at Firefly.  These include overcoming a fear of dogs, a fear of flies, developing better table manners, and being able to board a plane.  The School District does not discount these successes, or suggest that they do not represent important life skills.  However, a fear of flies, dogs, and boarding airplanes never interfered with Drew's ability to access education at Summit View.  [ROA Vol. II, at 399-400.] Put simply, the life skills that Firefly worked on were not necessary for Drew to receive a FAPE.

Another significant limitation of the program at Firefly was that Drew had no access to typically developing peers, and the academics were not aligned with state standards.  These are two essential mandates of the IDEA.  Firefly's clinical director claimed that "our goal is always for our kids to get back to their community," and that "we believe it's best for kids to be in their home schools and accessing a least restrictive environment." [ROA Vol. II, at 68.] Yet at the time of the administrative hearing, after two years of therapy at Firefly, Drew was no closer to being educated with typically developing peers.  Even now, Drew has been at Firefly for seven years, and is still being educated only with other students who present with disabilities.

By contrast, at Summit View, Drew had daily interactions with typically developing peers, including at recess, lunch, "specials," and other times of the school day.  [ROA Vol. II, at 245-49.] He even sometimes went to general education classrooms to participate in reading time or snack. Drew had friends with whom he sat with at lunch, and who eagerly greeted him in the hallways and joined him during recess.  [*Id.*]  Unfortunately, this critical aspect of his education is completely absent at Firefly.  Finally, the record is clear that Drew's educational program at Firefly

is not aligned with Colorado's educational standards. Whereas Drew's IEPs developed by the School District were written with those standards in mind, Firefly need not comply with those standards. [ROA Vol. II, at 144; *see id.*, at 208.]

## STANDARD OF REVIEW

The IDEA provides that a district court must independently review the administrative record and apply a preponderance of the evidence standard to decide if the requirements of the IDEA have been met. *See* 20 U.S.C. §1415(i)(2)(C); *L.B. v. Nebo Sch. Dist.,* 379 F.3d 966, 973-74 (10th Cir. 2004). The district court must "give 'due weight' to the hearing officer's findings of fact, which are considered prima facie correct." *Id.* at 974.

Further, the School District's IEP must be presumed to be appropriate. The *Endrew F.* decision did not disturb the rule that, as the party challenging the IEP, Petitioners bear the burden of establishing a violation of the IDEA. *See Schaffer v. Weast*, 546 U.S. 49 (2005); *see C.G. v. Waller Indep. Sch. Dist.*, 2017 U.S. App. LEXIS 11139, *7 (5th Cir., June 22, 2017) ("The burden of proof to overcome the legal presumption that the education program developed by the child's school is appropriate rests on the parents.") (*citing Schaffer*, 546 U.S. at 57-58); *Board of Educ. of Albuquerque Public Schools v. Maez*, 2017 U.S. Dist. LEXIS 120600, at *12 ("IDEA creates a presumption in favor of the educational placement established by the child's IEP, and the party attacking its terms should bear the burden of showing why the educational setting established by the IEP is not appropriate.") (internal brackets and quotation marks omitted).

## ARGUMENT

Under the IDEA, public school districts are required to provide children with disabilities a "free appropriate public education" by providing special education and related services

individually tailored to meet the student's unique needs, aligned with the state's educational standards, and provided in conformity with an IEP that is developed according to the Act's procedures. *See* 20 U.S.C. § 1401(9); 23 C.F.R. § 300.17.

**1. The April 2010 IEP Provided Drew With A Free Appropriate Public Education.**

The appropriateness of an IEP generally involves a two-pronged analysis. First, a court evaluates whether the IEP was developed in accordance with the IDEA's procedural requirements. *See Rowley v. Board of Education*, 458 U.S. 176, 206-207 (1982). Second, the court looks to whether the resulting IEP was reasonably calculated to enable the child "to make progress in light of the child's circumstances." *Endrew F.*, 137 S. Ct. at 1001. If Petitioners cannot meet their burden to establish a violation, the IEP is appropriate under the IDEA.

