# CASE NO. 14-1417

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

ENDREW F., A MINOR, BY AND THROUGH HIS )
PARENTS AND NEXT FRIENDS, )
JOSEPH and JENNIFER F., )
)
    Appellants, )
)
    v. )
)
DOUGLAS COUNTY SCHOOL DISTRICT RE-1, )
)
    Appellee. )

---

Appeal from the United States District Court
for the District of Colorado
Civil Action No. 12-cv-2620-DME-MEH

---

### APPELLANT'S SUPPLEMENTAL BRIEF

---

Respectfully submitted on June 8, 2017,

SPIES, POWERS & ROBINSON, P.C.
/s/ Jack D. Robinson

_____
Jack D. Robinson, #22037
950 South Cherry Street, Suite 700
Denver, Colorado 80246
Telephone: (303) 830-7090
Facsimile: (303) 830-7089
Attorneys for Appellant

## Introduction and Summary of Appellant's Position

This Court has ordered the parties to (1) identify the issues remaining for this Court's resolution in light of the Supreme Court's decision in *Endrew F. v. Douglas County School District RE-1*, 137 S. Ct. 988 (2017), and (2) address how the Supreme Court's analysis affects the positions taken by the parties in briefs previously filed in this Court.

Appellant's short answers to the Court's inquiries are as follows:

**1.** The issue remaining for this Court's resolution is whether appellee Douglas County School District provided appellant Endrew F. (Drew) with a free appropriate public education (FAPE) for fifth grade (and thereafter) as required by the Individuals With Disabilities Education Act (IDEA). For the reasons explained below, it did not.

**2.** The Supreme Court's analysis does not affect the *position* appellant previously took in this Court—that the school district failed to provide Drew a FAPE. But the Supreme Court's analysis does affect the proper *outcome* and, indeed, requires reversal of the district court's decision that Drew was provided a FAPE. In ruling in favor of the school district, this Court acknowledged that Drew's claim that he was denied a FAPE presented "without question a close case" under this circuit's "prevailing standard." *Endrew F. v. Douglas Cty. Sch. Dist. RE-1*, 798 F.3d 1329, 1342 (10th Cir. 2015). Because, thereafter, the Supreme Court held that the proper

FAPE standard was "markedly more demanding" than the standard employed by this Court, *Endrew F.*, 137 S. Ct. at 1000, Drew was not provided a FAPE.

In the pages that follow, we first summarize the key facts relevant to the FAPE issue and then explain in more detail why the Supreme Court's decision requires reversal.[1]

**Factual Background**

As this Court is aware, Drew is a child with autism who attended Douglas County public schools through fourth grade. Drew's autism entitled him to special education services under the IDEA, as implemented through annual Individual Educational Programs (IEPs). *See Endrew F.*, 137 S. Ct. at 993-94.

Over Drew's early grade-school years, Drew's parents became increasingly concerned with Drew's lack of behavioral and academic progress. His "IEPs largely carried over the same basic goals and objectives from one year to the next, indicating

---

[1] Because the factual record is fully developed on the FAPE issue, and there is nothing left for this Court to do but apply the Supreme Court's new legal ruling, this Court should decide the FAPE issue rather than remanding for further proceedings. This Court did the same thing last year under similar circumstances after a remand from the Supreme Court. *See Green v. Brennan*, 669 Fed. Appx. 951 (10th Cir. 2016), *on remand from Green v. Brennan*, 136 S. Ct. 1769 (2016). *See also Adarand Constructors, Inc. v. Slater*, 228 F.3d 1147, 1159 n.4 (10th Cir. 2000); *Elkins v. Comfort*, 392 F.3d 1159, 1162 (10th Cir. 2004). On the other hand, if this Court holds that the school district did not provide Drew a FAPE, as we urge it to do, it should then remand to the district court for further proceedings on the appropriate remedies—issues that have not been fully ventilated or decided below.

that he was failing to make meaningful progress toward his [educational] aims." *Endrew F.*, 137 S. Ct. at 996. Toward the end of Drew's fourth-grade year, "the school district presented [Drew's] parents with a proposed fifth grade IEP that was, in their view, pretty much the same as his past ones." *Id.* For that reason, and because Drew had not made any meaningful behavioral or educational progress for the last several years, his parents removed him from public school at the end of fourth grade and enrolled him at Firefly, a school specializing in educating children with autism. *Id.*

