IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 12-cv-2620-LTB

**ENDREW F., a minor, by and through his parents and next friends, JOSEPH and JENNIFER F.,**

Petitioner,

v.

**DOUGLAS COUNTY SCHOOL DISTRICT RE 1,**

Respondent.

_____

## PETITIONER'S REPLY BRIEF ON REMAND

_____

Petitioner, Endrew F. ("Drew"), a minor, by and through his parents and next friends, Joseph F. and Jennifer F., through counsel Spies, Powers & Robinson, P.C., submits the following Supplemental Reply Brief on Remand.

## INTRODUCTION

The School District doesn't get it. It clings to the argument that the IDEA's FAPE-implementing provisions are nothing more than a checklist of procedures, requiring only that school staff meet and, at the least, make an effort. Not so. The Supreme Court specifically rejected this argument holding that the FAPE-implementing provisions clearly impose substantive obligations. *Endrew F. v.*

1

*Douglas Cnty Sch. Dist. RE-1*, 137 S.Ct. 988, 1000 (2017).

In *Endrew F.*, the Supreme Court issued a forceful rebuke to the legal standard used by the Tenth Circuit and a number of other circuit courts - on a fundamental right "of critical importance to the life of a disabled child" - concluding that it failed to ensure the child was being "offered an education at all." *Id.* at 1001. According to the Court, the standard used to determine the adequacy of Drew's educational program aimed so low that it was tantamount to allowing him to sit idly by awaiting the time when he was old enough to drop out. *Id.* The Court held that the IDEA demands more - markedly more. *Id.*

By its Response Brief, the School District makes clear that it has no intention of changing the manner in which it develops and reviews IEPs despite the Supreme Court's strong rebuke and the establishment of a "markedly more demanding" FAPE standard. This Court should not condone such intransigence. Doing so would only invite more school districts to do the same.

## ARGUMENT

**A.      The School District Misinterprets and Misapplies the *Endrew F.* Decision.**

The School District's position that the Supreme Court in *Endrew F.* merely

"clarified" the "old 'more than *de minimis*' standard"[1] and just added a couple of elements for the court's inquiry, evidences a serious misunderstanding of the Court's decision and its holding.

In the opening paragraph of the *Endrew F.* decision the Court proclaimed that its prior decision in *Board of Education v, Rowley*, 458 U.S. 176 (1982) held only that the "Individuals with Disabilities Education Act establishes a *substantive right* to a free appropriate public education for certain children with disabilities" and cautioned that the *Rowley* decision *did not* establish a "substantive standard" for determining when that right was satisfied. *Endrew F.*, 137 S.Ct. at 993 (emphasis added). Rather, the Court stated that this "more difficult problem" was being decided for the first time by the Court in *Endrew F.*

The significance of this pronouncement cannot be overstated, in that it resolved a 35-year spilt in the circuit courts and eradicated the precedential effect of prior substantive FAPE standards that relied on *Rowley*. In its analysis, the Supreme Court specifically rejected the School District's argument (there as here) that "procedural compliance alone will lead to substantive adequacy" and that "*any* educational benefit" is enough. *Id.* at 998, 999.

---

[1] Even here, the School District gets it wrong. The FAPE standard in question was "*merely more than de minimis.*"

3

While the School District makes reference to the FAPE standard established in *Endrew F.*, the School District misreads it. According to the School District, for those students who ("with all due respect") have a cognitive disability and who ("sadly") have other disabilities, the school district need only focus on their "circumstances" with little expectation for meaningful progress.[2] *See* Response Brief, 1-3, 21-22. The School District's none too subtle inference that the *Endrew F.* standard is some sort of double-standard that endorses low expectations for children with cognitive disabilities - unlike children with disabilities who are able to aim for grade-level advancement - should not be countenanced. The *Endrew F.* decision specifically cautioned against such a reading. *Endrew F.* 137 at 1000-1001.

Despite Drew's inability to achieve grade-level advancement in all areas, the FAPE standard established in *Endrew F.* makes clear that school districts are required to provide students like Drew a comparably rigorous educational program to those students who achieve on grade level. *See Id.* at 1000 ("It cannot be the case that the Act typically aims for grade-level advancement for children with disabilities who can be educated in the regular classroom, but is satisfied with barely more than *de minimis*

---

[2] With all due respect to Respondent, there is nothing sad about having a disability. Drew's disabilities should be embraced as opposed to pitied. Regardless, the School District's representation that Drew had "exceedingly low cognitive skills," Response Brief, 21, is unjustified and not supported by the record. Rather, the School District uses this to, again, infer that *any* progress is enough progress for a child like Drew.

progress for those who cannot."). The School District refuses to accept this fundamental pronouncement made by the Supreme Court which is reflected in its Response Brief.