**a. The April 2010 IEP Was Developed In Compliance With The IDEA's Procedural Requirements And Is Thus Entitled to Substantial Deference.**

The IDEA includes extensive procedural requirements governing the development of the IEP. These include the requirements that it be developed by a team of individuals with knowledge about the child, and that it be based upon the input of the IEP meeting participants, as well as evaluative data derived from valid, scientifically based assessments conducted in accordance with the IDEA's requirements. *See, e.g.*, 34 C.F.R. §§ 300.301-300.304 and 300.320-300.324. In *Rowley*, the Supreme Court stressed the importance of compliance with the IDEA's procedural requirements:

> [W]e think that the importance Congress attached to these procedural safeguards cannot be gainsaid. It seems to us no exaggeration to say that Congress placed every bit as much emphasis upon compliance with procedures giving parents and guardians a large measure of participation at every stage of the administrative process, as it did upon the measurement of the resulting IEP

> against a substantive standard. We think that the congressional emphasis upon full participation of concerned parties throughout the development of the IEP … demonstrate[s] the legislative conviction that <u>adequate compliance with the procedures prescribed would in most cases assure much if not all of what Congress wished in the way of substantive content in an IEP</u>.

*Rowley*, 102 S. Ct. at 205-206 (emphasis added, internal citations omitted).

While Petitioners initially objected to some of the procedural aspects surrounding Drew's IEPs, they declined to appeal the Tenth Circuit's rejection of their claims to the Supreme Court. For that reason, there is no present dispute that Drew's IEP was developed in full compliance with the IDEA's requirements, which afforded Drew's parents a large measure of participation at every turn. The IEP meeting included all of the necessary stakeholders and participants, and the resulting document reflected the team's thorough consideration of Drew's unique needs and abilities from an academic, behavioral, and functional perspective. As the *Rowley* Court stated above, in most cases, procedural compliance alone will lead to substantive adequacy.

**b. The April 2010 IEP Was Reasonably Calculated To Enable Drew To Make Progress In Light Of His Circumstances.**

With respect to the substantive appropriateness of the IEP, the question is no longer one of whether a child's IEP must be reasonably calculated to guarantee "some educational benefit" or a "meaningful educational benefit." *See Endrew F. v. Douglas Cnty. Sch. Dist. Re-1*, 798 F.3d 1329, 1339-40 (10th Cir. 2015). Rather, the Supreme Court made clear that its focus was instead on how a school district could "enable" a child to make reasonable progress. *Endrew F.,* 137 S. Ct. at 999.

To be clear, an analysis of the substantive appropriateness of an IEP is a forward-looking inquiry. A student's substantive right is to the <u>reasonable calculation</u> of his or her appropriate progress by an IEP team. As this Court is aware, "the measure and adequacy of an IEP can only

be determined at the time it is offered to the student, and not at some later date … Neither the statute nor reason countenance 'Monday Morning Quarterbacking' in evaluating the appropriateness of a child's placement." *See O'Toole v. Olathe Dist. Schs. Unified Sch. Dist. No. 233,* 144 F.3d 692, 701-02 (10th Cir. 1998).

Further, the question is whether the progress contemplated by the IEP is reasonable, "not whether the court regards it as ideal." *Endrew*, 137 S. Ct. at 992. The *Endrew* Court stated that "the adequacy of a given IEP turns on the unique circumstances of the child for whom it was created. The absence of a bright-line rule, however, should not be mistaken for an invitation to the courts 'to substitute their own notions of sound educational policy for those of the school authorities which they review.'" *Endrew*, 137 S. Ct. at 1001 (quoting *Rowley,* 102 S. Ct. at 206).

As the Supreme Court noted, a court may fairly expect school personnel "to be able to offer a cogent and responsive explanation for their decisions that shows the IEP is reasonably calculated to enable the child to make progress appropriate in light of his circumstances." *Endrew*, 102 S. Ct. at 1002. Unsurprisingly, this court's inquiry thus includes a deferential review of "the application of expertise and the exercise of judgment by school authorities." *Id.*; *see also Smith v. Cheyenne Mountain Sch. Dist. 12*, 2017 U.S. Dist. LEXIS 100475, *44 (D. Colo., May 11, 2017) ("[E]ducation of minors is generally a matter for local and state governments' educational agencies, not federal courts.").