No one disputes that shortly after Drew left the school district he was "thriving" at Firefly. *Endrew F.*, 798 F.3d at 1342. He made rapid and significant behavioral progress there, which in turn allowed him to make educational progress in areas on which the public school had failed him entirely. *See Endrew F.*, 136 S. Ct. at 996-97 (explaining that Firefly "developed a 'behavioral intervention plan' that identified Endrew's most problematic behaviors and set out particular strategies for addressing them. Firefly also added heft to Endrew's academic goals. Within months, Endrew's behavior improved significantly, permitting him to make a degree of academic progress that had eluded him in public school.") (citation to record omitted).

About six months after Drew entered Firefly, the school district presented Drew's parents with another IEP, but because it was essentially unchanged from Endrew's previous IEP, Drew's parents rejected it. *See Endrew F.*, 137 S. Ct. at 997. As the Supreme Court observed, Drew's parents "were particularly concerned that the

stated plan for addressing [Drew's] behavior did not differ meaningfully from the plan in his fourth grade IEP, despite the fact that his experience at Firefly suggested that he would benefit from a different approach." *Id.*

Because the parties have been asked to file *supplemental* briefs, and this Court's briefing order acknowledged the briefs already filed in this Court, we do not repeat the factual record wholesale. Instead, we highlight the principal relevant facts in three categories: (1) the inadequacies of Drew's IEPs; (2) Drew's lack of behavioral and academic progress in Douglas County schools; and (3) Drew's experience at Firefly.

**1. The inadequacy of Drew's IEPs**

• The school district never implemented any serious, comprehensive plan for helping Drew manage his autism-related behavioral and adaptive struggles. Although one of Drew's early IEPs, dated October 2007, included a "draft" two-page behavior intervention plan (BIP), it addressed only one behavior—Endrew's fixation on a classroom timer—and did not address the many other harmful behaviors that impeded Drew's learning. App. Vol. 3, at 167-168. This inadequacy does not appear to have been lost on the Supreme Court. Citing the factual record in this case, the Court noted a range of disruptive and education-impeding behaviors and listed Drew's "severe fears of commonplace things" well beyond his fixation on one classroom object. *Endrew F.*, 137 S. Ct. at 996.

• Drew's subsequent IEPs were much the same. The April 2008 IEP lacked any

4

BIP at all, despite a statement in the IEP itself that Drew required one. App. Vol. 3, at 203. The next year's IEP—from April 2009—included what purported to be a BIP, but it lacked specificity. *Id.* at 248-249. For example, the document addressed only two of Drew's disruptive behaviors: 1) Drew "[y]ells out in class"; and 2) "Drew begins to wander the room and removes items from counters and desks." *Id*. Like the 2007 IEP, this IEP did not identify, let alone address, the many other disruptive behaviors that stymied Drew's learning.

    • Finally, Drew's 2010 IEP did not include a BIP at all. App. Vol. 3, at 252. In sum, years after Drew's enrollment in the Douglas County public schools, and years after manifestation of Endrew's many serious behavioral problems, the school district's IEP—the document that is supposed to serve as the "centerpiece" of the IDEA's promise to educate children with disabilities, *Endrew F.*, 137 S. Ct. at 994 (quoting *Honig v. Doe*, 484 U.S. 305, 311 (1988))—contained no plan to tackle those problems.

    • The school district's special education teacher claimed to be "unable to discern" any way to prevent Drew's disability-related challenges from impeding his educational progress. App. Vol. 1, at 99. As Drew grew older, the school district postponed the majority of his academic goals from one year to the next or abandoned them altogether. *See id.* at 14-15. For example, the vast majority of Drew's IEP goals for fourth grade—the grade that became the last straw for Drew's parents—were

5

simply "continued." App. Vol. 3, at 222-238. The next year's IEP year contained even fewer goals than previous years. And, in the words of the administrative law judge, the goals that it did include were "the same or similar" to those from the three previous years. App. Vol. 1, at 14. For instance, for the third consecutive year, the IEP included the goal of learning multiplication for single-digit numbers. *See* Supp. App. Vol. 3, at 197, 229, 266. And the great majority of Drew's IEP goals for fourth grade were "continued," that is, not achieved. App. Vol. 3, at 222-238.