**B.      The Tenth Circuit's Determination That Whether Drew Made "Merely More Than *De Minimis*" Progress Was "Without Question a Close Case" Is Not *Dicta*, But a Judicial Opinion That Embodied the Court's Resolution of the Case.**

The School District casts aside as *dicta* this Court's conclusion that whether Drew had been provided a FAPE presented "without question a close case." *Endrew F. v. Douglas Cnty Sch. Dist. RE-1*, 798 F.3d 1329, 1342 (10th Cir. 2015). *See* Response Brief, 27-28. This effort fails.

The closeness of this case under the "merely more than *de minimis*" standard was plainly germane to the Tenth Circuit's FAPE decision. The Court began its discussion of Drew's substantive FAPE challenge by noting that "we *must* first address the parents' contention that our circuit recently shifted the standard with which we measure the substantive adequacy of an IEP" from the "merely more than *de minimis*" standard to a "heightened" standard. *Endrew F.*, 798 F.3d at 1338 (emphasis added).

The Court then discussed at considerable length why circuit precedent bound it to the lower standard. *Id.* at 1338-1340. It was only after that discussion – which would have been unnecessary if a more demanding standard would have led to the

same result – that this Court concluded that the "merely more than *de minimis*" standard had been met.

Moreover, the Tenth Circuit's "close case" opinion was the premise for the Court's concluding paragraph – where it applied the "merely more than *de minimis*" standard to the facts of this case. Thus, the Court began that paragraph by observing that Drew's was "without question a close case" and then found "sufficient indications of Drew's past progress" to render the IEP "substantively adequate" under "our prevailing standard." *Id*. at 1342.

Despite the Tenth Circuit's lengthy analysis about the substantive differences between the "some educational benefit" standard and the heightened "meaningful educational benefit" standard, the Court never hinted that the facts of this case evidenced any thing more than just-above-trivial benefit. Indeed the case was presented on the Parents' argument of no progress and the School District's argument of at least some progress. No party argued that the evidence showed a "meaningful educational benefit" or anything more than some progress.

It is against this backdrop that a case previously viewed as unquestionably close and decided in the school district's favor under a standard set at just-above-*de minimis* should, as a matter of logic, be decided in Drew's favor when gauged against a standard that is "markedly more demanding" of the school district (and thus markedly

more favorable to Drew).[3] *See Endrew F.*, 137 S. Ct. at 1000.

**C.     This Court Found, and the Supreme Court So Observed, That the Modifications to Drew's IEP Objectives over the Years  Evidenced Only "A Pattern Of, at the Least, Minimal Progress."**

Just as the Tenth Circuit's "close case" finding was not mere *dicta*, this Court's statement - based on its review of the administrative record - that there was evidence of "at the least, minimal progress," is a judicial opinion that embodied its resolution of the central issue about whether Drew's IEPs afforded him the ability to make "some progress" according to the Tenth Circuit's then applicable FAPE standard. *Endrew F. v. Douglas Cnty Sch. Dist. RE-1*, 2014 U.S. Dist. LEXIS 128659, *25 (D. Colo. Sept. 15, 2014).

The Parents argued to this Court - and presented expert testimony - that Drew's IEPs revealed "an almost complete lack of progress." *Id.* at *16, 25.  The School District for its part did not argue that Drew made meaningful, or even measurable, progress.  Rather, the School District argued that "while not always consistent or as robust as the IEP team would have hoped, Petitioner did in fact make educational/functional progress. . . ." *Id.*

The focus certainly was not on an "ambitious" educational program designed

---

[3]  The School District mistakenly asserts that by remanding this case to the district court the Tenth Circuit declined to adopt this reasoning.  It did nothing of the sort.  Because a circuit court is a "court of review, not first view," *Shirk v. United States*, 773 F.3d 999, 1007 (9th Cir. 2014), it is no surprise that the Tenth Circuit remanded the case to this Court to enter judgment.

and implemented to "meet challenging objectives," that addressed all of Drew's unique circumstances. *Endrew F.* 137 S. Ct. at 1000. Rather, the inquiry was about whether the modifications to IEP objectives - some that were carried over from year to year, some that were abandoned for lack of progress, and some that were "only slightly modified" over the years - evidenced "some progress." *Endrew F.*, 2014 U.S. Dist. LEXIS 128659, * 30. Notably, this case epitomized that "close case" between no progress and just-above-trivial progress..