Thus, with respect to the question of whether the IEP was calculated to enable Drew to make progress in light of his circumstances, it is important to remember what Drew's circumstances were (and continue to be). He is a child with autism, ADHD, and exceedingly low cognitive skills, whose disabilities significantly impede his ability to access education. He has

serious behavioral problems, and pronounced sensory needs. *Accord K.D. v. Downingtown Area Sch. Dist.*, 2017 U.S. Dist. LEXIS 141428, *24 (E.D.Pa., Aug. 31, 2017) (after *Endrew F.*, a student's potential "progress must necessarily be considered in light of the fact that she suffers from a severe learning disability and ADHD.")

The School District's April 2010 IEP unquestionably addressed those needs. As described above, Drew's IEP was developed by dedicated, qualified teachers and service providers, as well as by Drew's parents. Academically, it included educational goals aligned with Colorado standards, and provided Drew with increasingly challenging and difficult objectives. Behaviorally, it provided Drew with accommodations to meet his unique autism-related needs (including sensory accommodations for emotional regulation, movement and sensory breaks, visual or written schedules, clear expectations and consequences, social stories, etc.), as well as a behavior plan developed based upon a functional analysis of the causes of his behaviors and strategies to address them. The IEP's goals and objectives built on Drew's progress on previous IEPs. Indeed, these same IEP goals developed by the School District were used by Firefly, whose staff testified that the IEP goals were important for Drew. [ROA Vol. II, at 141.]

Further, Amy Holton, Drew's special education teacher at Summit View, gave detailed testimony about the IEP's objectives, and the school team's behavioral approach. As Ms. Holton explained, "I have to take the child into consideration where they are, take in state standards and everything I know about a student … But we take the child where they are. I have to forecast where I think I can—we can get them reasonably in a year." [ROA Vol. II at 281.] Ms. Holton is certified and licensed, and has training in research-based educational practices and interventions for children with autism. Her testimony was deemed credible and reliable, and was given weight

by both the ALJ and this Court.  Consistent with the Supreme Court's reasoning, the school staff provided a "cogent and responsive explanation" for the 2010 IEP.  In short, every indicator of reliability set out in the Supreme Court's *Endrew F.* decision has been met in this case.

Lower court opinions issued since *Endrew F.* support the School District's position. In *Board of Education of Albuquerque Public Schools v. Maez*, 2017 U.S. Dist. LEXIS 120600 (D.N.M, Aug. 1, 2017), a student with autism exhibited significant delays in cognitive abilities, sensory processing, communication, and daily living skills.  He had difficulty focusing on academic tasks, had a pattern of elopement, was fixated with doors, and showed no awareness of danger.  The school district used an intensive support program classroom, rather than an "Emerging Autism" classroom, because the school team determined that the student needed attention to his global deficits.  The student's parents objected to the ISP classroom because they wanted the student educated exclusively using ABA principles, rather than the "hybrid" of strategies offered by the school district in the ISP classroom.

Accordingly, the parents removed the student from school and provided him with private, in-home clinical services from a Board Certified Behavior Analyst (BCBA) who educated him using ABA.  The BCBA testified that without ABA, the student could not make progress.  The hearing officer even agreed, finding that the school district's failure to provide autism-specific methodologist needed by the student was unacceptable, and that the school district's failure to provide the student with the FBA or BIP identified in his IEP denied him a FAPE.