• The school district's inability to formulate IEPs that dealt systematically with Drew's behavior and educational challenges likely stemmed from its failure to perform, at any time, a functional behavioral assessment to determine why Drew engaged in the disruptive behaviors that impeded his learning and to assess how those behaviors related to the school environment.[2] Although conducting a functional behavioral assessment may not be mandatory in any given case, and so the lack of one may not itself constitute legal error, *Endrew F.*, 798 F.3d at 1337, the school district's failure to conduct one and, as a result, to be able to generate a sensible and comprehensive BIP surely contributed to its inability to provide Drew with a FAPE.

---

[2] For an explanation of the central role of a functional behavioral assessment in overcoming serious behavioral problems in children, with particular emphasis on its role in educating children with disabilities, see Amanda Morin, *Functional Assessment: What It Is and How It Works*, https://www.understood.org/en/school-learning/evaluations/evaluation-basics/functional-assessment-what-it-is-and-how-it-works.

## 2. Drew's lack of progress

• It is generally agreed that Drew stopped making educational progress in Douglas County public schools during second grade (2007-2008) as his problematic behaviors began to escalate. Drew had frequent outbursts and suffered from fixations that caused him to disrupt neighboring classrooms and sometimes to crawl over students to get to things. When he was denied a particular object, he would scream, cry, run away to find the object, throw himself on the floor, and, often, wet himself. App. Vol. 3, at 167. He would climb and fall off of furniture, hit the computer and TV screens, scream, kick walls and others, bang his head, and run away. App. Vol. 1, at 7, ¶ 2. Drew was also gripped by extreme fear of flies and spills, and his fear of public restrooms made it nearly impossible for him to go to the bathroom at school. *Id.* at 7, ¶ 2; *id.* at 12, ¶ 43; *id.* at 77.

Not surprisingly, then, though Drew's second-grade IEP included six goals with twenty-six corresponding objectives, App. Vol. 3, at 147-160, twenty-one were abandoned because of lack of progress. App. Vol. 1, at 25-27.

• The next year (third grade, 2008-2009), Drew regressed in several areas, including the skills needed to prepare him for an independent life. App. Vol. 3, at 222 (goal of retelling a passage deemed "no longer appropriate"); *id.* at 230 (regressing in goal of learning division with numbers ranging from 0-5). He was generally unable to express the cause of his feelings to others, *id.* at 271, to learn his peers' names, *id.*

7

at 272, or to put on a coat, *see* App. Vol. 5, at 196-97. Of the twenty-three objectives included in Drew's third-grade IEP, fourteen were eventually abandoned because of lack of progress. *See* App. Vol. 1, at 26. The remaining nine objectives were "continued" to subsequent IEPs for the same reason. *Id.* at 172-174.

• Without receiving any coping mechanisms or therapies from his school, Drew's negative behaviors intensified. He struggled with self-harming behaviors like head banging. On at least two occasions, he ran away from school unattended. App. Vol. 1, at 10, ¶ 22. When he was brought back to school, he became so agitated that he took off his clothing and relieved himself on the floor. *Id.*

**3. Drew's progress at Firefly**

As noted earlier, after years of regression, Drew's parents removed Drew from Douglas County schools after fourth grade and enrolled him in Firefly. This change brought Drew immediate behavioral and educational benefits.

• From the start, the new school recognized that, for Drew to make academic progress, his behavior problems had to be addressed—and addressed seriously and comprehensively. The school instituted a behavioral intervention plan addressing Drew's unique needs. App. Vol. 4, at 113-115. The plan identified each of Drew's problematic "target" behaviors and proposed a specific strategy and therapeutic program to deal with each of them. *Id.* at 113-114, 125-132. To use just one example, to help Drew tolerate feared items such as flies, teachers in the new school

systematically exposed Drew to the items while providing positive reinforcements aimed at improving Drew's tolerance for each item. *Id.* at 114.