No doubt this Court does not need the parties to further parse the IEP objectives that, according to the Court, were "only slightly modified." *See Id.* However, the School District's attempt to turns these lemons into lemonade cannot go unaddressed.

The School District points to Drew's reading comprehension objectives as evidence of "some progress." However, even a lay person can easily discern that they demonstrate the opposite:

1.     Drew's 2007 (2nd Grade) IEP contained five reading comprehension objectives: 1) "Using Story Grammar Marker Drew will be able to identify the beginning, middle, and end of a story"; 2) "After reading a simple sentence Drew will answer simple WH questions using pictures/words cards for prompts;" 3) "After reading a short story, Drew will answer a simple question about the story by writing a simple sentence;" 4) "Given pictures/word card for prompts Drew will predict what

happens next in a story;" 5) "After listening to a simple sentence Drew will answer simple questions about the sentence using visual prompts." ROA III, 149-151. The baseline for all of these objectives indicate that Drew "Does not participate" (has no discernable skill) on any of these objectives[4] and there is no measurable progress noted. *Id.*

2. Drew's 2008 (3rd Grade) IEP *abandoned all* of these reading comprehension objectives and included just two different ones: 1) "Given text at an instructional level, Drew will read a passage and retell it in logical sequence providing 1-2 details and answering WH questions about the passage;" and 2) "Given a text at an instructional level, Drew will be able to make predictions and draw simple inferences from the story." *Id.* at p. 191. No progress at all is noted on these two objectives. *Id.* For the first objective the IEP states that "Drew currently needs a lot of support," and on the second it states that Drew "Does not participate." *Id.*

3. Drew's 2009 (4th Grade) IEP contained two reading comprehension objectives: 1) "Given text at an instructional level, Drew will read a passage and retell it in logical sequence;" 2) "Given a text at an instructional level, Drew will be able to answer why and how questions as it relates to the information read." *Id.* at pp. 222-

_____

[4] The baseline for the second objective states that Drew "Participates with maximal *physical* assistance," which simply makes no sense as there is nothing physical about answering a question. ROA III, 149 (emphasis added).

223. As is evident, the first objective was continued virtually verbatim from the previous IEP and split into these two objectives, and the second objective from the previous IEP was abandoned altogether. The 2009 IEP documents that these two objectives were thereafter abandoned by April 2010. *Id.*

4. Drew's 2010 (5th Grade) IEP abandoned the previous two IEP objectives and replaced them with one reading comprehension objective: "Drew will read non-fiction texts and answer teacher directed questions from his reading."[5] *Id.* This objective is objectively less challenging than the previous year's objectives and demonstrably simpler than Drew's reading comprehension objectives from 2nd Grade.

The other IEP goals and objectives fare no better. In its Response Brief, the School District grossly exaggerates the exceedingly minimal gains reflected in the IEPs to somehow suggest that Drew was making progress. Yet, the School District ignores the fact that Drew's IEPs never changed over the years in any meaningful way. This Court already performed a careful review of the record and concluded that the IEPs were substantially similar and that modifications made to certain IEP objectives over the years revealed only a pattern of "some progress."[6] *Endrew F.*,

---

[5] The 11/10/2016 IEP developed by the School District contains this single reading comprehension objective verbatim with the identical baseline. ROA IV, 15.

[6] The School District's assertion that this Court found the modifications to these objectives to reveal "meaningful educational progress," Response Brief, 27, is a serious misreading of this Court's opinion and is contrary to the readings of the Tenth Circuit, *Endrew F.* 798 F.3d at 1329, n. 10, and the Supreme Court, *Endrew F.*, 137 S. Ct. at 997.

2014 U.S. Dist. LEXIS 128659, *30.

It is not surprising that the School District's Response Brief focuses mainly on the efforts it made on complying with the procedural requirements of the IDEA. *See* Response Brief, 15. However, procedural compliance is a given and only a part of the equation that is not at issue here. Despite this, the School District makes too much of its "efforts" which it asserts includes: "extensive data collection" (simply non–existent); "numerous productive meetings" (only evidence of annual IEP review meetings as required by the IDEA); and "consultation with an autism and behavioral specialist" (if this occurred it happened only after Drew had already been removed from school (see below)). *See* Response Brief, 15.