However, the district court rejected the hearing officer's analysis, and reversed.  Relying on the Supreme Court's holding in *Endrew,* the court concluded that M.M. made progress relative to the severity of his disabilities, and his IEP was reasonably calculated to enable him to progress

in light of his circumstances. With respect to the parents' argument that M.M. required ABA strategies in order to make benefit, the district court noted that the school district's IEP did incorporate ABA strategies and techniques, and that a "strict ABA program is not the only way to provide autism-specific interventions in the classroom setting." *Maez*, 2017 U.S. Dist. LEXIS 120600, at *18. The district court found that the IEP team took M.M.'s individual needs and abilities into account and employed research-based strategies appropriate to M.M. As M.M.'s teacher testified, "evidence-based practices include methodologies other than ABA." *Id.* at *20. M.M.'s program "incorporated numerous teaching techniques, including ABA, which in total were appropriately ambitious and likely to provide M.M. with some educational benefit in light of his unique circumstances." *Id.* at **22-23.

Similarly, in this case, Drew's April 2010 IEP built on successes from previous years and was developed taking his needs and abilities into account. Petitioners contend that Drew requires the intensive ABA-based interventions available at Firefly. But as this Court has found, Drew was able to make meaningful progress in a special education classroom that provided services appropriate to students with autism, implemented by trained staff using evidence-based practices, including ABA. "A school district is not required to offer and implement the particular program and services preferred by a parent," and "[q]uestions of methodology must be left to the school district." *Maez*, 2017 U.S. Dist. LEXIS 120600, at *22.

Courts after *Endrew F.* have also recognized that a student's circumstances will obviously guide the measure of how ambitious an IEP can be. In other words, individualized educational plans need not overwhelm students with unrealistic expectations. *See A.G. v. Bd. of Educ. of the Arlington Cent. Sch. Dist.*, No. 16 CV 1530 (VB), 2017 U.S. Dist. LEXIS 47743, *24 (S.D.N.Y.,

March 29, 2017) ("Ultimately, the record and decisions below confirm that even though J.G. was noted as 'progressing inconsistently' in the area of writing, this is insufficient to conclude the IEP for the 2013-2014 school year was inadequate."); *see also K.M. v. Tehachapi Unified Sch. Dist.*, 2017 U.S. Dist. LEXIS 52179, *45 (E.D. Cal., April 5, 2017) ("The IEP annual goals must meet a student's needs, but the IDEA does not require that they have a one-to-one correspondence with specific needs. So long as the goals, as a whole, address the student's needs and enable progress appropriate in light of the student's circumstances, the IEP is appropriate.").

Petitioners attempt to support their argument with post-*Endrew* case law, but those efforts fail. First, Petitioners' reliance on *Paris School District v. A.H.*, 2017 U.S. Dist. LEXIS 50042 (W.D. Ark., April 17, 2017), is misplaced. In that case, the school district's behavior plans for a child with autism were lumped the category of "noncompliant behavior," and completely ignored the nuances of behaviors that manifest with autism. *Id.* at *23. By contrast, Drew's IEPs and behavior plans delineated different behaviors, and provided specific interventions for specific behaviors as diverse and specific as "climbing on furniture," "hitting computer/TV screens," "yelling/screaming," "kicking people and walls" and "head banging." [ROA Vol. III, at 243-244.]

For the same reason, Petitioners' reliance on *Pocono Mt. Sch. Dist. v. J.W.*, 2017 U.S. Dist. LEXIS 145491 (M.D. Pa. Sept. 8, 2017), is also unwarranted. In that case, the school district failed to adequately address the child's behaviors, resulting in a denial of FAPE. *Id.* at *24 (school district knew "that Student's serious behavioral issues were impeding his education," but "the various IEPs inadequately addressed and/or did not address these behaviors"). Here, by contrast,

this Court has already found that the School District was properly addressing Drew's behavioral issues.[14]

### 2. Drew's Progress At Firefly Is Not Relevant To The Question Of Whether The School District Offered Him A FAPE.

When parents seek reimbursement for a private placement, the test is not whether the School District's 2010 IEP was as good as, or better than, the education Drew was receiving at Firefly. The School District's IEP must be judged on its own, not by comparison to the private school program. *See Rockwall Indep. Sch. Dist. v. M.C.,* 816 F.3d 329, 339 (5th Cir. 2016) (if parents fail to satisfy their burden of showing that an IEP calling for placement in public school was inappropriate, "then there is no need to inquire further as to the appropriateness of the private school placement."); *G.D. v. Westmoreland Sch. Dist.,* 930 F.2d 942, 948 (1st Cir. 1991) (an IEP "may not be the *only* appropriate choice, or the choice of certain selected experts, or the child's parents' *first* choice, or even the *best* choice" yet still provide FAPE) (emphasis in original). Thus, whatever the quality of the services at Firefly, they cannot serve as the benchmark for the appropriateness of the School District's IEP.