- • Along with the behavioral therapy, Firefly enhanced Drew's academic goals without delay. Gone were the days in which Drew's IEP goals were largely repeated year after year, with little effort at improvement. In math, for example, Drew's goals immediately went from mastering multiplication through the "threes" table to mastery though the "twelves" table. App. Vol. 4, at 137. Similarly, when he entered the new school, Drew was able to do no more than distinguish the proper use of addition and subtraction signs. But his new IEP did not accept that as satisfactory; it sought significant improvement, explaining that, with "systematic teaching," Drew would "complete word problems using addition, subtraction, and multiplication." *Id*. And though Drew left fourth grade able to identify time increments on an analog clock only by the hour and half hour, Drew's new IEP expected him, in the coming year, to identify time on a variety of clocks "to the minute." *Id.* at 138.

- • Drew immediately made significant "academic, social and behavioral progress." App. Vol. 1, at 76. Less than four months after entering the new school, Drew "quickly mastered multiplication," *id.* Vol. 7, at 92, learned to type over 17 words per minute, *id.* Vol. 4, at 165, and began identifying emotions in himself and others, *id.* at 161. Within six months, Drew had overcome his fear of public restrooms and the frequency and severity of his behavioral outbursts were greatly reduced,

9

which, in turn, allowed him to progress academically. *See id.* Vol. 4, at 154.

## Application of the Supreme Court's Decision

In *Endrew F.*, the Supreme Court described in some detail what the IDEA envisions as an appropriate education for children with disabilities. Harkening back to its decision in *Board of Education v. Rowley*, 458 U.S. 176 (1982), the Court explained that "the IDEA requires that children with disabilities receive education in the regular classroom 'whenever possible.'" 137 S. Ct. at 999 (quoting *Rowley*, 458 U.S. at 202 (in turn, citing 20 U.S.C. § 1412(a)(5)). Under this system, "yearly advancement to higher grade levels is permitted for those children who attain an adequate knowledge of the course material." *Id.* (quoting *Rowley*, 458 U.S. at 203). This vision of regular, grade-level advancement "through the system," the Supreme Court observed, "is what our society generally means by an 'education.'" And that, the Court emphasized, "is what the IDEA promises." *Id.*

Thus, for "a child fully integrated in the regular classroom, an IEP typically should . . . be 'reasonably calculated to enable the child to achieve passing marks and advance from grade to grade.'" *Endrew F.*, 137 S. Ct. at 999. When year-to-year grade-level proficiency "is not a reasonable prospect for a child, his IEP need not aim for grade-level advancement. But his educational program must be appropriately ambitious in light of his circumstances, just as advancement from grade to grade is

appropriately ambitious for most children in the regular classroom. The goals may differ, but every child should have the chance to meet challenging objectives." *Id.*

In all circumstances—for children capable of regular, grade-level advancement and for those who are not—the IEP must be "*specially* designed" to meet each child's "*unique* needs." *Endrew F.*, 137 S. Ct. at 999 (quoting 20 U.S.C. § 1401(29)) (emphases supplied by the Supreme Court). "A focus on the particular child," the Court explained, "is at the core of the IDEA." *Id.*

The Court concluded its rendition of the FAPE requirement by acknowledging that FAPE is "a general standard, not a formula," and then turned to its principal holding: "But whatever else can be said about it, this standard is markedly more demanding than the 'merely more than *de minimis*' test applied by the Tenth Circuit." *Endrew F.*, 137 S. Ct. at 1000. The Court elaborated:

> It cannot be the case that the Act typically aims for grade-level advancement for children with disabilities who can be educated in the regular classroom, but is satisfied with barely more than *de minimis* progress for those who cannot.
>
> When all is said and done, a student offered an educational program providing "merely more than *de minimis*" progress from year to year can hardly be said to have been offered an education at all. For children with disabilities, receiving instruction that aims so low would be tantamount to "sitting idly ... awaiting the time when they were old enough to 'drop out.'" The IDEA demands more.

*Id.* at 1000-1001 (quoting *Rowley*, 458 U.S. at 179).