It is important not to forget that the administrative record (which includes Drew's entire educational records) does not contain any actual data of any kind related to Drew's IEP goals and objectives. There is no document that measures or records Drew's work on these goals and objectives or what progress, stagnation or regression he might have experienced. There are no examples of Drew's work on anything. There is no way to know why objectives were abandoned, were not mastered, or were continued from year to year. Drew received no grade report or progress report on his IEP goals and objectives. Such dereliction is not acceptable for any student - with or without disabilities - and a school district should not be allowed to just "make it up"

or explain it away after it has been called to task as it was here.

**D.** **This Court Conclusively Found That The School District Failed to Effectively Address Drew's Progressively Disruptive Behaviors That Impeded His Ability to Learn.**

Lost in the discussion of IEP goals and objectives is the fact that the focus on Drew's academic and functional skill advancement from 2nd to 5th Grade was trumped by a failed effort to deal with Drew's escalating problem behaviors at school.

This Court found it "undisputed that in his second grade year Petitioner experienced escalating tantrums, yelling, and crying, dropping to the floor and eloping from class." *Id.* At \*4. According to this Court, "In third grade . . . Petitioner's social skills declined and his disruptive behaviors increased." *Id.* And by fourth grade, Drew's "ability to function at school and access the educational environment became noticeably worse." According to this Court:

> [Drew] bolted from the classroom frequently and ran out of the school building and into the street on one occasion. He urinated and defecated on the floor of the 'calming room' twice. [Drew's] problem behaviors included climbing furniture, falling off furniture, hitting computers or TV screens, yelling, kicking others, kicking walls, head banging, and asking others to punish him.

*Id.*

This evidences a child in perpetual crisis - not one who is working on academic and functional goals.

The School District's bluster about its effort to address Drew's behaviors,

Response Brief, 8-9, is simply not supported by the administrative record. The notion that "behavior data" was collected and tracked "in painstaking detail" by Drew's "teachers," Response Brief, 9, is an audacious misrepresentation of the administrative record. No behavior data is contained in the administrative record.[7]

The "effort" of calling in the autism and behavior specialists rings hollow as this was not done (if at all) until after Drew had already been removed from school and it is admitted that neither of these specialists participated in any way in assessing Drew's behaviors or in the development of a BIP. ROA II, 296:1-298:12. And, the Response Brief's description of the special education teacher's particular "philosophy for dealing with behaviors" may be one thing in theory, but it was never employed with regard to Drew. ROA II, 228:21-229:20.

The School District does not attempt to defend the two draft BIPs contained in the administrative record as a reasonable effort to address Drew's problem behaviors. Rather, it changes tack and asserts that the "accommodations" contained in Drew's IEPs were designed to address these behaviors. Response Brief, 17, 13, 22. They don't, and such an assertion has never been raised by the School District in the lengthy

---

[7] Amy Holton, Drew's special education teacher, conceded that the only "behavior data" she knew of was the parent/teacher communication log indicated how Drew's day went (at school) and how Drew's night went (at home). *Id.*; See ROA VII, 143-183; *Endrew F.*, 2014 U.S. Dist. LEXIS 128659, *39 ("Ms. Holton testified that she was not aware, aside from her anecdotal classroom data, if other behavior data was collected by the District in order to create a BIP for Petitioner.").

history of this case. Certainly no testimony was ever provided in this regard at the administrative hearing and no brief filed by the School District since has included such an argument. These accommodations are only tangentially related to Drew's serious behaviors and in no way substitute for a properly conceived and executed behavior intervention plan.

It was only after Drew had already been removed from the School District that Drew's special education teacher apparently consulted with the School District's autism and behavior specialists.[8] Even if true, it was too little too late. Where were these professionals in 2nd Grade? In 3rd Grade? Or at the beginning of 4th Grade when Drew de-escalated to such an extent that on two occasions he removed his clothes and urinated and defecated on the floor? ROA II, 241:6-17. No help was requested and no help came. ROA III, 7:19-9:17. Even after Drew's special education teacher identified a specific pattern of problem behaviors as early as November 2009, no help was requested until April/May 2010.[9] ROA II, 234:20-24.

---

[8] This is qualified as "apparently" as there is no documentary evidence in the administrative record that an autism or behavior specialist was either consulted or participated in the development of the behavior intervention plan - only the special education teacher's testimony at the hearing. It is notable that the draft behavior intervention plan that was crafted after Drew had already left the School District does not indicate that either the School District's autism specialist (Cora Nash) or behavior specialist (Stacy Stressel) had any involvement in the behavior intervention plan. *See* ROA IV, 35.