It would be an odd result for this Court to conclude that Petitioners are entitled to compensation for private placement, simply because Summit View could never, as a legal reality, replicate the setting of a school run outside the auspices of the IDEA. Furthermore, though Petitioners contend that the only method to provide Drew with a FAPE is through an ABA-based

---

[14] Petitioners argue that even if progress was reasonably calculated, the *Endrew F.* decision added a new, separate question for judicial review: whether a student's goals were challenging. [Dkt. No. 46, at 25.] But Petitioners offer no analysis as to how this inquiry is distinct from the inquiry into a reasonable calculation of progress. Indeed, Petitioners imply that Drew's goals were *too* challenging, because they had to be continued when he could not meet them. [Dkt. 46, at 10-14.]

program such as that at Firefly, federal courts have consistently rejected the argument that parents may dictate or that FAPE is dependent upon the use of a particular methodology. *See Board of Education v. Rowley*, 458 U.S. *at* 208 (questions of methodology are for resolution by the states or school authorities); *Board of Educ. of Albuquerque Public Schools v. Maez*, 2017 U.S. Dist. LEXIS 120600, at *18 (D.N.M. Aug. 1, 2017). Put simply, the School District does not dispute that Drew made educational progress at Firefly. But the record is equally clear, and this Court has found, that Drew made meaningful educational progress in the School District as well. Without more, that finding should be dispositive. *See C.D. v. Natick Pub. Sch. Dist.*, 2017 U.S. Dist. LEXIS 113970, *4 (D. Mass., Jul. 21, 2017) ("[T]he standard articulated in *Endrew F.* is not materially different from the standard … that an IEP must be reasonably calculated to confer a meaningful educational benefit.").

### 3. The Tenth Circuit's Language That This Was a "Close Case" is Mere *Dicta.*

Petitioners rely heavily on the statement in the Tenth Circuit's earlier opinion that this was a "close case." Indeed, that statement, combined with the Supreme Court's statement that its new standard is markedly more demanding, is the crux of Petitioners' legal argument. However, the statement does not bind this Court on remand.

First, the statement constitutes *dicta* that played no part in its affirmance of the District Court. As this Court is aware, it is not bound by *dicta*. *See United States v. Chavez-Meza*, 854 F.3d 655, 660 (10th Cir. 2017) ("*[D]icta* and unpublished opinions do not bind panels of this court."). Second, the Court's statement that the prior appeal was a close case—even though it ruled in favor of the School District—was not a rule of law decided as a necessary step in resolving the earlier appeal, and is not the "law of the case." *See Sparks v. Rittenhouse*, 314 Fed. Appx. 104,

108 (10th Cir. 2008) ("The law of the case doctrine posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case. … The doctrine of law of the case does not apply to *dicta*.").

Separately, even to the extent that this Court gives effect to the statement that the case was "close," the meaning of the relevant statement is hardly dispositive on the present remand. The legal standard for evaluating an IEP has changed, and contains new elements that alter the nature of the judicial process: were a student's "circumstances" such that appropriate progress was reasonably calculated in his/her IEP?