Simply put, under the Supreme Court's decision, Drew was not provided a FAPE. As noted at the outset, this Court earlier found, under its then-prevailing

"merely more than *de minimis*" standard, that whether Drew had been provided a FAPE posed "without question a close case." *Endrew F.*, 798 F.3d at 1342. In vacating that finding, the Supreme Court held that the FAPE standard is "markedly more demanding" than the standard this Court had applied. Under the correct standard, then, the school district did not afford Endrew a FAPE. 137 S. Ct. at 1000. Put another way, an unquestionably "close case" that ended in victory for the school district under the "merely more than *de minimis*" standard must, as a matter of logic, end in victory for Drew under the "markedly more demanding" standard articulated by the Supreme Court. This Court could simply say that and little more, and then remand for a determination of the appropriate relief due Endrew's parents.

But the school district's conduct here runs afoul of the Supreme Court's ruling—and thus of the IDEA's FAPE requirement—in at least three other respects. *First*, the Supreme Court observed that a student provided IEPs that offer "merely more than *de minimis*" progress "can hardly be said to have been offered an education at all." *Endrew F.*, 137 S. Ct. at 1001. And a real education is, after all, "what the IDEA promises" for all children with disabilities. *Id.* at 999. Again, because this case was "without question a close" one, what the school district offered Drew was tantamount to an education that barely surpassed no "education at all." Under a statutory regime that demands an education for children with disabilities that is "appropriately ambitious," *id.* at 1000, that will not do.

*Second*, as explained, the Supreme Court held that, under the IDEA, "every child," including children who cannot meet grade-level objectives, must "have the chance to meet challenging objectives." *Endrew F.*, 137 S. Ct. at 1000. The school district's conduct here did not live up to this requirement. Even if we assume that Drew's IEPs sought non-trivial academic progress and that Drew "made *some* academic progress despite his behavioral challenges," *Endrew F.*, 798 F.3d at 1342-43 (emphasis added), no one, including the school district, has argued—nor did this Court suggest—that Drew's IEPs gave him the chance to meeting *challenging* educational objectives. Nowhere in the record is this more obvious than in Drew's transition from the public school to Firefly, where his stagnant objectives in mathematics and telling time (to use just two examples) went from rudimentary at best to much more demanding in a matter of a few months. *See supra* at 9.

*Third*, the Supreme Court's repeated affirmation that an IEP must be tailored to each child's unique needs, *see Endrew F.*, 137 S. Ct. at 999-1001, is particularly salient here. Where, as here, a child's IEPs remained largely moribund year to year, doing little to address that child's obvious and worsening behavioral and academic difficulties, those IEPs cannot have been focused on the child's unique needs. That Drew's IEPs appear to have randomly identified just one or two of his behavioral problems to the exclusion of all others (some quite serious) underscore that they were not trained on Drew's *unique* needs. Perhaps nothing speaks to the school district's

13

disregard for those needs more than its last fifth-grade IEP, presented to Drew's parents after Drew entered Firefly, which "did not differ meaningfully from the plan in his fourth grade IEP, despite the fact that his experience at Firefly suggested that he would benefit from a different approach." *Id.* at 997. For this reason as well, the Supreme Court's decision requires reversal.

## Conclusion

In sum, this Court should hold that appellant Endrew F. was not provided a FAPE, reverse the district court's contrary decision, and remand for further proceedings regarding the remedies due Drew's parents in light of the school district's failure to provide Drew a FAPE.

Respectfully submitted on June 8, 2017,

                                SPIES, POWERS & ROBINSON, P.C.
                                /s/ Jack D. Robinson

                                _____
                                Jack D. Robinson, #22037
                                950 South Cherry Street, Suite 700
                                Denver, Colorado 80246
                                Telephone: (303) 830-7090
                                Facsimile:  (303) 830-7089
                                *Attorney for Appellants*

## CERTIFICATE OF SERVICE

I hereby certify that on June 8, 2017, I electronically filed the foregoing with the Clerk of the Court using the Appellate CM/ECF system which will send notification of such filing to the following email addresses:

| | |
|---|---|
| Caplan & Earnest, P.C. | Douglas County School District |
| W. Stuart Stuller | William Trachman |
| 1800 Broadway, Suite 200 | 620 Wilcox Street, 3rd Floor |
| Boulder, Colorado 80302 | Castle Rock, CO 80104 |
| sstuller@celaw.com | wetracman@dcsdk12.org |
| *attorney for Appellee* | *attorney for Appellee* |

/s/ *Mary Lakey*