[9] The statement in the Response Brief that the School District made "serious and persistent efforts" to address and understand Drew's problem behaviors "Throughout the fall of 2009" has no cite to the record and is not true.

The post-*Endrew F.* cases cited by Petitioner in its Opening Brief are on point and instruct that the failure to adequately address a child's education-impairing behavior under the heightened *Endrew F.* standard constitutes a denial of FAPE. *Paris School District v. A.H.*, 2017 U.S. Dist. LEXIS 50042 (W.D. Ark. Apr. 3, 2017)("The Court agrees with the Hearing Officer's conclusion that the behavior plans were inadequate, especially in light of the higher standard of *Endrew F.* that must now be applied.); *Pocono Mt. Sch. Dist. v. J.W.*, 2017 U.S. Dist. LEXIS 145491 (M.D. Penn. Sept. 8, 2017)(school district's failure to adequately address the child's behaviors that impeded his education violated the IDEA and resulted in a denial of a FAPE.).

Petitioners do not assert that the School District completely ignored Drew's escalating disruptive behaviors. They drafted a BIP in 2007 that focused on one of Drew's perseverations (timers) and one in 2009 that focused on just a couple of Drew's multiple negative behaviors (yelling and wandering). ROA III, 167-168; 247-249. Under a FAPE standard in which seeking just-above-*de minimis* progress is lawful that approach may (or may not) be sufficient. After all, eliminating one fixation or coping with one negative behavior may be viewed as some non-trivial progress even if it does not contribute meaningfully to the child's overall ability to learn. But in a markedly more-demanding regime, such a patchwork approach would never be

viewed as sufficient, let alone "appropriately ambitious." *Endrew F.*, 137 S. Ct. at 1000. As the Supreme Court put it, that could be tantamount to providing almost "no education at all." *Id.* at 1001.

**E.  Drew's Rapid Academic, Behavioral and Functional Progress At Firefly Evidences the Inadequacy of the School District's Effort to Educate Drew.**

The School District makes a series of puzzling and inapt arguments about Drew's education at Firefly and its relevance to determining the adequacy of Drew's educational program in the School District.  Response Brief, 15-18, 26-27.  It appears that it is the School District's point to somehow show that Drew did no better at Firefly than he did at Summit View, or that Firefly's program does not jibe with the IDEA and, therefore, cannot be compared to its program.  This does not work.

Contrary to the School District's argument, this is not a dispute about methodology, and Petitioners never contended that only "one method" could provide Drew a FAPE.  Such an argument has never been previously raised by the parties or addressed by the courts.  Accordingly, the School District's reference to *Bd. of Educ. of Albuquerque Pub. Schs. v. Maez*, 2017 U.S. Dist. LEXIS 120600 (D.N.M. Aug. 1, 2017) is misplaced.  The Parents withdrew Drew because he was not making progress at school, was deteriorating behaviorally and socially, and the School District proposed an IEP for the following year that continued that same downward trend.  *See Endrew F.*, 137 S. Ct. at 996.  Reimbursement for the private school was sought only

after it was determined that Firefly could provide Drew an education the School District could not.

This Court specifically held that "it is undisputed that the education provided by Firefly is reasonably calculated to enable Petitioner to receive educational benefits." *Endrew F.*, 2014 U.S. Dist. LEXIS 128659, *8. The Tenth Circuit found it "clear from the testimony at the due process hearing that Drew is thriving at Firefly" and that there was no "contention that Firefly is not permissible under the Act." *Endrew F.*, 798 F.3d at 1342.

Drew's rapid and substantial behavioral and educational progress at Firefly is relevant not because it is a better program, but because it evidences that Drew could benefit from a different approach from what the School District had been pursuing with just-above-trivial progress for years. *See Endrew F.*, 137 S. Ct. at 997. It brings into focus the inadequacy of the School District's effort to educate Drew.

Firefly demonstrates that specific and effective strategies work and that the continued offer of failed strategies is insufficient. This is not "Monday Morning Quarterbacking." This is demonstrative proof that a school district cannot "ignore the fact that an IEP is clearly failing, nor can it continue to implement year after year, without change, an IEP which fails to confer educational benefit on the student." *O'Toole v. Olathe Dist. Schools Unified Sch. Dist. No. 233*, 144 F.3d 692, 702 (10th

Cir. 1998).