Thus, the question of whether Drew's April 2010 IEP may have been reasonably calculated to guarantee "some" educational benefit is wholly distinct from whether it was reasonably calculated to provide appropriate progress, *given Drew's unique circumstances*. There is no substantive reason why a court reviewing a "close" case under the prior standard cannot reach the same ultimate outcome under the new standard. Indeed, in cases such as this one, either standard should cause the Court to reach the same conclusion: that the School District provided a FAPE. *Cf. E.G. v. Great Valley Sch. Dist.*, 2017 U.S. Dist. LEXIS 77920, *13 (E.D. Pa., May 23, 2017) (finding that a school district had provided a FAPE even where a student's progress "was 'maddeningly slow' and 'stagnation on tests that link ability to grade level would be a strong indication that progress was not made and usually proves a denial of FAPE.").

Petitioners, by contrast, misread the Supreme Court's opinion. The new standard is *not*, as they appear to hope, just "a lot of progress." For that reason, it is no surprise that the Tenth Circuit declined to adopt Petitioners' syllogism, and instead remanded the matter to this Court for further proceedings.

### 4. At Most, Petitioner's Damages Are Limited To The Period Between April 2010 And November 2010.

To be clear, the only outstanding issue in this case is the adequacy of the April 2010 IEP. After Drew's parents moved him to Firefly, the School District offered another IEP on November 16, 2010, updating and modifying the objectives and criteria to reflect Drew's progress at Firefly. *See Endrew F.*, 2014 U.S. Dist. LEXIS 128659, at *24 (Drew's "objectives for his social goals are increased and more clearly defined."). The parents rejected the November 2010 IEP, and kept Drew at Firefly. Petitioners expressly disclaimed any argument regarding the November 2010 in their brief before the Tenth Circuit. *See* Exhibit 1 (Petitioners' Supplemental Appellate Reply Brief), at 7 ("The November 2010 IEP was no more adequate than the April 2010 IEP. But the simple and dispositive answer is that the November 2010 IEP was crafted after Drew enrolled at Firefly, and so it is not relevant here.").

Having avoided the Tenth Circuit's adverse judgment on the November 2010 IEP on remand, Petitioners may not now switch courses before this Court. *See Johnson v. Lindon City Corp.*, 405 F.3d 1065, 1070 (10th Cir. 2005) ("[J]udicial estoppel protects the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment."). Accordingly, even in the event that this Court holds additional proceedings, and later finds that Drew is entitled to any reimbursement for services at Firefly, that reimbursement must be limited to the time period between May 10, 2010 and November 16, 2010.

Moreover, even Petitioners agree that if this Court, in the future, determines that a FAPE was not provided, the appropriate procedure is not to enter a monetary award, but to determine what remedy should be provided by the School District. *See* Exhibit 2 (Petitioners' Supplemental Opening Brief), at 2 n.1 ("On the other hand, if this Court holds that the school district did not

provide Drew a FAPE, as we urge it to do, it should then remand to the district court for further proceedings on the appropriate remedies—issues that have not been fully ventilated or decided below.").

## CONCLUSION

For the reasons articulated above, the School District respectfully submits that in April 2010, it offered Drew an IEP that provides him with a free appropriate public education, consistent with the Supreme Court's decision in *Endrew F.* Accordingly, judgment should issue in favor of the School District, and all claims and reimbursement sought by Petitioners must be denied. If the Court cannot reach such a holding on the record as it stands, it should order appropriate additional proceedings. Additionally, the School District requests that this Court entertain oral argument at a hearing on the instant question.[15]

Respectfully submitted,

/s/William E. Trachman
William E. Trachman, General Counsel
Wendy Jacobs, Deputy General Counsel
DOUGLAS COUNTY SCHOOL DISTRICT RE-1
620 Wilcox St.
Castle Rock, CO 80104
303-387-0197
wetrachman@dcsdk12.org
wendy.jacobs@dcsdk12.org

---

[15] The School District discloses that in conferral, Petitioners opposed the request for a hearing.

**CERTIFICATE OF SERVICE**

I hereby certify that on November 2, 2017, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following email addresses:

Jack D. Robinson, Esq.
Spies, Powers & Robinson, P.C.
950 South Cherry Street, Suite 700
Denver, CO 80246
robinson@sprlaw.net
Attorney for Petitioner

/s/William E. Trachman
Deputy General Counsel