This was not lost on the Supreme Court. As the Court recognized, Firefly did up front what the School District had failed to do before - "The school developed a 'behavioral intervention plan' that identified Endrew's most problematic behaviors and set out particular strategies for addressing them." *Id.* at 996. This plan also involved a therapeutic program to address Drew's academic, behavioral and functional needs. ROA IV, 113-114, 125-132. As a result, "Within months, Endrew's behavior improved significantly, permitting him to make a degree of academic progress that had eluded him in public school." *Id*. at 997.

## F. The November 2016 IEP Does Not Limit Petitioner's Claim for Reimbursement.

The School District's half-hearted attempt to argue that the November 2016 IEP limits Petitioner's claim for the costs associated with Firefly is baseless - and has never been raised before by the School District. First, as stated in Petitioner's Opening Brief, the measure and adequacy of an IEP can only be determined as of the time it is offered. *See, e.g.*, *O'Toole*, 144 F.3d at 701-02 (10th Cir. 1998). A school district cannot cure a materially defective IEP after it is offered to the parents and the parents rely on that offer to make their educational placement decision. *R.E. v. New York City Dep't of Educ.*, 694 F.3d 167, 188 (2nd Cir. 2017)("A school district cannot rehabilitate a deficient IEP after the fact.").

Further, the evidence was un-refuted, and this Court so found, that the May 2016 and November 2016 were substantially (and substantively) the same. *Endrew F.*, 2014 U.S. Dist. LEXIS 128659, * 20. But for a change to Drew's social goal, the two IEPs provided "essentially the same goals and objectives." *Id.* In this regard, the Court also noted the testimony of the Special Education Director who acknowledged that the two IEPs "were very similar and contained 'only slight' changes in either criteria or the actual wording of the goal." *Id.* at *25. While the November 2010 IEP is not relevant to a determination of this case, it fails for the same reasons as the April 2010 IEP.

## G. The April 2010 IEP Was Not Reasonably Calculated to Enable Drew to Make Progress Appropriate in Light of His Circumstances.

Under the "merely more than *de minimis*" standard, this was a borderline case between no progress and just-above-trivial progress, that the Tenth Circuit determined to be "without question a close case." *Endrew F.*, 798 F.3d at 1341.

Although the Supreme Court did not define a specific level of progress that was required for all children, it did observe that a student provided IEPs that offered just-above-trivial progress "can hardly be said to have been offered an education at all." *Endrew F.*, 137 S. Ct. at 1001. Rather, the Supreme Court held that under the IDEA, "every child," even children who cannot meet grade-level objectives, must be afforded an educational program that is "appropriately ambitious" and must "have the chance

to meet challenging objectives." *Id*. at 1000.

Minor changes in objectives from year to year, when the majority of objectives are abandoned and behavior is deteriorating, hardly equates to an educational program that is "appropriately ambitious." That the goals and objectives remained nearly the same, reflects a failure on the School District's part to change strategies in order to enable Drew to meet "challenging objectives" in light of his circumstances; i.e., his unique needs and potential for growth.

The School District's offer of FAPE cannot stand on any pillar of the *Endrew F.* standard. Its argument of low expectations for children like Drew has been rejected by the Supreme Court and is directly contrary to the intent of the IDEA. *See* 20 U.S.C. § 1400(c)(4). This Court should not condone an IEP that proposed a plan that was obviously not working when it was clear that a different approach and new strategies were needed - which were readily available and have since proved to be successful.

## CONCLUSION

Petitioner requests that this Court decide that Endrew was not provided a FAPE, reverse this Court's contrary decision, and enter judgment in favor of Petitioner.[10]

---

[10] The School District's request for "additional proceedings" on the substantive FAPE issue and oral argument on the supplemental briefs is unwarranted. This case has been pending for over five years, and this Court is well positioned to rule on the purely legal application of the Supreme Court's decision.

Respectfully submitted on November 22, 2017,

SPIES, POWERS & ROBINSON, P.C.

*/s/ Jack D. Robinson*
Jack D. Robinson, #22037
950 South Cherry Street, Suite 700
Denver, Colorado 80246
Telephone: (303) 830-7090
Facsimile: (303) 830-7089
**Attorneys for Petitioner**

## CERTIFICATE OF SERVICE

I hereby certify that on November 22, 2017, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following email addresses:


William E. Trachman
General Counsel
Douglas County Public Schools
*Attorney for Respondent*

W. Stuart Stuller
Caplan & Earnest, P.C.
*Attorney for Respondent*


*/s/ Mary Lakey*